UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                            Case No. 3:13-cr-177-LSC-JEG

AARON M. RICHARDSON

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The United States, through its undersigned Assistant United States Attorney, opposes Aaron M. Richardson's Motion to Suppress (Doc. 63) ("the motion"). The motion seeks to suppress searches of Richardson's bedroom in his mother's apartment and cell-site information the Government obtained during the investigation of this case. The apartment searches took place under the well-recognized protective sweep and plain view exceptions to the search warrant requirement and also were conducted after valid, written consents by Richardson's mother. The Government obtained the cell-site information by proper application and order under 18 U.S.C. § 2703(d). The Court should, therefore, deny the motion.

I.   **THE RELEVANT FACTS**

A federal grand jury indicted Aaron M. Richardson for a number of crimes related to his attempt to murder United States District Judge Timothy J. Corrigan shortly after midnight on June 23, 2013. Doc. 1. On August 13, 2015,

Richardson filed the present motion seeking to suppress evidence seized from his mother's apartment. Richardson also seeks to suppress cell-site information the Government obtained by application and order under 18 U.S.C. § 2703(d). For the court's convenience, a short overview of the evidence the United States anticipates producing at the suppression hearing follows.

### A. The Searches of the Mother's Apartment

On June 23, 2015, Richardson attempted to murder United States District Judge Timothy J. Corrigan by using a rifle to shoot at the judge through a family-room window of the judge's home. That act generated a number of potential persons of interest, including Richardson. Richardson was currently on supervised release to Judge Corrigan and had absconded and failed to appear for court hearings on June 3 and June 11, 2013. Due to those failures to appear, the United States Magistrate Judge issued a capias for Richardson's arrest.[1]

Two days later, on June 25, 2013, Deputy United States Marshals and Task Force Officers with a United States Marshals Service ("USMS") fugitive task force arrested Richardson on the outstanding capias. The arrest took place at 6710 Collins Road, Apartment 2519 in Jacksonville—an apartment leased by Richardson's mother, Sharon Richardson.

Preceding the arrest, USMS fugitive task force officers reviewed a Jacksonville Sheriff's Office report noting that on May 2, 2013, Richardson had reported a motorcycle theft from the same apartment. Following up on that

---

[1] *See United States v. Aaron M. Richardson*, Case No. 3:08-cr-302(S1)-J-32TEM, Doc No. 167.

information, on the afternoon on June 25, 2013, USMS Task Force Officer ("TFO") David Brock made contact with Jennifer Clavel, the apartment complex manager. Ms. Clavel immediately recognized Richardson and stated that he was living in Apartment 2519. She indicated that Richardson was not on the lease, but he was living with his mother, Sharon Richardson, the tenant who held the lease. Sharon Richardson had requested that Richardson be permitted to stay in her apartment over the summer while Richardson was trying to get re-enrolled in school.

      Ms. Clavel and the apartment maintenance man, Larry Trees, then went to Apartment 2519. Mr. Trees attempted to make contact with the occupant of the apartment for a maintenance call, but no one answered. Mr. Trees reported to TFO Brock that no one would open the door. Mr. Trees also advised TFO Brock that the door had three locks: a regular door lock and two deadbolt locks. One of the deadbolt locks was customary for apartments in the complex, but a previous tenant had installed the second deadbolt lock and then vacated the apartment without leaving a key. That lock could only be engaged by someone from the inside of the apartment. According to Mr. Trees, because he observed that lock engaged, someone had to be inside the apartment.[2]

      At this point, TFO Brock, TFO Jeff Alvarez, TFO Mike Calhoun, TFO Rod Pinckney, and Officer Wes Bowen, a K-9 Officer with the Jacksonville Sheriff's Office ("JSO"), attempted to make contact with the occupant. They knocked and

---

[2] The apartment is a second floor apartment, and the locked door was the only reasonable means of ingress and egress.

announced their presence for several minutes. While doing this, they noticed that vertical blinds in the rear of the apartment were moving, consistent with the motion a ceiling fan might make. When no one responded to their knocks, the officers forcibly entered the apartment, as they reasonably believed Richardson was present.

Once inside, and consistent with their standard practices, the task force officers conducted a very quick primary sweep of the apartment in which they visually inspected each room without looking in closets, under beds, and other places where a person might hide. When they got to the master bedroom, the door was locked from the inside. The officers then forcibly breached the interior master bedroom door, but did not see anyone during a quick visual sweep of that room. One officer stood guard at the master bedroom door while the other officers started a regular protective sweep of the apartment for officer safety. During this protective sweep, the officers looked inside closets and other places where a person might hide.

TFO Brock conducted the sweep of the room where Richardson was living, although he did not know the room was Richardson's room at the time. TFO Brock located a Savage bolt-action rifle with an attached scope when he looked in the closet. For officer safety, TFO Brock immediately notified the other officers of the presence of the weapon, made the weapon safe, and placed the weapon on a nearby bed. After completing the protective sweep of all rooms but the master bedroom, JSO Officer Bowen brought his K-9, Justice, into the

residence to sweep the master bedroom. Before releasing the dog, Officer Bowen announced, "Police K-9. Come out, or I will release my dog and he will bite you." Richardson failed to respond, and Officer Bowen released the dog. The dog went into the master bedroom closet and located Richardson hiding behind a pile of laundry and an overturned laundry basket. The dog bit Richardson on his left arm and left ankle, but Richardson ultimately was subdued, arrested, and transported to a local hospital for medical treatment of the dog bites.

       The USMS contacted the FBI, and FBI Special Agents Logan and Burros proceeded to the scene. The FBI then took over the scene. Special Agents Logan and Burros spoke to Richardson's mother, Sharon Richardson, who had now arrived. Burros obtained consent from her to search the apartment, including the room that she identified as being Richardson's room. In discussing the living arrangements, Sharon Richardson said that her house was in foreclosure, and she lived in the apartment with Richardson and her other fourteen-year-old son. She stated that Richardson began residing with her in May, and she had moved all of his clothing and personal things to the apartment from her home. Sharon Richardson stated that she routinely entered the room and gave examples like putting away Richardson's laundry, arranging the furniture in the room, and inflating an air mattress that Richardson used for sleeping. She stated that she permitted Richardson to reside in her apartment, but that he did not have his own key. She also stated that she would routinely go

5

into Richardson's room to gather his clothing and do his laundry. She stated that she had access to all parts of the apartment. In addition to providing verbal consent, Sharon Richardson provided agents with a signed, written consent.

After receiving Sharon Richardson's consent, agents searched Richardson's room and seized the following items:

- A Savage bolt-action, .30-06 caliber rifle with scope;

- A loose zip lock bag that contained a rifle magazine with three cartridges and that contained four additional loose cartridges;

- A black, LG cellular phone;

- A Verizon Samsung Droid cellular phone;

- A black backpack that contained a bag of zip ties, another zip lock bag with 16 rounds of .30-06 ammunition, a box of 9 mm Luger rounds, and a box of Winchester .30-06 ammunition containing 12 unused cartridges;

- A machete with a case; and

- Two pairs of shoes, including a pair of gold Nike basketball-type shoes and a pair of black dress shoes.

Sharon Richardson signed a receipt for these items. Sharon Richardson also became very upset when she learned that the Marshals had seen a rifle. She stated that the rifle came from Richardson's room, and she was disappointed in her son for bringing a rifle into her home and hiding it. She stated that she did not allow weapons in her home, and no one else in the family had guns.

Several days later, on June 28, 2013, after receiving preliminary indications that the bullet used in the murder attempt was a .30 caliber bullet,

agents again approached Sharon Richardson and again requested that she permit another search of her apartment. Sharon Richardson agreed and signed a second, written consent. This time, the FBI agents conducting the search collected or photographed another 40 pieces of potential evidence that included the following:

- A sham court order purportedly signed by Judge Corrigan. This order was in a plastic bag under the kitchen sink and purports to exonerate Richardson from all pending federal, state, and local charges. Judge Corrigan's signature on the document appears to be a photocopy of Judge Corrigan's signature on Richardson's judgment and sentence from his earlier federal case.

- A movie receipt purchased at 8:02 p.m. on June 22, 2013 (about four hours prior to the attempted murder), from the Tinseltown Movie Theater (a business close to the attempted murder scene) for an 8:00 p.m. showing of the movie, *Now You See Me*.

- Various hand tools, including a small hatchet with a piece of black, electrical tape affixed.

The United States intends to introduce evidence from both searches at Richardson's upcoming trial scheduled to begin on January 19, 2016.

### B. The Cell-Site Information

The facts surrounding the cell-site information are straightforward and should be uncontested. On July 2, 2013, the United States filed its *In Camera* Application for an order under 18 U.S.C. § 2703(d). *See In re Application of the United States of America for an Order Pursuant to 18 U.S.C. § 2703(d) for Historical Cellular Site Information*, Case No. Misc. No. 3:13-mj-M13-G25. That same day, after reviewing the application, the United States Magistrate Judge granted the application and permitted the Government to obtain the information

7

by written order. The Government subsequently obtained those records from the phone company.

## III. LEGALITY OF THE APARTMENT SEARCHES

Richardson's motion to suppress the apartment searches lacks merit. Richardson argues that the seizure of evidence was not a valid search incident to arrest. That argument misses the point. Law enforcement officers made a lawful *Payton* entry, conducted a lawful protective sweep, and located the rifle in plain view. FBI agents, moreover, seized all evidence following valid, written consents of Richardson's mother.

### A. The *Payton* Entry

The initial issue the Court must resolve is whether the deputy United States Marshals and task force officers lawfully entered Sharon Richardson's apartment without a search warrant. In other words, did the outstanding arrest warrant for Richardson do away with the need for a search warrant?

In *Payton v. New York*, 445 U.S. 573, 603 (1980), the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Following *Payton*, the Eleventh Circuit applies a two-pronged test to determine the validity of entries under an issued arrest warrant. "[F]irst there must be a reasonable belief that the place to be searched is the suspect's dwelling and second the police must have 'reason to believe' that the suspect is within." *United States v. Magluta*, 44 F.3d 1530, 1533

(11th Cir. 1995) (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)); *accord United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000); *United States v. Bellamy*, 456 F. App'x 863, 864 n.1 (11th Cir. 2012); *United States v. Weeks*, 442 F. App'x 447, 452 (11th Cir. 2011); *United States v. Zavala*, 408 F. App'x 319, 321 (11th Cir. 2011); *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009).

When applying this test, certain principles govern. First, "reasonable belief" is distinct from, but analogous to probable cause. *Bervaldi*, 226 F.3d at 1265-66; *Bellamy*, 456 F. App'x at 864-65. Second, the analysis requires looking to the "totality of the circumstances" involved in the case. *Magluta*, 44 F.3d at 1535. Third, the Court must be deferential to on-the-spot determinations of law enforcement officers regarding their beliefs that a suspect lives at the residence they enter and their belief that the suspect is present. *See Bervaldi*, 226 F.3d at 1263 (noting deference required for the belief that a person lives at the residence); *Maglutta*, 44 F.3d at 1535 ("courts must be sensitive to common sense factors indicating a resident's presence").

With these guiding principles in mind, both prongs of *Payton* show a valid entry here. Regarding the first prong—whether the officers had a reasonable belief that the dwelling was Richardson's residence—the responding officers had that reasonable belief. The officers relied upon a JSO report from May 2, 2013, in which Richardson stated he had been moving into the apartment over the past several weeks. Additionally, the apartment manager, Jennifer Clavel, told the

officers that Richardson was permitted to live there on a temporary basis while he was trying to get back into school.

Turning to the second prong—whether the officers had "reason to believe" Richardson was inside—that reasonable belief likewise existed. First, from reviewing the report that led them to the apartment, officers knew Richardson lived there. They knew that at 6:08 p.m. on May 2, 2013, Richardson made a complaint to JSO about a stolen motorcycle at the apartment complex. From this report, officers knew the following information that supported their reasonable belief that Richardson would be inside: (a) Richardson had been at the apartment on a weekday reporting a theft at 6:08 p.m., thereby supporting the belief that Richardson would be in the apartment on the afternoon of another weekday, June 25; (b) Richardson reported working for Labor Ready, a known manual labor temporary agency, supporting the belief that any actual employment Richardson might have would be during the cooler early-morning hours; (c) Richardson reported the theft happened between 6:30 p.m. and 6:30 a.m. because Richardson discovered the theft when leaving for early morning work at 6:30 a.m., further supporting the belief that any actual employment Richardson might have was early-morning work; and (d) Richardson stated that he had been moving his things to apartment 2519 for several weeks, and did not have a key, thereby supporting the belief that Richardson was the person inside.

Second, the information provided by the apartment complex employees supported the officer's reasonable belief that Richardson was inside. The

manager advised officers that Richardson was living in the apartment for the summer while trying to get re-enrolled in school. This information further supported the belief that Richardson had no full-time employment and would be home. *See Bervaldi*, 226 F.3d at 1263 (discussion of college students having more than one address when they use a parent's address on things like drivers licenses, etc.). Additionally, after learning why the officers were present, both employees physically went to the apartment to check on Richardson. They did not immediately indicate Richardson would not be home due to work or other daily patterns. Instead, by their actions, they both exhibited their own subjective belief that Richardson would be in the apartment.

Third, the physical condition of the property supported the officer's reasonable belief that Richardson would be inside. The maintenance man, Mr. Trees, reported that the only lock engaged was the lock installed by the prior tenant—a lock that could only be engaged from the inside since no one had a key to the exterior of the lock. This fact, coupled with the apartment being on the second floor with no alternative means of ingress or egress, provided near-conclusive proof that someone was inside. In addition, the officers' observations included moving blinds, consistent with the movement a ceiling fan might cause. This, of course, lent further support to the reasonable belief that someone was inside because people normally turn those devices off when they leave.

Fourth, Richardson's failure to appear at two prior court hearings and his failure to answer the door when officers knocked strongly supported the officers'

11

reasonable belief. The officers will testify that, based on their training and experience, when an unwanted person without warrants is inside, that person generally opens the door. On the other hand, wanted people with warrants often will not come to the door. In other words, armed with knowledge that someone was inside, when no one answered the door in response to knocking and announcing, the officers made the very reasonable inference that the person inside was Richardson. Refusal to answer, then, is one factor supporting a reasonable belief that a suspect is inside. *See United States v. Weeks*, 442 F. App'x 447, 453 (11th Cir. 2011).

Finally, TFO Brock knew Richardson's parents worked. He had spoken with a JSO officer who lived several houses down from the parents' former marital home prior to making entry. According to this officer, both parents worked, and Richardson normally did not. These facts further led officers to believe that Richardson would be inside.

In sum, given the totality of circumstances and the deference the Court is required to show to on-the-spot law enforcement determinations, the officers had a reasonable belief that Richardson lived in the apartment and was actually inside when they made entry. Of course, their belief turned out right.

### B. The Protective Sweep and Plain View

Once officers lawfully entered the apartment, seizure of the attempted-murder weapon was fully supported by the plain view doctrine. At the time TFO Brock located the rifle, he was actively looking for Richardson and anyone else

who might be hiding in the closets. In *United States v. Jenkins*, 901 F.2d 1075 (11th Cir. 1990), the Eleventh Circuit summarized the law applicable to plain-view seizures.

> To justify application of the plain view doctrine, the seizing officer must (1) have independent justification for being in a position to see the items; (2) must discover the items inadvertently; and (3) must immediately observe that the items are evidence. *United States v. Blum*, 753 F.2d 999, 1002 (11th Cir.1985) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). The officers must have probable cause to believe the items are evidence of the crime. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

*Id.* at 1081-82.

Here, TFO Brock had an independent justification for being in the apartment due to the valid *Payton* entry discussed above. He was not looking for a rifle, but instead was looking for Richardson. Given his knowledge that Richardson had a federal felony conviction and was on conditions of release and supervision that prohibited him from possessing firearms, he had probable cause to believe the rifle was evidence. *See United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (police are "free to seize any evidence they discovered in plain view within the proper scope of the protective sweep").

The seizure of the rifle is also supported by the protective sweep doctrine. The TFOs forcibly entered the apartment and quickly checked each room, without checking areas within the rooms where people could hide. During this initial sweep, they breached the master bedroom door because it was locked

from the inside. When they saw no one visible in the rooms, they began a secondary sweep to check closets and other locations where a person might hide. The officers did this in all but the master bedroom, and a K-9 swept the master bedroom. TFO Brock located the rifle in Richardson's unoccupied bedroom during this secondary sweep.

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court authorized the protective sweep of a house following an arrest when the sweep was a limited search of the residence to protect the safety of the law enforcement officers or others. The facts of Buie are helpful. There, the defendant was arrested as he came up the stairs from a basement. The officers then did a protective sweep of the basement (where the defendant had just been). The Supreme Court upheld the sweep.

In *United States v. Hromada*, 49 F.3d 685 (11th Cir. 1995) the Eleventh Circuit summarized the protective sweep doctrine by stating,

> In *Buie*, the Court ... found a protective sweep, incident to a lawful arrest, valid, if it was "a quick and limited search of a premises, ... conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327, 110 S.Ct. at 1094. Officers faced with risks during in-home arrests are permitted "to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* at 334, 110 S.Ct. at 1098. A balance of the competing interests of the arrestee and the arresting officers, the Court found, suggested that the officers' interest in their safety is "sufficient to outweigh the intrusion such procedures may entail." *Id.* Officers have a legitimate interest "in taking steps to assure themselves that the house in which a suspect is

> being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333, 110 S.Ct. at 1097–98.

*Id.* at 690.

Here, the officers did nothing more than a quick search of the places where Richardson or someone else may have been hiding. The entry to apprehend Richardson was proper under *Payton*. The search for Richardson and anyone else inside was proper under *Buie.*

The entry and sweep in this case were text-book examples of what the officers could do under the Constitution.

### C. Consent Searches

Apart from the valid protective sweep and plain view observations, Sharon Richardson provided voluntary, written consent to the FBI searching her apartment. Her valid consents provide a fully independent basis to deny the motion. *See United States v. Delancy*, 502 F.3d 1297, 1308-09 (11th Cir. 2007) (even assuming unlawful protective sweep, evidence not subject to suppression when untainted voluntary consent to search provided).

The Fourth Amendment allows law enforcement authorities to search property without a warrant or probable cause when someone provides valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973). A third party may give that consent if she has common authority over "or other sufficient relationship" to the property. *United States v. Matlock*, 415

15

U.S. 164, 171, 94 S. Ct. 988, 993 (1974). Even if the third party does not have the requisite common authority or sufficient relationship to the property, the Fourth Amendment is not violated when an officer "ha[d] an objectively reasonable, though mistaken, good-faith belief" that he had obtained valid consent. *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997). *See also United States v. Garcia-Jaimes*, 484 F.3d 1311, 1323 (11th Cir. 2007) (common authority rests on mutual use of property by persons generally having joint access or control for most purposes); *United States v. Shields*, 675 F.2d 1152, 1159 (11th Cir. 1982) ("The Supreme Court has upheld the validity of searches conducted upon the consent of a third party where that party has a sufficient relationship to the property which has been searched.").

Common authority "does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7 (internal quotation marks and citations omitted).

While Richardson outlines in some detail why he has standing to seek suppression of the items seized from his mother's apartment, Richardson wholly ignores that his mother consented—two times in writing—to the searches that

16

resulted in the seizure of evidence in this case. Those written consents, on their own, provide ample grounds for denying Richardson's motion.

Sharon Richardson, moreover, had actual and apparent authority to provide the consents. She was the tenant of the apartment and the only person who had a key to the apartment. Most of the furniture in Richardson's room belonged to her. She had access to the room and exercised control and dominion over items within the room, including Richardson's clothing, the furniture, and the linens. Indeed, during a captured phone call from one of Richardson's prior periods of detention on April 14, 2013, Richardson and Sharon Richardson specifically discussed Sharon Richardson moving things in and out of Richardson's room. Sharon Richardson also advised agents at the scene that she often entered Richardson's room to do things like put away clothing and wash dirty laundry. In fact, between the time of the first search and the second search, Sharon Richardson had actually moved the bag containing the sham Corrigan order and relocated it below the kitchen sink because she was packing up Richardson's things. Consequently, Sharon Richardson had both actual and apparent authority to consent to the searches of her apartment and of Richardson's room within that apartment. Her written consents fully authorized the searches here.

## IV. DENIAL OF THE MOTION TO SUPPRESS CELL-SITE INFORMATION

Richardson's request to suppress cell-site information lacks merit under Eleventh Circuit precedent. Richardson has filed the motion to preserve the

issue, but as Richardson notes, the Eleventh Circuit has rejected his argument in an *en banc* opinion. *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (obtaining cell site information not a Fourth Amendment search and even if it is 2703(d)-process found reasonable). Thus, this claim must be rejected.

## V. CONCLUSION

For the reasons outlined above, Aaron M. Richardson's Motion to Suppress (Doc. 63) must be denied.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

BY: *s/ Mac D. Heavener, III*
MAC D. HEAVENER, III
Assistant United States Attorney
Florida Bar No. 0896748
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: mac.heavener@usdoj.gov

**U.S. v. AARON M. RICHARDSON**  Case No. 3:13-cr-177-LSC-JEG

### CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

John J. Ossick, Jr, Esquire.

*s/ Mac D. Heavener, III*
MAC D. HEAVENER, III
Assistant United States Attorney