1               UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                  JACKSONVILLE DIVISION

3   UNITED STATES OF AMERICA,        Jacksonville, Florida

4           Plaintiff,               Case No. 3:13-cr-177-J-LSC-JEG

5   -vs-                             Tuesday, December 1, 2015

6   AARON MARCUS RICHARDSON,         10:00 a.m.

7           Defendant.               Courtroom 12A
    _____

8

9     **TRANSCRIPT OF EVIDENTIARY HEARING RE: PENDING MOTIONS**
            BEFORE THE HONORABLE JAMES E. GRAHAM
10             UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20
    OFFICIAL COURT REPORTER:
21
          Shelli Kozachenko, RPR, CRR
22        221 North Hogan Street, #185
          Jacksonville, FL  32202
23        Telephone:  (904) 301-6842

24                         (Proceedings reported by stenography;
                             transcript produced by computer.)
25

1                          A P P E A R A N C E S

2  GOVERNMENT COUNSEL:

3      **Mac Heavener, Esquire**
       **Mark Devereaux, Esquire**
4      United States Attorney's Office
       300 North Hogan Street, Suite 700
5      Jacksonville, FL  32202

6

7  DEFENSE COUNSEL:

8      **John Ossick, Jr., Esquire**
       Law Offices of John J. Ossick, Jr.
9      P.O. Box 1087
       Kingsland, GA  31548
10

       **Meredith Kingsley, Esquire**
11     Alston & Bird, LLP
       1201 West Peachtree Street, Suite 4200
12     Atlanta, GA  30309

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 T A B L E   O F   C O N T E N T S

2

3    GOVERNMENT WITNESSES:                              Page No.

4      SPECIAL AGENT JOHN DAVID BROCK
          DIRECT EXAMINATION BY MR. HEAVENER........      9
5         CROSS-EXAMINATION BY MR. OSSICK...........     40

6      DETECTIVE ROD PINCKNEY
          DIRECT EXAMINATION BY MR. HEAVENER........     56
7         CROSS-EXAMINATION BY MR. OSSICK...........     68

8      OFFICER KENNETH "WES" BOWEN
          DIRECT EXAMINATION BY MR. DEVEREAUX.......     73
9         CROSS-EXAMINATION BY MR. OSSICK...........     88

10     SPECIAL AGENT STEVEN BURROS
          DIRECT EXAMINATION BY MR. DEVEREAUX.......     89
11        CROSS-EXAMINATION BY MR. OSSICK...........    115

12     SPECIAL AGENT SCOTT WATERS
          DIRECT EXAMINATION BY MR. DEVEREAUX.......    128
13        CROSS-EXAMINATION BY MS. KINGSLEY.........    145
          REDIRECT EXAMINATION BY MR. DEVEREAUX.....    148
14
       SPECIAL AGENT WILLIAM LOGAN
15        DIRECT EXAMINATION BY MR. HEAVENER........    150
          CROSS-EXAMINATION BY MS. KINGSLEY.........    211

16

17

18   DEFENSE WITNESSES:                                 Page No.

19     SHARON RICHARDSON
          DIRECT EXAMINATION BY MR. OSSICK..........    238
20        CROSS-EXAMINATION BY MR. HEAVENER.........    249

21     RONNA RICHARDSON
          DIRECT EXAMINATION BY MR. OSSICK..........    274
22        CROSS-EXAMINATION BY MR. DEVEREAUX........    276

23

24

25

<u>G O V E R N M E N T   E X H I B I T S   R E C E I V E D</u>

**Page No.**

GOVERNMENT'S EXHIBITS 1A THROUGH 24A . . . . . . . . . .          9

<u>D E F E N S E   E X H I B I T S   R E C E I V E D</u>

**Page No.**

(None.)

<u>C O U R T   E X H I B I T S   R E C E I V E D</u>

**Page No.**

(None.)

1           P R O C E E D I N G S

2    Tuesday, December 1, 2015                    10:00 a.m.

3                           -  -  -

4           COURT SECURITY OFFICER:  All rise.  United States

5    District Court in and for the Middle District of Florida is now

6    in session, the Honorable James E. Graham presiding.

7           Please be seated.

8           COURTROOM DEPUTY:  Case No. 3:13-cr-177-LSC-JEG, the

9    United States of America versus Aaron Richardson.

10          Counsel, please state your presence for the record.

11          MR. HEAVENER:  Good morning.  Mac Heavener and Mark

12    Devereaux on behalf of the United States.

13          MR. OSSICK:  John Ossick and Meredith Kingsley for

14    the defendant, Your Honor.

15          THE COURT:  All right.  We're here today for a

16    motions hearing in these two cases, or primarily in Case No.

17    3:13-cr-177.

18          The clerk's office previously mailed a notice to

19    counsel asking counsel to identify any motions which had not

20    been resolved, further indicating that any motion not

21    identified to the Court would be presumed resolved and be

22    dismissed as moot.

23          On behalf of Mr. Richardson, the attorneys have

24    submitted a list of nine motions in need of resolution,

25    including three requiring an evidentiary hearing, that being a

1  motion to suppress, a motion to suppress identification, and a

2  motion to determine voluntariness of statements.

3          We will take up those motions requiring evidentiary

4  hearing initially and then hear any argument on the other

5  motions, if that is desired.

6          Is the government ready to proceed?

7          MR. HEAVENER:  We are, Your Honor.

8          THE COURT:  Mr. Ossick, are you ready to proceed?

9          MR. OSSICK:  Yes, sir.

10          THE COURT:  Do you want to invoke the rule?

11          MR. HEAVENER:  We do, Your Honor.

12          THE COURT:  All right.  If you would --

13          MR. OSSICK:  We do as well.

14          THE COURT:  If the government will get its witnesses

15  and have them come forward.

16          Are they outside?

17          MR. HEAVENER:  They are, Your Honor.

18          THE COURT:  Well, let's get all the witnesses in here

19  and have the oaths administered at one time, and then we'll --

20          MR. OSSICK:  Your Honor, we have two witnesses as

21  well that would be in addition to the government witnesses, and

22  they're present in the courtroom so that -- I just wanted to

23  point that out to the Court.

24          THE COURT:  All right.  Do you want them excluded

25  also?

1          MR. HEAVENER:  Yes, Your Honor.

2          THE COURT:  All right.  They can come forward,

3    Mr. Ossick, with the witnesses for the government.

4          MR. OSSICK:  Okay.

5       (The witnesses entered the courtroom.)

6          THE COURT:  If y'all will come forward, please, and

7    stand behind the podium.

8          MR. OSSICK:  Your Honor, the defense witnesses are

9    Ms. Richardson and Ms. Ronna Richardson.

10         THE COURT:  If they would come forward too,

11   Mr. Ossick.

12         Ms. Richardson, if you all could stand on this side,

13   please.

14         All right.  If each of you would please identify

15   yourself, starting from my left.

16         THE WITNESS:  K. W. Bell, Jacksonville Sheriff's

17   Office.

18         THE WITNESS:  Special Agent John Soares, FBI.

19         THE WITNESS:  Special Agent David Brock, Florida

20   Department of Law Enforcement.

21         THE WITNESS:  Special Agent Scott Waters, FBI.

22         THE WITNESS:  Detective Rod Pinckney, Jacksonville

23   Sheriff's Office.

24         THE WITNESS:  Detective Jeff Alvarez, St. Johns

25   County Sheriff's Office.

1          THE WITNESS:  Detective Mike Calhoun, Clay County

2     Sheriff's Office.

3          THE WITNESS:  Special Agent Steve Burros, FBI.

4          THE WITNESS:  Special Agent Alexander Silverstein,

5     FBI.

6          THE WITNESS:  Special Agent William Logan, FBI.

7          THE COURT:  Yes, ma'am.

8          THE WITNESS:  Ronna Richardson.

9          THE WITNESS:  Sharon Richardson.

10         THE COURT:  All right.  Each of you please raise your

11    right hand while the -- do you administer the oath?

12         COURTROOM DEPUTY:  Yes.

13         THE COURT:  The clerk will administer the oath to

14    each of you.

15         COURTROOM DEPUTY:  Do you all solemnly swear or

16    affirm that the testimony you're about to give before this

17    Court will be the truth, the whole truth, and nothing but the

18    truth, so help you God?

19         THE WITNESSES:  I do.

20         THE COURT:  Who is your case agent?

21         MR. HEAVENER:  Special Agent Logan, Your Honor.

22         THE COURT:  All right.  He may remain in the

23    courtroom.

24         Who's going to be your first witness?

25         MR. HEAVENER:  It will be Special Agent Dave Brock.

1    THE COURT:  All right.  Agent Brock, if you'd take

2  the stand, please.

3    If the rest of you all will wait in the hall, you

4  will be called when it's your turn to testify.

5    (The witnesses left the courtroom. )

6    MR. HEAVENER:  And, Your Honor, as we begin, I've

7  discussed with Mr. Ossick we're going to introduce Government's

8  Exhibits 1A through 24A at one time.  We provided the original

9  exhibits to the Court with an exhibit list.  We've also

10  provided notebooks to the Court and Mr. Ossick.

11    MR. OSSICK:  No objection, Your Honor.

12    THE COURT:  All right.  Those exhibits are admitted

13  without objection.

14    MR. HEAVENER:  Thank you, Your Honor.

15    (Government's Exhibits 1A through 24A were received in

16  evidence.)

17    THE COURT:  You may proceed.

18    MR. HEAVENER:  Thank you, Your Honor.

19   SPECIAL AGENT JOHN DAVID BROCK, GOVERNMENT'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21  BY MR. HEAVENER:

22  Q.   Sir, would you tell us your name?

23  A.   John David Brock.

24  Q.   And where are you currently employed?

25  A.   The Florida Department of Law Enforcement.

1  Q.    And what is your position at the Florida Department of Law

2  Enforcement?

3  A.    I'm a special agent.

4  Q.    Okay.  Can you tell us a little bit about your educational

5  background?

6  A.    Yes.  I have a bachelor's degree from Florida State

7  University in criminology.

8  Q.    And in studying for your bachelor's degree at Florida

9  State University, did you have courses that involved both

10  searching and that type of thing?

11  A.    Yes.  As well, I also completed the basic law enforcement

12  academy in the state of Florida as well.

13  Q.    Okay.  And where was that law enforcement academy?

14  A.    At that time it was the law enforcement academy in

15  Tallahassee.

16  Q.    Okay.  Was that as part of becoming an FDLE special agent?

17  A.    That's part of becoming sworn in the state of Florida, a

18  sworn officer.

19  Q.    Okay.  Tell us a little bit about your law enforcement

20  background prior to FDLE.

21          THE COURT:  Do you have any objection to a

22  stipulation -- or to stipulating to his qualifications?

23          MR. OSSICK:  That's fine, Your Honor.  I believe he's

24  qualified.  I've reviewed his report so I'm satisfied.

25  BY MR. HEAVENER:

1  Q.   Agent, can you pull the microphone closer to you and speak

2  up.  The court reporter's having a hard time hearing you.

3  A.   (Complies.)

4  Q.   All right.  So you're a special agent with FDLE.

5       How do you interact with the United States Marshals

6  Service?

7  A.   Well, in the past I was assigned to the task force as a

8  task force officer.

9  Q.   And what task force is that?

10  A.   The U.S. Marshals fugitive task force.

11  Q.   Okay.  And how many agents or police officers are on that

12  fugitive task force?

13  A.   By task force officers, at the time I believe there was

14  four or five of us.

15  Q.   Okay.  And how long did you work on it?

16  A.   I was there approximately a year and a half.

17  Q.   Okay.  And can you describe how that task force operates?

18  What is it that the task force is doing?

19  A.   The purpose of the task force is to arrest -- arrest any

20  fugitives, especially fugitives that are thought to be violent

21  in nature, in the Jacksonville region.  It's made up of local

22  law enforcement officers as well as people from the U.S.

23  Marshals that are assigned to the task force.

24  Q.   Okay.  And, sir, I'd like to direct your attention to the

25  date of June 25th of 2013 and an individual named Aaron Marcus

1   Richardson.

2          Do you recall that date and Mr. Richardson?

3   A.   Yes, I do.

4   Q.   All right.  Do you see Mr. Richardson here in the

5   courtroom?

6   A.   Yes.

7   Q.   Can you point him out and describe what he's wearing?

8   A.   He's wearing a red jumpsuit.

9          MR. HEAVENER:  Your Honor, I'd request the record

10  reflect the identification.

11         THE COURT:  The record so reflects.

12  BY MR. HEAVENER:

13  Q.   Okay.  And can you give us some information about, on June

14  25th of 2013, why you were interested in Aaron Marcus

15  Richardson?

16  A.   Well, in regards to that question, as far as the

17  background of why we were looking for him or --

18  Q.   Yes, sir.

19  A.   Okay.  My understanding was he came up as a possible

20  suspect in the attempted murder of Judge Corrigan, and it came

21  to my attention personally because I was assigned to --

22  assigned the case to find him, because he did have an active

23  warrant for his arrest not related to him being a suspect.

24  Q.   Okay.  And when you say he had an active warrant for his

25  arrest --

1      MR. HEAVENER:  Your Honor, may I publish exhibits

2   that have been introduced?

3      THE COURT:  Yes, sir.

4      MR. HEAVENER:  Okay.  If we could take a look at

5   Government's Exhibit 1A, and you'll see it on the screen in

6   front of you, Agent.

7   BY MR. HEAVENER:

8   Q.   Do you recognize that as being the order that directed the

9   issuance of a warrant for Mr. Richardson's arrest?

10  A.   Yes.

11  Q.   And then showing you Government's Exhibit 1B, what is

12  that?

13  A.   That appears to be the warrant for his arrest.

14  Q.   Okay.  And when the fugitive task force tries to track

15  down someone who has an outstanding warrant, is that warrant

16  actually made a part of the file?

17  A.   It is, yes.

18  Q.   And is it something that the agents have knowledge of --

19  A.   Yes.

20  Q.   -- before they go out and arrest someone?

21  A.   Yes.

22  Q.   Okay.  All right, sir.  And on June 25th of 2013, you had

23  knowledge of the existence of that arrest warrant.

24  A.   Yes.  That's correct.

25  Q.   Okay.  Can you describe -- you were telling us that you

1    were interested in apprehending Mr. Richardson on this

2    outstanding warrant.

3            Can you kind of give us some preliminary steps that

4    you or other agents on your task force took to do that?

5    A.    Sure.   Initially, on any of the cases, we will do a

6    database check through local databases to try to gain some

7    intelligence as far as where they might be located or living,

8    that kind of thing.

9            And so that was done in this case, and initially we

10   found a residence in Jacksonville where we suspected that he

11   may be located.

12   Q.    Okay.   Was that an apartment, or was that initial

13   residence a home?

14   A.    It was a home.

15   Q.    Okay.   And what did you do in terms of doing any kind of

16   follow-up as to whether or not he lived there?

17   A.    We went to the area of the home, and we discovered that it

18   was close or near proximity to a Jacksonville Sheriff's Office

19   officer.   And so I made contact with that officer to, again,

20   gain any intelligence as far as him having seen Richardson at

21   the residence or knowing if he lived there.

22           And based on what I recall of that conversation, he

23   did know of Richardson.   He had seen him.   He -- I believe he

24   relayed to me that Richardson's parents both worked but he knew

25   Richardson to be home during the day and had seen him at the

1    house.

2              MR. HEAVENER:  Sorry, Your Honor.  The

3    computer's . . .

4              THE COURT:  You can proceed.

5              MR. HEAVENER:  All right.

6    BY MR. HEAVENER:

7    Q.   So, Agent, you talked to this sheriff's officer.

8              Did he tell you that Mr. Richardson or Ms. Richardson

9    had moved out of the house?

10   A.   I don't recall when -- when we learned of that.  I do

11   recall we learned that she was going through a divorce or was

12   divorced from her husband and had moved into a different

13   residence.  I don't recall how we learned that.

14   Q.   Okay.  At about the same time, was a task force officer

15   named Mike Calhoun, was he conducting what I'll call law

16   enforcement checks, looking at police reports and that type of

17   thing?

18   A.   Yes.

19   Q.   Okay.  And did he locate a police report in which

20   Mr. Richardson had provided an apartment as his previous

21   address?

22   A.   Yes.  That's correct.

23              MR. HEAVENER:  May I retrieve the exhibits, Your

24   Honor?

25              THE COURT:  Yes.

1    BY MR. HEAVENER:

2    Q.   All right, Agent.  I've handed you what's been already

3    introduced as Government's -- a series of government's

4    exhibits.  It's a notebook in front of you, and under tab 2 is

5    a Jacksonville Sheriff's Office report dated Thursday, June

6    2nd, of two thousand and -- or Thursday, May 2nd of 2013, at

7    6:30.

8          Is that the report that Detective Calhoun had

9    located?

10   A.   Yes.

11   Q.   And you and other members of the task force had reviewed

12   the information in that report?

13   A.   Yes.

14   Q.   Okay.  I'd like to take you through that report.

15          Where did -- where did Mr. Richardson in that report

16   indicate that he had been residing?

17   A.   According to this report, it was 6710 Collins Road.

18   Q.   And was there an apartment number?

19   A.   Sorry.  I'm looking for it.

20          I don't see one given.

21   Q.   Had he -- had he pointed an apartment number out to the

22   officer who took that report?  And take a look at the text of

23   the report itself.  Look at the third paragraph from the top,

24   bottom sentence.

25   A.   Okay.  He pointed out Apartment No. 2519.

1    Q.    Okay.  And that's information that you and the other task

2    force officers had when you were serving the arrest warrant on

3    June 25th?

4    A.    Yes.

5    Q.    Mr. Richardson -- on this report -- if you could just read

6    us the text of the report, since the computer's not --

7    A.    Okay.

8    Q.    -- not working.

9    A.    "On May 3rd, 2013, at 1808 hours, I responded to 6710

10   Collins Road, which is Westland Parks Apartments, in reference

11   to a stolen motorcycle.

12          "Upon arrival I met with the complainant, Aaron

13   Richardson, referred to as witness No. 1.  Mr. Richardson

14   stated that his motorcycle was stolen from the parking lot of

15   the apartment complex between the hours of 1830 on May 2nd,

16   2013, and 6:30 a.m. on May 3rd, 2013."

17   Q.    And if you'd slow down just a little bit for our court

18   reporter.

19          Okay.  Go ahead.

20   A.    "The motorcycle was described as a red and black 2007

21   Kawasaki.  Mr. Richardson, who stated that he purchased the

22   motorcycle three days earlier, was unable to provide a bill of

23   sale, license plate, or VIN.  He also was unable to tell me the

24   previous owner's name or provide me with a phone number.

25          "I asked Mr. Richardson why, if he discovered the

1    motorcycle missing at 6:30, he waited until -- until 5:40 to

2    report the incident" -- "5:40 p.m.," correction on my part.

3    "He stated that he had to go to work, which was Labor Ready on

4    Edgewood."

5    Q.   Let me stop you for a second.

6             Are you familiar with Labor Ready?

7    A.   Not in and of itself, but I understand it's a temporary

8    placement service for employment.

9    Q.   Okay.  And do you have an understanding, based on your

10   training and experience, these temporary employment places

11   around Jacksonville, the hours people normally work when they

12   go to work at those places?

13   A.   Yeah.  It's usually they -- the first thing in the

14   morning.

15   Q.   Okay.  All right.  Go ahead.

16   A.   "I asked Mr. Anderson [verbatim] for his address.  He

17   stated that his address is 5323 Marsala Drive.  I asked why we

18   were at Westland Park Apartments.  Mr. Anderson stated that he

19   had been in a several-week process of moving into an

20   apartment."

21   Q.   Okay.  Let me stop you for a second, Agent.

22   A.   Sure.

23   Q.   The references in this report to Mr. Anderson, did you

24   understand that to be a typographical error?

25   A.   Yes.

1    Q.    Okay.  Go ahead.

2    A.    "He was unable to provide" -- sorry, "unable to

3    confidently tell me which one.  I asked him to point out the

4    apartment that he had been moving into for weeks.  He pointed

5    out Apartment No. 2519, though advised he did not have a key."

6    Q.    Okay.  Go ahead.

7    A.    "I then asked where the motorcycle was parked.

8    Mr. Anderson and I walked to the very end of the complex where

9    he showed me an empty parking spot where the motorcycle once

10   was.  I asked why he parked so far away from his apartment.  He

11   stated there was no available parking spots.

12          "I gave Mr. Anderson a case card and advised him to

13   call back when he had anything to indicate that the motorcycle

14   he was trying to report stolen existed."

15   Q.    All right, sir.  And I'd like to direct your attention to

16   the very top of that report.

17          What time and date was it that Mr. Richardson was

18   making this report to the police?

19   A.    That was May 2nd, 2013, at 6:30 p.m.

20   Q.    And May 2nd of 2013, was that a week day?

21   A.    Thursday.

22   Q.    Thursday.

23          All right.  So after reading this report -- you

24   learned that Mr. Richardson was not at the Marsala Road

25   address.  After reading this report, what did your task force

1    do at that point?

2    A.    Once we found this information, I went to the apartment

3    office, which was the Westland Park Apartments office, and

4    spoke with the office manager --

5    Q.    Okay.

6    A.    -- of the apartment complex.

7    Q.    Are you familiar with the name Jennifer Clavell?

8    A.    That sounds familiar, yes.

9    Q.    Is that the manager that you spoke with?

10   A.    Yes.

11   Q.    Okay.  And when you got to the apartment, did you do any

12   type of surveillance on this unit mentioned in the report, this

13   2519 unit?

14   A.    Yes.  I'm the one that responded in person to speak with

15   the apartment manager, but other members of the task force went

16   and did surveillance on the apartment -- on the apartment

17   itself.

18   Q.    Okay.  And can you -- can you describe to us, are you

19   outfitted in tactical gear at this point?

20   A.    At that point in time I was wearing plain clothes,

21   probably.

22   Q.    Okay.  And does there come a point when you change from

23   your plain clothes into more tactical gear?

24   A.    Yes.  Before we would have approached the apartment, I

25   would have put on a tactical vest that's labeled front and back

1    "police."

2    Q.    Okay.  All right.  So you go and you speak with

3    Ms. Clavell.

4            What does she tell you?

5    A.    She advised me that -- that the mother had -- had rented

6    the apartment, leased the apartment.  The apartment was in her

7    name and that the apartment manager herself had allowed Aaron

8    Richardson to stay in the apartment as a student because they

9    were trying to get him reenrolled into school.

10   Q.    Okay.  And the apartment you're referring to, was that

11   that same unit, 2519 --

12   A.    Yes.

13   Q.    -- that was mentioned in the police report we just read?

14   A.    Yes.

15   Q.    Okay.  All right, sir.  And the -- when you mentioned the

16   name -- can you just kind of step us through, when you first

17   interacted with Ms. Clavell, how you approached it?  What did

18   you say to get that information?

19   A.    Sure.  Initially -- I'll refer to my report that I

20   authored.

21           Based on my report, initially I showed her a picture

22   of Richardson, which she identified right away.  Immediately

23   she recognized him.

24   Q.    Okay.  And that's when she said that he was living in 2519

25   as a student?

1  A.   Yes.

2  Q.   All right.  When you showed her the picture of Aaron

3  Richardson, how immediate was her response of knowing who he

4  was and describing where he lived and the circumstances of why

5  he was living there?

6  A.   Based on my using the word "immediate" in my report, I

7  take it, based on my recollection, it was -- it was right away.

8  Q.   Okay.  And so once Ms. Clavell confirmed that he was

9  actually a resident living in this Apartment 2519, what did you

10  do to try to confirm whether or not he was actually there?

11  A.    In addition to speaking with the manager, we also spoke

12  with a person I'll refer to as the apartment -- the complex

13  maintenance person.

14  Q.   Do you recognize the name Larry Trees?

15  A.   Yes.

16  Q.   Is that him?

17  A.   Yes.

18  Q.   Okay.  So when you speak with Mr. Larry Trees, tell us

19  what you talk about and what he does.

20  A.   We asked him the same questions that we asked of the

21  apartment manager as far as if he had seen Mr. Richardson

22  around and knew of him.

23        And we also asked him to do -- do a maintenance check

24  of the apartment, maintenance call, you know, just go inside

25  and just seeing who would be in the apartment or that kind of

1  thing.

2  Q.   Okay.  How does that fit into your standard procedures

3  when you're looking for someone that you know is residing in an

4  apartment with an outstanding warrant?  Would that be a typical

5  request for your task force?

6  A.   It would be.  Again, they're doing a maintenance call to

7  the apartment to check on plumbing or whatever issue, and they

8  can go in the apartment and see who's actually residing in the

9  apartment.

10  Q.   Okay.  And, sir, you're familiar with the way the

11  apartments looked that day, on June 25th of 2013?

12  A.   Yes.

13  Q.   All right.  Let me direct your attention to Government's

14  5A --

15          MR. HEAVENER:  Are we live now?

16          THE COURT:  I'm told we're on the small monitors but

17  not on the screen.

18          COURTROOM DEPUTY:  Yeah.  It's not going to work

19  because it won't show.

20  BY MR. HEAVENER:

21  Q.   All right.  Let me show you --

22          COURTROOM DEPUTY:  It won't show on the big screen.

23  It will only show on the small so he can look at it on the

24  small screen.

25  BY MR. HEAVENER:

1   Q.   All right.  Do you see 5A in front of you, Detective?

2   A.   Yes, I do.

3   Q.   All right.  Is that the exterior of the apartment building

4   that 2519 is located in?

5   A.   Yes.

6   Q.   And what floor is 2519 on?

7   A.   The second floor.

8   Q.   The second floor?  All right.

9        5B, is that the exterior of Unit 2519?

10  A.   Yes.

11  Q.   All right.  And take a look, Agent, if you would, at 5C

12  all the way through 5G -- actually, through 5E.

13       You didn't go to the back of the apartment, did you?

14  A.   No, I did not.

15  Q.   All right.  So take a look through 5E.

16  A.   (Complies.)

17  Q.   Are those all basically scenes of the apartment?  Is that

18  the way it looked that day?

19  A.   Yes.

20  Q.   All right.  So you asked Mr. Trees to go do this

21  maintenance check.

22       Do you receive any further information from Mr. Trees

23  after you asked him to do that?

24  A.   Yes.  He goes to the apartment and attempts to gain entry

25  into the apartment using a key they have to the door, and he's

1  able to unlock the locks on the door except for one lock that

2  he explained to me had been installed by a previous tenant in

3  that apartment.

4  Q.   Okay.  And what did he tell you about what -- what was

5  going on if that lock was actually engaged and the other locks

6  weren't engaged?

7  A.   The third lock, I'll call it, it was a deadbolt lock, and

8  he said the previous tenant installed that on their own without

9  the permission of the apartment complex and that only that

10  tenant would have had a key to it.

11        And being a deadbolt-style lock with a toggle only on

12  the inside, the only way to lock it from the outside is with a

13  key.  So that indicated to us that it was locked from the

14  inside and somebody was inside the apartment.

15  Q.   Okay.  And this apartment we're talking about -- I may

16  have misheard you.

17        The apartment we're talking about is on the top floor

18  of that apartment complex?

19  A.   I recall it being on the second floor based on the 2519,

20  but I'm not sure on that totally.

21  Q.   Okay.  All right.  So once the maintenance man gave you

22  this information, did you make any observations about the

23  parking lot itself?  Were you looking for the mother's car,

24  that type of thing?

25  A.   Yes.  I recall that there was not any cars there that we

1    could associate with the apartment present in the parking lot.

2    Q.    Okay.  And from your previous conversations with the JS.

3    With the police officer in Orange Park, the Marsala Drive

4    police officer that was the neighbor, and knowing about the

5    mother's work schedule, what did that indicate to you?

6              If the door lock was engaged and it had to be engaged

7    from the inside and there was no car parked in the parking lot

8    that you could associate with the mother, what did that lead

9    you to believe?

10   A.    Well, that indicated to us that the mother was probably at

11   work, but there was somebody home inside the apartment.

12   Q.    Okay.  And did you have any belief about who that would be

13   that would be inside that apartment?

14   A.    Yes.  Based on the information we had received from

15   witnesses, other people, we believed it to be Richardson.

16   Q.    Okay.  All right, sir.  Now, you told us earlier when you

17   spoke with the maintenance -- or the apartment staff that you

18   were just wearing plain clothes.

19             You at some point changed into tactical gear?

20   A.    Yes.  That's correct.

21   Q.    Could you describe for us what kind of tactical gear you

22   were wearing.

23   A.    I would have donned a tactical vest that had a -- that had

24   a -- what we call a hard plate in the front for frontal

25   protection.  It had body armor all the way around myself, and

1    it's identified with labeling front and back as far as being

2    police and law enforcement.

3    Q.   Okay.  And why would you feel the need, going in to effect

4    an arrest, to wear that kind of equipment?

5    A.   Obviously the body armor is in case of being shot.  It

6    protects against small arms fire.

7    Q.   Okay.  How about head gear?  Did you have any head gear on

8    that day?

9    A.   I do not recall if that -- in that incident in particular.

10   I do have a helmet issued to me.  I do not recall if I put it

11   on that day or not.

12   Q.   Okay.  And in terms of the gear that you were carrying,

13   obviously you're equipped with a firearm; is that --

14   A.   Yes.  That's correct.

15   Q.   And did you have any particular function that day with

16   regard to any other equipment that repels bullets?

17   A.   Yes.  That day I was assigned to a ballistic shield, which

18   is a large shield designed to stop, again, small arms fire, and

19   the shield is identified on the front as being law enforcement.

20   Q.   Okay.  And why do you carry that shield?

21   A.   Again, to protect against small arm fire.

22   Q.   Okay.  And do you have a recollection of that day -- after

23   you received the information from the maintenance man, did you

24   proceed to Apartment 2519?

25   A.   Yes, we did.

1    Q.    Okay.  And when you got to Apartment 2519, what

2    observations did you make about what the maintenance man had

3    told you?

4    A.    What he told us about the lock was correct.  There was two

5    locks on the door in the normal location; I'll call it normal

6    location.  There was the standard latch lock as well as a

7    deadbolt lock above the latch lock, and there was a third lock

8    on the top of the door that was a deadbolt lock.

9    Q.    Okay.  And with regard to the operation that day, were you

10   working in two-man teams?

11   A.    Yes.  There was four of us total, so we would have been

12   split up in two-man teams.

13   Q.    Okay.  And how about the perimeter?  Was anyone else

14   working the back of the apartment to make sure someone doesn't

15   go out the back?

16   A.    Yes.  JSO Officer Wes Bowen was on the back of the

17   apartment.

18   Q.    Okay.  And the two-man team that you were assigned to, was

19   it you and Detective Calhoun?

20   A.    That's correct.

21   Q.    And the other two-man team would have been Detective

22   Pinckney and who else?

23   A.    And Jeff Alvarez.

24   Q.    Okay.  From St. Johns County Sheriff's Office?

25   A.    Yes.  That's correct.

1    Q.    And so your job is to hold this bulletproof shield.

2          Who was the person that was going to be responsible

3    for breaking open the door if that was necessary?

4    A.    That was Rod Pinckney.

5    Q.    Okay.  All right.  So you made these observations about

6    the lock.  Your team is in place.

7          Can you explain what you did first before making

8    entry?

9    A.    Initially when we went up to the apartment door, we

10   observed there was one door leading to the apartment as well as

11   a window next to the door.  So we knocked and announced that we

12   were police, law enforcement, knocked on the door several

13   times, numerous times, for a matter of minutes, announcing our

14   presence.

15   Q.    Okay.  And that knocking and announcing your presence, did

16   anyone come to the door and open the door up?

17   A.    No.

18   Q.    Okay.  And knowing what you knew about the fact that

19   Mr. Richardson had an outstanding warrant for him, knowing that

20   someone had to be inside the apartment based on the lock

21   condition, what -- can you tell us what your beliefs were at

22   that point?  Did that -- what effect did nobody answering the

23   door have on you?

24   A.    Well, during my time on the task force, it was common for

25   people that had warrants, especially if they knew they had a

1    warrant, to hide inside the residence or a residence to avoid

2    apprehension by law enforcement.

3    Q.    Okay.  And do you have a -- I mean, I understand you

4    weren't, you know, making a note of the amount of time that

5    transpired after your knocking, but do you have a recollection

6    of approximately how long it was?

7    A.    It would have been probably -- at least several minutes.

8    Five to ten minutes I'm estimating.

9    Q.    All right.  And describe for us the type of knocking

10   you're doing and the volume of the announcing you're doing

11   standing there at the door.

12   A.    I'll describe it as usually in an apartment complex, the

13   neighbors around us can hear us knocking and announcing.  It's

14   a very loud knock; it's a very loud announcement.

15         Essentially it's a yell.  We were yelling, "U.S.

16   Marshals.  Law enforcement.  Police.  Come to the door.  Come

17   to the front door," as well as loud knocks.

18   Q.    Okay.  At some point you and the other task force officers

19   make a decision to actually break into the door; is that right?

20   A.    Yes.  After a period of time we decided to breach the

21   door --

22   Q.    Okay.

23   A.    -- and go from there.

24   Q.    Who was the person that actually breached the door?

25   A.    That was Rod Pinckney.

1  Q.   Okay.  And after you and the other marshals or the other

2  task force officers breached the door, can you describe, did

3  you immediately run into the apartment?

4  A.   No.  After we breached the door, again, we announced our

5  presence for a period of time over and over again saying, "Come

6  to the door.  Please come to the front door.  Please come to

7  the front door."

8  Q.   Okay.  And did anyone come to the front door?

9  A.   No.

10 Q.   Okay.  And what did that do to your suspicion that Aaron

11 Richardson was inside?

12 A.   Well, again, it increased it because your average person,

13 when somebody breaks in their front door, they're going to come

14 check it out.

15 Q.   All right.  And can you describe -- are you familiar with

16 the terms a preliminary sweep and a secondary sweep as it

17 relates to fugitive apprehension?

18 A.   Yes, I am.

19 Q.   Explain to us what a preliminary sweep is and what a

20 secondary sweep is.

21 A.   Well, the first sweep that we do is basically looking for

22 that guy standing there with a weapon, initial clearings of the

23 spaces where somebody could be with a gun to where they'd be an

24 immediate threat to us.

25          The secondary sweep is where you're looking for

1   somebody that's hiding, somebody -- it could be under a bed or

2   in a closet or in the attic, that kind of thing.

3   Q.   Okay.  So is that the procedure you used on June 25th of

4   2013 with regards to Aaron Richardson's --

5   A.   Yes.

6   Q.   -- apprehension?

7   A.   That's correct.

8   Q.   Okay.  All right.  So when you make this preliminary

9   sweep, are you still operating in teams?

10  A.   Yes.

11  Q.   Okay.  And you go into each of the rooms in the apartment?

12  A.   Yes.

13  Q.   Okay.  And when you get to what I'll call the master

14  bedroom door, was that door accessible?

15  A.   The door going -- leading to the master bedroom was

16  locked, again, from the inside.

17  Q.   Okay.  And so what did you and the other task force

18  officers do when you encountered a locked bedroom door on the

19  inside of the apartment?

20  A.   When we encountered that door, we breached that door also

21  and went into the master bedroom.

22  Q.   Okay.  And did you see anybody in the master bedroom?

23  A.   No.

24  Q.   All right.  And so what did you -- what did you do next in

25  terms of your -- you've engaged in your preliminary sweep.

1      Did you determine to do a secondary sweep?

2   A.   Yes.  We cleared the master bedroom, which was pretty much

3   empty of furniture except for the closet, which was very full

4   of miscellaneous items.  So we left a person to hold the master

5   bedroom and closet area while we went back and did a secondary

6   sweep of the other rooms.

7   Q.   Okay.  And why would you do this secondary sweep when

8   you'd encountered this locked bedroom door?  What's the purpose

9   of doing a secondary sweep of the other rooms?

10  A.   Just to make sure there's no one to our backs or to our

11  rears that's hiding somewhere that could come up behind us.

12  Q.   Okay.  All right.  So you're doing the secondary sweep.

13      Do you enter into a bedroom that you later learned

14  was the bedroom that Aaron Richardson was residing in?

15  A.   Yes.

16  Q.   Okay.  And during your secondary sweep, what did you --

17  what areas of Aaron Richardson's bedroom did you look through?

18  A.   Again, like I said, it would have been the areas where a

19  person could hide, whether under the bed or in a closet.

20  Q.   Okay.  And did you look in Aaron Richardson's closet?

21  A.   Yes, I did.

22  Q.   And when you looked in Aaron Richardson's closet, what did

23  you see?

24  A.   I saw a Savage -- a bolt action rifle in the closet.

25  Q.   Okay.  And if you could take a look.  I just want to

1  review some photographs.

2          The marshals took photographs that day of the things

3  that we've been discussing; is that right?

4  A.   Yes.  That's correct.

5  Q.   And let me show you Government's Exhibit 6A, if I can --

6          MR. HEAVENER:  I guess is the zoom not working

7  either?

8  BY MR. HEAVENER:

9  Q.   All right.  So showing you 6A, is this a photograph that

10  depicts the doorway, the doorjamb, where you and the other task

11  force officers made entry?

12  A.   Yes.

13  Q.   All right.  And so if we start at the bottom, we see two

14  areas where a lock would be.  We move up to the top and we see

15  splintered wood.

16          Describe what we're looking at there where the

17  splintered wood is.

18  A.   So as I stated before, there was -- there was a latched

19  lock or latch doorknob on the bottom, a hole in the door frame.

20  You're looking at a doorjamb.  Above that would have been a

21  deadbolt.  Those were unlocked by the maintenance --

22  maintenance person of the apartment.

23          The top -- top of the doorjamb you see where a second

24  deadbolt lock was, and you can see where it splintered,

25  indicating that it was engaged.  And so it splintered out the

1  doorjamb when we breached the door.

2  Q.   Okay.  And I'm going to show you 6B.  If you look at it,

3  you probably -- you can even look at it in the notebook in

4  front of you if it's easier.

5        But 6B shows that same doorway.  It's a backed-up

6  view, but in the -- I'm going to point my finger.

7        That's the actual front door of the house --

8  A.   Yes.

9  Q.   -- or the apartment?

10       And did the door -- when Detective Pinckney -- when

11  he breached it, did the door actually come off of its hinges?

12  A.   Based on my -- based on what I recall, I believe it did,

13  yes.

14  Q.   Okay.  Government's 6C, take a look at that.

15  A.   (Complies.)

16  Q.   That's the interior look at the door; is that right?

17  A.   Yes.

18  Q.   And, again, we see at the top, where my finger's pointing,

19  that's the lock that was actually engaged from the inside?

20  A.   Yes.  That's correct.

21  Q.   And if we take a look at 6D, is this the closet that you

22  were telling us about clearing during your secondary sweep?

23  A.   Yes.  Based on what -- based on what I can recall, that's

24  accurate.

25  Q.   Okay.  And when you located -- when you saw this bolt

1    action rifle in the closet, what -- you're there with your

2    teammate Detective Calhoun.

3            Did you -- what did you do?

4    A.    As soon as I saw the rifle, I called the presence of the

5    rifle out to where the other members in the residence and the

6    apartment could hear there's a rifle in the room.

7    Q.    Okay.  And showing you Government's 6E, is that the rifle

8    that you recall seeing that day?

9    A.    Yes, it is.

10   Q.    Okay.  And what did -- do you have any understanding of

11   what Detective Calhoun did once you told him that there was a

12   rifle in the closet?

13   A.    My understanding was that he pulled the rifle out of the

14   closet and made it clear, meaning he pulled any cartridges out

15   of the chamber or magazine of the rifle.

16   Q.    Okay.  So after you locate this rifle, you've got this

17   master bedroom where the door was locked and the other task

18   force officers kind of standing guard, what decision was made

19   with regard to investigating that room further?  What kind of

20   secondary sweep did you do in that room?

21   A.    We went back to the master bedroom to do a secondary

22   sweep, and as I explained, there was not much furniture in that

23   room other than there was a lot of stuff in the closet, and so

24   the only place for somebody to hide was inside the closet

25   itself.  And we also noticed that there was a hatch going to an

1    attic or crawl space above the -- above the closet.

2           So at that point we'd cleared the rest of the

3    apartment so we knew that if somebody was hiding in the

4    apartment, they were inside the closet or they'd gone into the

5    crawl space or hatch up into the attic.

6    Q.   Let me show you 6G.

7           Is this a view looking into the closet that you were

8    just describing?

9    A.   Yes.  That's correct.

10   Q.   All right.  So you have your suspicion that someone is

11   either in that closet or in the attic within the closet.

12          What decision is made at that point?

13   A.   At that point we made contact with Officer Bowen, who was

14   outside on perimeter with a K-9, and he came into the

15   apartment, and he deployed the K-9 inside the master bedroom.

16   Q.   Okay.  And were you there present when the K-9 was brought

17   into the master bedroom?

18   A.   Yes, I was.

19   Q.   And describe what happened.

20   A.   When he deployed the K-9, the rest of the team members

21   stayed right at the master bedroom door so we would not

22   interfere with the K-9 locating anybody.  And immediately, as

23   soon as the dog was released, it went into the closet and made

24   contact with Mr. Richardson.

25   Q.   Okay.  And did the K-9 engage?  Did he bite

1    Mr. Richardson?

2    A.    Yes.

3    Q.    Do you know the K-9's name?

4    A.    I believe it was Justice.

5    Q.    Okay.  All right.  And Mr. Richardson was then apprehended

6    by your team; is that right?

7    A.    Yes.

8    Q.    Okay.  And after the apprehension, was rescue called to

9    treat whatever injuries Mr. Richardson had?

10   A.    Yes.  That's correct.

11   Q.    Okay.  And showing you what's in evidence as Government's

12   6F, is that a photograph of Mr. Richardson just depicting his

13   treatment by rescue after the arrest?

14   A.    Yes.

15   Q.    We see, in 6F, Mr. Richardson is cuffed.

16         Was he cuffed as a result of the arrest?

17   A.    Yes.  That's correct.

18   Q.    Okay.  And so what happened after -- after rescue

19   responds?  Does he stay -- does Mr. Richardson stay there on

20   the scene, or where does he go?

21   A.    No, he does not.  He is transferred -- transported to the

22   hospital, Shands Hospital, downtown Jacksonville.

23   Q.    Okay.  And did you stay there on the scene, or did you go

24   with him down to Shands?

25   A.    I stayed on scene.

1   Q.   Okay.  And why were you staying on scene?

2   A.   At that point we were basically holding the apartment for

3   the FBI.

4   Q.   Okay.  Once you got Mr. Richardson out of the apartment,

5   once the firearm had been secured on the bed, did you and your

6   team members back out of the apartment?

7   A.   We backed out and stood outside the front door.

8   Q.   Okay.  And did you -- did you have -- while you were

9   standing outside the front door, did you have any observations

10  of FBI agents arriving and any interaction they may have had

11  with --

12  A.   Yes.  From the stoop outside the door, I could see when

13  they arrived.

14  Q.   Okay.  And did you also -- were you able to observe them

15  interacting with a woman who later turned out to be

16  Mr. Richardson's mother?

17  A.   Yes.

18  Q.   Okay.  And during that interaction, I mean, were you able

19  to hear it, or were you just standing there watching?

20  A.   We were not within earshot.  We could watch it from the

21  parking lot.

22  Q.   Okay.  Did it appear like a normal interaction?

23  A.   Yes.

24  Q.   Was there anything out of the ordinary?

25  A.   No.

```
 1   Q.    Okay.

 2         MR. HEAVENER:  Just a moment, Your Honor.

 3         Nothing further, Your Honor.

 4         THE COURT:  Mr. Ossick --

 5         MR. OSSICK:  Thank you, Your Honor.

 6         THE COURT:  -- or Ms. Kingsley?

 7         John, you can come up here if you want to.  Use

 8   whichever one you want to use.

 9         MR. OSSICK:  Okay.  I don't really want to use that,

10   I don't think.

11                        CROSS-EXAMINATION

12   BY MR. OSSICK:

13   Q.    Good morning.

14   A.    Good morning.

15   Q.    Detective Brock; is that correct?

16   A.    It's special agent.

17   Q.    Special agent.  I'm sorry.

18   A.    No problem.

19   Q.    I missed the very first part when you were saying it.

20   A.    No problem.

21   Q.    I couldn't hear.

22         The pictures that you showed us, I think that it's

23   the 5 series, 5A, something like that, 5A, 5B, that depict the

24   apartment --

25   A.    Yes.
```

1  Q.    -- were those taken that day, the day you just described,

2  the 25th of June, 2013?

3  A.    Based on what I recall, there were pictures taken that

4  day.  I do not -- I can't say for sure that these were those

5  pictures, but I know there were pictures taken that day on

6  scene, yes.

7  Q.    Well, you see the door is intact there.

8  A.    Correct.

9  Q.    Okay.  Did you take pictures -- did you observe someone

10 taking pictures that day before the door was breached from that

11 sort of vantage point?  It looks like they're on that landing,

12 that third-level landing --

13 A.    Correct.

14 Q.    -- taking that picture.

15        Do you know if that occurred?

16 A.    If what occurred?

17 Q.    Someone took those pictures that day on the third-level

18 landing before the door's knocked off the hinges.

19 A.    No.  No, sir.  Based on what I recall, the door itself was

20 replaced after we breached the door.

21 Q.    Okay.  I'm asking, do you see that picture that's in 5A?

22        It shows the door, doesn't it?

23 A.    Yes.

24 Q.    And it's not knocked off.

25 A.    Correct.

1   Q.   So when was that picture taken?

2   A.   I cannot say for sure when the picture was taken.

3   Q.   Did you see any member of your team on the balcony taking

4   photographs like the scene depicted in those exhibits before

5   the breach?

6   A.   No.

7   Q.   Have you ever seen these photos before?

8   A.   Yes.

9   Q.   Okay.  The sheriff's officer that you spoke with that

10  lived near the prior residence of the Richardsons on Marsala --

11  A.   Yes.

12  Q.   -- what was that person's name?

13  A.   I do not recall.

14  Q.   Did you make any sort of report of that?

15  A.   No.

16  Q.   How is it that you knew about that person?

17  A.   I don't recall how we made contact with him.  I remember

18  we obviously went by the residence and saw there was a police

19  car, I believe, parked nearby.  Somehow we knew that he lived

20  close to Richardson and that he knew of Richardson.  I do not

21  recall how we knew that information.

22  Q.   Did you speak with him personally?

23  A.   I did, yes.

24  Q.   Was anyone else present that you recall?

25  A.   No.

1    Q.    And do you recall what day that took place?

2    A.    That was the same day of the arrest.

3    Q.    Okay.  So it's on the 25th.

4    A.    Yes.

5    Q.    Now, you had actually gotten a warrant, I think, that

6    you'd talked about in Exhibit 2, I believe it might have

7    been -- or, excuse me, 1B.

8          That was on the 11th -- is that correct? -- of June?

9    A.    The warrant?

10   Q.    The warrant for Mr. Richardson, yes.

11   A.    When it was assigned to us, it was assigned the same day

12   of the arrest.

13   Q.    So you had never seen the warrant.

14   A.    It was in the file folder that was handed to me at the

15   time of -- that day.

16   Q.    Okay.  So I know you talked about that your duties are

17   essentially fugitives --

18   A.    Right.

19   Q.    -- arresting people who have --

20   A.    Correct.

21   Q.    -- failed to appear that warrants are out for.

22   A.    Correct.

23   Q.    So you had a file.  Your office had a file about this

24   warrant for some period of time prior to the 25th; is that

25   correct?

1    A.    I have no knowledge of that.  What I have knowledge of is

2    the day of the arrest, they gave the file to me to find

3    Mr. Richardson.

4    Q.    Okay.  So you don't know if there had been any effort to

5    arrest Mr. Richardson prior to the 25th.

6    A.    Based on what I recall and what I know, there was no

7    effort on the task force to find Mr. Richardson prior to that

8    day.  Whether or not another agency was involved, I can't say.

9    Q.    Okay.  So the reason the task force is then doing it on

10   the 25th is because he's become a suspect in the shooting.

11   Isn't that correct?

12   A.    That's correct.

13   Q.    So it's -- really the fact that there was a warrant, you

14   weren't even aware of for several weeks after it had been

15   issued, until that day.

16   A.    That's correct.

17   Q.    Okay.  Now, the maintenance person that you spoke with

18   concerning the locks on the door, you had that conversation,

19   right?

20   A.    Yes.

21   Q.    Was anybody else present at that conversation?

22   A.    I don't recall.

23   Q.    Had the apartment manager told you anything about that

24   third lock?

25   A.    I don't recall if she did or not.

1  Q.   Okay.  So the maintenance man's understanding of that lock

2  was that a prior tenant, meaning someone before

3  Ms. Richardson --

4  A.   Yes.

5  Q.   -- had placed it in the apartment?

6  A.   That's correct.

7  Q.   So it wasn't the complex's lock.  It wasn't --

8  A.   It did not belong to them, no, and they did not have a key

9  for it.

10  Q.   So he had no idea whether or not Ms. Richardson had

11  obtained her own key or anything of that nature, had he?

12  A.   No.

13  Q.   And you didn't discuss any of that with him.

14  A.   Based on what he told me, it was installed by a previous

15  tenant, so therefore the complex did not have a key and the

16  Richardsons would not have had the key because it was installed

17  prior to them moving in.

18  Q.   Well, he didn't know if they did or not, but he didn't

19  think they did, I guess.  He was guessing, right?

20        He didn't know if Ms. Richardson had had one made,

21  did he?

22  A.   No.

23  Q.   Okay.  Now, you had the maintenance man leave the other

24  locks unlocked; is that correct?

25  A.   That's correct.

1   Q.   What time did you first arrive there that day, best

2   recollection?  Is it around noon?

3   A.   I believe it would have been after that.  It would have

4   been after noon sometime.

5   Q.   About how many hours were you there before the door was

6   breached?

7   A.   It's hard to say.  Maybe half an hour to an hour.

8   Q.   You didn't --

9   A.   By the time we did our investigation, I spoke with the

10  apartment manager and the maintenance person.  The maintenance

11  man went up.  Before we even approached was probably at least

12  45 minutes to an hour.

13  Q.   Okay.  You didn't -- you didn't speak with the apartment

14  manager around the lunchtime?

15  A.   I don't recall.

16  Q.   Okay.  And that was a Ms. Clavell?

17  A.   Yes.

18  Q.   Now, in none of those discussions with the maintenance

19  person or the manager was any particular room identified as

20  being occupied by any particular person, was it?

21  A.   Not that I recall.

22  Q.   So it was your belief, from the information you had, that

23  Ms. Richardson rented the apartment and that Aaron Richardson

24  may be staying there, at least at times.

25  A.   That's correct.

1   Q.    Okay.  Now, you had reviewed that incident report from the

2   alleged motorcycle theft.

3   A.    Yes.

4   Q.    And it showed you that a person reported the theft

5   occurring, like, sometime before 6:30 in the morning and the

6   report being made sometime, like, 6:30 in the evening.  Is that

7   approximately correct?

8   A.    Yes.

9   Q.    So that's completely consistent with a person who's at a

10  day job, isn't it?

11  A.    Possibly.

12  Q.    I mean, if you have a 9:00-to-5:00 job or an 8:00-to-5:00

13  job, that's the same sort of hours; is that right?

14  A.    Yes.

15  Q.    And what was the training you had that related to the

16  labor force business?

17          Do you have training of that, or did you just --

18  A.    Experience.  In my experience as a law enforcement

19  officer, labor jobs are very common -- or very commonly, people

20  don't show up a lot of times as far as it's not a

21  day-to-day-to-day job.

22          They'll work for a day, take a few days off, work

23  another day, take a few days off.  It's not a steady

24  day-in-day-out job.

25  Q.    And those jobs often are for the full day, aren't they?

1    A.    They can be, yeah.

2    Q.    So there was nothing particular in your training about

3    temporary labor that said it's going to be a half day, is it?

4    A.    No.

5    Q.    Now, 6E is, I believe, the picture -- and let me make sure

6    I'm getting it right because I can -- of the rifle.

7    A.    You said 6E?

8    Q.    Yes.

9              MR. OSSICK:  Am I right about that?

10             MR. HEAVENER:  Yes.

11   BY MR. OSSICK:

12   Q.    6E.

13   A.    Okay.

14   Q.    Who did you say placed that rifle where it's shown in this

15   photograph?

16   A.    That was Detective Calhoun.

17   Q.    Okay.  But you -- you were the one who first observed it?

18   A.    I saw it, yes.

19   Q.    Now, at the time you observed it, you had no idea who

20   occupied that room, did you?

21   A.    No.

22   Q.    When did you learn or did someone tell you that -- who

23   they thought occupied that room?

24   A.    I don't recall when I learned who they thought occupied

25   that room.

1    Q.    I mean, was it that day?

2    A.    I believe so, yes.

3    Q.    Do you know who provided you that information?

4    A.    I don't recall exactly.  The FBI, when they got on scene,

5    spoke with the mother.  The mother may have relayed that

6    information.

7    Q.    Okay.  But you don't have an independent recollection of

8    her saying it.

9    A.    No.

10   Q.    Okay.  Did you hear the questioning of Mr. Richardson by

11   the dog handler?

12   A.    What questioning are you referring to?

13   Q.    Did you hear any questioning of Aaron Richardson after the

14   breach when he's in custody by the -- Officer Bowen?

15   A.    Not that I recall.

16   Q.    Were you present during the time he was in the presence of

17   Mr. Richardson?

18   A.    I was initially, yes.  We provided medical care to

19   Mr. Richardson in waiting for EMS to arrive.

20   Q.    Have you ever reviewed, in preparation for your testimony,

21   the report that Officer Bowen had filed?

22   A.    I have reviewed it, yes.

23   Q.    Do you recall whether or not he made any reference to some

24   questioning?

25   A.    I don't recall.

1  Q.   Okay.  So you don't know whether any questioning that's in

2  there is complete or incomplete.

3  A.   No.

4  Q.   Did you hear any questioning?

5  A.   Not that I recall.

6  Q.   Okay.  So clearly, then, I guess it couldn't have been

7  Mr. Richardson who said it was his room, from your knowledge.

8  A.   I don't recall.

9  Q.   Okay.  Was there any particular difference in the

10 furnishings or the belongings or whatever, you know, the stuff

11 in the rooms, that allowed you to differentiate between the

12 various sons?

13 A.   Yes.  I do recall there was -- the way the apartment was

14 set up, there was two small rooms and a large bedroom, the

15 master bedroom.  And the -- from what I recall --

16 Q.   If you'll just let me interrupt you for a minute.

17 A.   Sure.

18 Q.   I've got an exhibit that's kind of a diagram.  I know

19 you --

20 A.   Right.

21 Q.   -- didn't do it, but it's -- it's in the government's

22 exhibits before you.

23           MR. DEVEREAUX:  10.

24 BY MR. OSSICK:

25 Q.   10, I believe it is.

1    MR. OSSICK:  I'm displaying it.  I had marked it 9.

2  I believe it's identical to 10.

3  BY MR. OSSICK:

4  Q.   Does that appear to be that?

5  A.   Yes.

6  Q.   Government's 10?

7  A.   No. 10, yes.

8  Q.   Okay.  So we'll just use the one that's already before the

9  Court.

10      If you would for me on this, by the letter, let me

11  know which was the room where the rifle was located in the

12  closet.

13  A.   It would have been room No. B.

14  Q.   Okay.  And I interrupted you when you were answering a

15  question about the difference between the rooms.  Let me -- I

16  apologize for that interruption.

17      But describe -- and if you would, make reference to

18  the room when you're doing --

19  A.   Sure.

20  Q.   -- the description, if you could, please.

21  A.   Based on what I recall, there was a musical instrument of

22  some type in room C.  Again, this is my recollection.  It's

23  been two-and-a-half years.  I don't recall what instrument it

24  was, but it was in room C, which indicated to us that it was

25  probably Richardson's younger brother, maybe.

1        Then there was -- I believe there was a gaming

2   station in room B, so there was some differences in the rooms

3   as far as the items in the room.

4   Q.   You hadn't received prior information about Aaron

5   Richardson being in a college band?

6   A.   Not that I recall.

7   Q.   Well, who gave you the information about Aaron

8   Richardson's younger brother?

9   A.   I don't recall where that came from.  It's just something

10  I recall vaguely.

11  Q.   Now, was that something you knew at the time of the

12  breach?

13  A.   It's something I would have known shortly -- there or

14  shortly thereafter.

15  Q.   Well, who gave you the briefing prior to the breach that

16  gave you this other information you've not already identified,

17  like -- like the younger brother being in a band --

18  A.   Again, I don't recall where the information came from.

19  Q.   -- or playing an instrument?

20  A.   I don't recall why -- where it came from or why I remember

21  that.

22  Q.   Okay.  Where in the -- where in the other room was the

23  instrument?

24  A.   I don't recall.

25  Q.   When is it you first saw that instrument?

1    A.    I don't recall that I saw it.  I recall that it was

2    mentioned.

3    Q.    Now, unlike the rifle, it wasn't something that you

4    considered a potential for harm or threat, was it?

5    A.    No.

6    Q.    After Mr. Richardson was in custody and transported, I

7    think that you indicated you stayed but were not privy to any

8    conversation between agents from the FBI and Ms. Richardson; is

9    that correct?

10   A.    That's correct.  I stayed at the apartment.

11   Q.    Okay.  Now, at the time you observed that discussion,

12   where was Ms. Richardson, outside the apartment?

13   A.    In the parking lot.

14   Q.    Parking lot?

15   A.    Yes.

16   Q.    So they, they meaning the agents, met with her well away

17   from the apartment itself.

18   A.    Yes.

19   Q.    And was -- do you recall what FBI agents were speaking

20   with her?

21   A.    I do not.

22   Q.    Do you know if Mr. Logan -- if Agent Logan was?

23   A.    I recall him being on scene.  I don't recall who actually

24   spoke with her.

25   Q.    Okay.  Did you -- other than, of course, the follow-up

1  reports and things that you have filed in preparation for

2  hearing, that type of thing, have you had any other duties in

3  connection with this case?

4  A.   No.

5  Q.   So it's pretty much the date of the arrest --

6  A.   That was it.

7  Q.   -- and the execution of the warrant.

8  A.   Yes.

9          MR. OSSICK:  Thank you.  No other questions.

10         THE COURT:  Any redirect?

11         MR. HEAVENER:  No, Your Honor.

12         THE COURT:  All right.  May this witness be excused?

13         MR. HEAVENER:  He may.

14         THE COURT:  Mr. Ossick?

15         MR. OSSICK:  Yes.

16         THE COURT:  You may be excused, Agent Brock.

17     (Witness excused.)

18         THE COURT:  I am told by the technician that the only

19  way to make this operable is to take a recess so he can do some

20  work in here.  I'm prepared to proceed without that and to rely

21  on the books and the monitors on tables, whatever -- whatever

22  will make it go faster.

23         MR. HEAVENER:  Your Honor, I don't anticipate using

24  any exhibits with the next witness.

25         Did the technician say how long it would take if we

1  did take a break?

2  COURTROOM DEPUTY:  He said he could work on it so I'm

3  thinking 15, 20 minutes.

4  MR. HEAVENER:  My concern is some of our evidence is

5  actually video recordings that I think both of us have a desire

6  to use.  If we could -- I think our next two witnesses we're

7  not going to have that many exhibits.

8  THE COURT:  How -- in its entirety, how long do you

9  think these hearings will last?

10  MR. HEAVENER:  I think we'll be here all day, is what

11  we were planning.

12  MR. DEVEREAUX:  Are we going to plan to take a lunch

13  break?

14  THE COURT:  Well, depending on how long you're going

15  to -- how long-winded you're going to be.

16  We'll proceed with your next witness then, and if we

17  then -- if you're anticipating an all-day hearing and all-night

18  hearing, then we'll take a lunch break.

19  MR. DEVEREAUX:  Somewhat, if we could get through

20  these next two witnesses, Your Honor, it would more be directed

21  more towards that first Tuesday, the 25th.

22  THE COURT:  All right.

23  MR. DEVEREAUX:  Then it would be a good time if we

24  did take a break.

25  THE COURT:  Okay.  Call your next witness.

1              MR. HEAVENER:  Your Honor, the United States would

2     call Detective Rod Pinckney.

3              THE COURT:  Detective, you can come forward and have

4     a seat in the witness stand, please.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  You may proceed.

7              MR. HEAVENER:  Thank you, Your Honor.

8          DETECTIVE ROD PINCKNEY, GOVERNMENT'S WITNESS, SWORN

9                        DIRECT EXAMINATION

10    BY MR. HEAVENER:

11    Q.   Tell us your name.

12    A.   Rod Pinckney.

13    Q.   And how are you employed?

14    A.   I'm employed with the Jacksonville Sheriff's Office,

15    currently a member of the U.S. Marshal task force.

16    Q.   And how long have you been a police officer?

17    A.   I've been a police officer for 25 years.

18    Q.   Okay.  And what other positions besides the marshals task

19    force have you held?

20    A.   I've been on SWAT for eight years.  I was in patrol for

21    five years, and also on the career criminal team after that.

22    Q.   Okay.  And the marshals task force, how long have you been

23    on that?

24    A.   About 13 years now.

25    Q.   Okay.  As part of that task force, do the members of that

1  task force -- do you receive any kind of specialized training

2  in terms of executing search and arrest warrants?

3  A.    Yes, sir.

4  Q.    Okay.  Is that training all here locally, or do you --

5  A.    We --

6  Q.    -- do you travel for that?

7  A.    We train here locally.  Sometimes we train down in

8  St. Johns County.

9  Q.    All right.  And I'm not going to go through your

10 background in any more detail than that.

11        But the task force that you're on, when it -- when it

12 obtains a person that needs to be apprehended, can you describe

13 the process in terms of do y'all get a folder or that type of

14 thing?

15 A.    Yes, sir.  There's a folder, and the case agent has the

16 folder, and he pretty much directs us where to go in reference

17 to the fugitive he's looking for.

18 Q.    Okay.  And are you familiar with a fugitive named Aaron

19 Richardson?

20 A.    Yes, sir.

21 Q.    And did you participate in an arrest of Mr. Richardson on

22 June 25th of 2013?

23 A.    Yes, sir.

24 Q.    Okay.  Do you have a recollection of seeing the folder

25 that y'all used during that arrest?

1    A.    Yes, sir.

2    Q.    And what was in that folder?

3    A.    They had a picture in it and a copy of the warrant.

4    Q.    Okay.  Did you actually review the warrant before making

5    that arrest?

6    A.    Well, the case agent mostly reviews the warrant.  We look

7    at the pictures for identification purposes.

8    Q.    Okay.  All right.  And tell us your recollection.  What

9    was your role that day on June 25th of 2013?

10   A.    I recall we met at the Gate station on Collins Road.  An

11   address was obtained at another location where we went, which

12   was an apartment complex.

13   Q.    Okay.  And who was the lead agent for this particular

14   apprehension?

15   A.    That would have been Agent Brock.

16   Q.    Okay.  And so that day what was your role supposed to be?

17   A.    My role then -- once we got to the complex and we decided

18   to go knock on the door, my role then was to act as the

19   breacher.

20   Q.    Okay.  And what does that mean, the breacher?

21   A.    A breacher is the one who, when the door is -- needs to be

22   opened, breached, we have breacher tools called rams that we

23   use to open the door.

24   Q.    Okay.  So did you have any discussions with the apartment

25   management that day, or were you being relayed information by

1   Task Force Officer Brock?

2   A.    Yeah.  I was relayed information by Task Force Officer

3   Brock.

4   Q.    And what did you understand at the point that you

5   proceeded up to Apartment 2519?

6   A.    When we proceeded up to the apartment, Brock advised us

7   that the way that the door was situated or whatever and the

8   maintenance guy tried to open it, couldn't open it, that the

9   way it was secured, that someone had to be inside the

10  apartment.

11  Q.    Okay.  And you had the knowledge of the prior police

12  report where Mr. Richardson had indicated that that was where

13  he was residing?

14  A.    Yes, sir.

15  Q.    Okay.  All right.  So tell us a little bit about standing

16  there at the door.

17         Once the maintenance man had told this -- relayed

18  this information to Task Force Officer Brock --

19  A.    Right.

20  Q.    -- and once he related it to the other members of the

21  team, tell us a little bit about how the entry was made.

22         What happened when you get to the front door of the

23  apartment?

24  A.    When we get to the front door of the apartment, Case Agent

25  Brock had advised me that this was the mom's apartment.  One of

1  the things I didn't want to do, I did not want to use the

2  breaching tool to take the door down because I know it can

3  cause damage.  I also know that sometimes the apartment complex

4  will make the tenant pay for it.

5       So as the breacher, what I'll do is I will try the

6  door, see if it's unlocked.  It was not.  And I made several

7  voice commands, "Please open the door.  I don't want to tear

8  your mother's door down."  And this went on for a little bit.

9  Q.   Okay.  So tell us a little bit about the length of time

10  you're standing at the door knocking and giving those voice

11  commands.

12  A.   Like I said, the first thing the breacher does is go up to

13  the door and he tries the handle.  It was locked, as I said, so

14  I knocked on the door repeatedly, "Open the door.  Aaron

15  Richardson, please open the door.  Open the door.  I don't want

16  to tear the door down.  Your mama will have to pay for this

17  door.  You know, open the door."  I kept knocking and knocking,

18  and he wouldn't open the door.

19  Q.   Okay.  And how loud were you saying the things that you

20  just told us about?

21  A.   Loud.  It was very loud.

22  Q.   Okay.  Based on your training and experience as a task

23  force officer on this fugitive apprehension team, what did that

24  indicate to you?

25       Having knowledge that you believed someone was

1  inside, you're knocking, hollering for him to come to the door.

2  Nobody comes to the door.

3          What did that do for your belief that --

4  A.   That lets --

5  Q.   -- somebody was inside?

6  A.   -- me know that the person inside is refusing to open the

7  door and is not going to cooperate with letting us in without

8  taking that door down.

9  Q.   Okay.  And you're the breacher.

10         Do you recall how you were dressed that day?

11 A.   Yes.  We had vests on that has U.S. Marshal strapped

12 across it.  We also wear the hats with the U.S. Marshal

13 insignia on top.  Then our thigh holster -- my thigh holster

14 also has a badge on it that says U.S. Marshals.

15 Q.   Okay.  And that tactical equipment, why are you wearing a

16 vest and a helmet like that?

17 A.   For protection purposes.

18 Q.   Okay.  You're familiar with the terms preliminary and

19 secondary sweep?

20 A.   Yes, sir.

21 Q.   Okay.  I'm going to talk about that in a moment.

22         So you're standing at the door.  You're yelling for

23 Mr. Richardson to come.  He doesn't come.

24         Do you make a decision to breach the door?

25 A.   Yes, sir.

1    Q.    And tell us how that happened.  What did you do?

2    A.    Well, after -- as I said, after repeatedly knocking and

3    asking him to open the door, it didn't happen, then I pretty

4    much look at -- I looked at Brock, and we pretty much -- you

5    know, it's like a head nod, just go ahead and just take the

6    door, and I took the door.

7    Q.    Okay.  And you use your --

8    A.    We used the ram to hit the door.  It -- what's kind of

9    peculiar about that incident, the whole door actually fell down

10   inside.

11   Q.    Okay.  Was that something that normally happens?

12   A.    No, sir.  That doesn't normally happen.

13   Q.    Okay.  All right.  So the door's down.

14         Do you immediately go into the apartment?

15   A.    No.  As the breacher, no.  When we take the door, no, we

16   step back and let the other guys go in first so we can secure

17   the ram and then I can get my gun out.

18   Q.    Okay.  Are you familiar with the term "breach and hold"?

19   A.    Yes.

20   Q.    Okay.  Is that what happened that day?

21   A.    Yeah, we breached the door.  Once that door fell inside,

22   we yelled, you know, "Come out.  Come out.  Come out."  And

23   like I said, we got no reply.

24   Q.    All right.  And you were on two-man teams that day?

25   A.    Well, all -- it was -- that day, all us up there, what we

1    do is when we stack up in a stack -- originally the two-man

2    teams, when the team begin to go in, we already know where one

3    person ahead of you go, the other person is following and go to

4    the opposite side of the room, they go.

5    Q.    Okay.   These phrases, preliminary and secondary sweep,

6    explain what that means and what you did that day.

7    A.    Okay.   On that particular day --

8         THE COURT:   Hasn't Agent Brock already done that?

9         MR. HEAVENER:   He has, Your Honor.

10        THE COURT:   Well, I don't see any reason for him to

11   repeat --

12        MR. HEAVENER:   All right.

13        THE COURT:   -- everything that Brock said.

14   BY MR. HEAVENER:

15   Q.    All right.   So did you do a preliminary sweep that day?

16   A.    Yes.

17   Q.    And what did you find when you got to the master bedroom

18   door?

19   A.    Well, we got to the master bedroom door, and it was

20   secured.   It was locked from inside.

21   Q.    Okay.   And were -- did y'all breach that door as well?

22   A.    Yes, we did.

23   Q.    Did you see anybody standing in the master bedroom?

24   A.    No, sir.

25   Q.    All right.   And so Detective -- or Agent Brock and

1    Detective Calhoun, they did the secondary sweep of other rooms

2    in the apartment?

3    A.    Yes.

4    Q.    Do you recall them -- either of them relaying information

5    that a gun had been found in one of the closets?

6    A.    Yes.

7    Q.    Okay.  And Mr. Richardson was apprehended through the use

8    of a K-9; is that right?

9    A.    That's correct.

10   Q.    Were you standing there when that happened?

11   A.    The K-9 officer went in himself with the dog.  You know,

12   you have to stand back, you know, at least six to -- or more

13   than six feet, six to eight feet, what have you.  And so when

14   he went in with the K-9, we were actually back outside the

15   door.

16   Q.    Okay.  And once the K-9 goes into the room, does it engage

17   Mr. Richardson?

18   A.    Yes.

19   Q.    Okay.  And were you able to effect an arrest at that

20   point?

21   A.    Yes, we were.

22   Q.    Now, in terms of the marshals team, there were four of you

23   there that day; is that right?

24   A.    Yes.

25   Q.    Okay.  And once Mr. Richardson was arrested, rescue was

1  called to treat his dog bite wounds?

2  A.    Yes.

3  Q.    Okay.  Did you accompany Mr. Richardson from the arrest

4  scene to the hospital?

5  A.    Yes, I did.

6  Q.    Okay.  And you were with him the whole time he was at the

7  hospital?

8  A.    Yes, I was.

9  Q.    And then you accompanied him from the hospital back to the

10 Jacksonville Sheriff's Office where he was interviewed by the

11 FBI?

12 A.    Yes, sir.

13 Q.    Okay.  Tell us about Mr. Richardson's demeanor.  After

14 he -- after you guys put -- after you and the task force

15 officers get him under control, put cuffs on him, tell us about

16 what his demeanor was like.

17 A.    Well, when we got him outside the bedroom, we sat him in a

18 chair so he could calm down, relax.  He was complaining of the

19 pain, whatever.  So we rendered first aid, even wrapped a

20 bandage around his arm.

21       I even gave -- he wanted a drink of water.  I went

22 into the kitchen, gave him a drink of water, trying to make him

23 as comfortable as possible.

24 Q.    Okay.  And how about at the hospital?  Do you recall being

25 with him at the hospital?

1  A.   Yes.  I was with him at the hospital.  He would ask me,

2  you know, several times "Am I going to be okay?" and I

3  reassured him he was fine, because you could look at the dog

4  bite.  It didn't seem severe at all.

5  Q.   Okay.  And do you have any specific recollections about

6  being there at the hospital with him in terms of his condition

7  versus other patients' conditions?

8  A.   Yes.  Mr. Richardson, like I said, he seemed to be very

9  dramatic about his injury.  Like I said, the bite wasn't that

10  severe at all.

11       We took him into x-ray, and he said he was in extreme

12  pain.  When they would try to move his arm over to get it

13  x-rayed, like I said, just really overdramatic.

14       When we were in the hall at Shands, he would call me

15  over and say is he going to be all right, and I told him

16  "You're going to be fine."

17       And this went on all the way up to the point we took

18  him over to the Jacksonville Sheriff's Office.

19  Q.   Okay.  And what are the protocols?  When a person you've

20  apprehended has been bitten by a dog or somehow suffers some

21  injury, you take them to the hospital.

22       Do you keep them at the hospital until a medical

23  doctor says it's okay to move them further?

24  A.   Yes.  What we normally -- like I said, he was taken in,

25  and what we'll normally do is stay with them.

1          Now, there are some cases where we will actually call

2    for a guard, but those are the cases being -- when it's not a

3    federal case.  So it being a federal case, then we stay with

4    him until he was able to go back over to 501.

5    Q.    And did you stay with him?

6    A.    Yes, sir, I did.

7    Q.    Did you speak with the medical personnel and ask them if

8    it was okay for you to transport him back to JSO?

9    A.    Yes.  We -- once they're x-rayed -- they get x-rays.  They

10   checked his blood pressure.  They did everything, and they

11   pretty much said he was fine.

12   Q.    Okay.  And when I say JSO, that's something we use here

13   locally.  That's Jacksonville Sheriff's Office?

14   A.    Yes, the Jacksonville Sheriff's Office.

15   Q.    Okay.  All right.  And then did you -- you did transport

16   him back to the -- I think the robbery section of the sheriff's

17   office?

18   A.    Yes.

19   Q.    And you actually -- you've seen a video of -- the

20   beginning at least of a video of the interview of

21   Mr. Richardson?

22   A.    Yes.

23   Q.    And you're actually depicted on that video; is that right?

24   A.    Yes.

25   Q.    Okay.  All right.  The clothing you're wearing on that

1  video, was that the way you were dressed when the arrest took

2  place?

3  A.    Yes, sir.

4  Q.    Okay.

5          MR. HEAVENER:  Nothing further, Your Honor.

6          THE COURT:  Mr. Ossick?

7                      CROSS-EXAMINATION

8  BY MR. OSSICK:

9  Q.    Agent Pinckney, who were you partnered with that day?

10  A.    We were -- it's not so much of a partnership.  When we

11  line up together as a team, we all are partners.  It's just one

12  team.

13  Q.    That was probably a poor question.

14          Do the two of you kind of work together when you go

15  into rooms?

16  A.    We all work together, yes.

17  Q.    Not two groups of two?  All four go in the same room?

18  A.    Well, like I said, how it works is basically when we line

19  up on a door -- like I explained earlier, we have training.  We

20  line up on a door.  We don't necessarily say, "Okay.  I'm your

21  partner.  You line up here.  You line up there."

22          We're trained in the way we -- it doesn't matter how

23  you line up, once you make entry, when that first guy goes in

24  one direction, that second guy will follow him.  When the third

25  guy goes in one direction, that fourth guy will follow him.

1    Q.    All right.

2    A.    Okay.

3    Q.    Okay.  I didn't mean to cut you off.

4          Were you in the room when Officer Calhoun saw the

5    rifle?

6    A.    I don't recall being in the room when Officer Calhoun

7    found the rifle, no.

8    Q.    I'm sorry.  I did not hear you.

9    A.    No.  I do not -- I don't recall being in the room when

10   Officer Calhoun found the rifle, no.

11   Q.    Okay.  Did you hear him say anything about the rifle?

12   A.    Yes.  We were told that a weapon was found, yes.

13   Q.    Did you see anyone move the weapon from anywhere?

14   A.    No.

15   Q.    Had anybody told you anything about who in the family

16   played what musical instrument before the breach?

17   A.    No.

18   Q.    Had anybody told you who, if anyone, lived in any

19   particular room in the apartment --

20   A.    No.

21   Q.    -- before the breach?

22         Had you heard any discussion about Mr. Richardson's

23   employment hours?

24   A.    No.

25   Q.    Were you told how many people were in the family?

1    A.    No.

2    Q.    Did you hear any questioning of Mr. Richardson by anyone

3    at the scene?

4    A.    I'm sorry.  Did I hear any questioning about

5    Mr. Richardson?

6    Q.    Did you hear any questioning of Mr. Richardson by any law

7    enforcement person at the scene that day?

8    A.    At the scene did I hear any questioning?

9    Q.    Yeah.

10   A.    Once we got him in custody?

11   Q.    At the scene.  I'm talking about at the apartment.

12   A.    Okay.  At the -- well, at the apartment, now, when we got

13   him in custody, we took him -- I was with him all the way till

14   he got through with rescue, all the way till we got to Shands.

15   Q.    Okay.

16   A.    The FBI was notified, and they came out to Shands

17   Hospital --

18   Q.    Okay.

19   A.    -- or UF Health, whatever it's called these --

20   Q.    My question is, did you hear Mr. Richardson questioned at

21   the scene that day of the arrest?

22   A.    No.  I didn't -- basically -- when you say questioning, we

23   were making sure he was okay, first aid, "What do you need?"

24   Like I say, I gave him a glass of water, so what kind of

25   questions are you talking about?

1  Q.   Well, any questioning about what he was doing there, what

2  he had done, the rifle, anything of that nature?

3  A.   No.  No one -- sir, no one questioned him about the rifle.

4        Like I said, Mr. Richardson was saying he was in a

5  lot of pain.  We put a bandage on him and secured him.

6        And like I said, he was a little dramatic.  I mean, I

7  didn't -- I don't have his -- basically his feelings, but he

8  was saying he was in a lot of pain, so we made him as

9  comfortable as possible.  We sat him down in a seat, and

10 literally I, you know, helped carry him down the steps.

11 Q.   I think there's a 10A in front of you, which is a diagram.

12       Would you tell me which room you sat him on the seat

13 in?

14       MR. OSSICK:  10A, am I right about that?

15       MR. HEAVENER:  Yes.

16 BY MR. OSSICK:

17 Q.   In that book there's a 10A.

18 A.   This book here?

19 Q.   It's a diagram of the apartment.

20 A.   Right.

21 Q.   It looks like the apartment you were in that day.

22       If you could tell us where you -- where you placed

23 Mr. Richardson, as you have described --

24 A.   Okay.

25 Q.   -- in your testimony.

1   A.   Let me look at this.

2   Q.   Yeah.

3   A.   Okay.  This living room area that's on this paper, in the

4   living room area, that's where we sat him in a chair.

5   Q.   All right.  And do you know where the chair came from, or

6   was it already there?

7   A.   I believe it was already there.

8   Q.   Okay.  And you indicated that you felt Mr. Richardson

9   wasn't being very realistic about the extent of his injuries?

10  A.   I -- well, I -- sir, I don't know how he felt.  It just

11  seemed, looking at the bite -- in my career I've seen some

12  serious bites.  The bite didn't look serious at all, so it

13  seemed like he was being overly -- you know, a little

14  overdramatic.

15          Like I said, it didn't bleed much or anything, but we

16  bandaged it up.  We called rescue.  Rescue cleared him, but we

17  took him to the hospital anyway.

18  Q.   Okay.  What time did you get to the apartment that day,

19  best recollection?

20  A.   I don't recall the time.

21  Q.   Do you know about how long you were at the apartment

22  complex before the breach occurred?

23  A.   No.  We'd -- like I said, we'd have to review the reports

24  and everything.

25          And it's not that I'm not trying to be cooperative or

1    anything, we do this all the time, so we may hit three or four

2    locations in one day.

3              MR. OSSICK:  No more questions.  Thank you.

4              THE COURT:  Any redirect?

5              MR. HEAVENER:  No, Your Honor.

6              THE COURT:  Can he be excused?

7              MR. HEAVENER:  He may, yes.

8              MR. OSSICK:  Yes.

9              THE COURT:  You may be excused.

10             THE WITNESS:  All right.

11        (Witness excused.)

12             THE COURT:  Who's your next witness?

13             MR. DEVEREAUX:  Jacksonville Sheriff's Officer Wes

14   Bowen.

15             THE COURT:  Bold?

16             MR. DEVEREAUX:  Bowen, B-o-w-e-n.

17             THE COURT:  If you'd come forward, please, Officer

18   Bowen, and have a seat in the witness stand up here.

19             You may proceed.

20      OFFICER KENNETH "WES" BOWEN, GOVERNMENT'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22   BY MR. DEVEREAUX:

23   Q.   Sir, would you please state your name.

24   A.   It's Kenneth Bowen.

25   Q.   And the spelling of your last name?

```
 1    A.    B-o-w-e-n.

 2    Q.    And your occupation, sir?

 3    A.    I'm a police dog handler with the Jacksonville Sheriff's

 4    Office.

 5    Q.    And how long have you been with the Jacksonville Sheriff's

 6    Office?

 7    A.    Just short of 19 years as a policeman, and I've been in

 8    the K-9 unit for 13 years.

 9    Q.    And in the K-9 unit -- we've had some nonmarshals, deputy

10    marshals, testify here today saying that they're a member of a

11    fugitive task force that the Marshals Service has here in

12    Jacksonville.

13              Are you aware of that fugitive task force?

14    A.    Yes, sir.

15    Q.    Are you a member of that?

16    A.    No, sir.

17    Q.    Do you work with them, those individuals that are members

18    of the Jacksonville U.S. Marshals fugitive task force?

19    A.    Yes, quite frequently.

20    Q.    And why is that?

21    A.    The -- part of our jobs sort of overlap.  I assist them on

22    perimeters usually, and I even occasionally work a few fugitive

23    cases when I -- in my spare time.

24    Q.    And do you train with them?

25    A.    Yes, sir.
```

1  Q.   I'd like to direct your attention to a specific date, that

2  being Tuesday, the 25th of June of 2013.

3         And on that date do you recall whether or not you

4  worked with the Jacksonville Sheriff's Office -- excuse me, the

5  Jacksonville Marshals Service's task force?

6  A.   Yes.

7  Q.   And in what capacity?

8  A.   I was assisting them in locating a wanted subject named

9  Aaron Richardson.

10 Q.   And do you recall -- you stated that you have worked with

11 them in training sessions and then actually out in the field,

12 I'll call it, correct?

13 A.   Yes.  Yes, sir.

14 Q.   And do you recall on this occasion where you met up with

15 the task force?

16        If you're not a member of that task force, I would

17 assume your duties call you to be in different locations at

18 different times?

19 A.   Yes.  We met over at a Gate station on Collins Road.

20 Q.   All right.  And was this before or after going to an

21 apartment complex -- I'm not going to go through everything,

22 but we know there's an apartment complex on Collins Road.

23 A.   It was before.

24 Q.   It was before.

25        And what was the purpose of meeting, and who did you

1    meet with?

2    A.    Members of the task force.  There were several deputy U.S.

3    marshals there, several task force officers from other

4    agencies.

5          We briefed basically on the layout of the target

6    apartment and assignments that we were -- each person would

7    have a different assignment.  So we just kind of got a plan

8    together before going over there.

9    Q.    And I would assume you got there by --

10   A.    We drove.

11   Q.    You drove there?

12         And your partner is two-legged or four-legged?

13   A.    He's four-legged.

14   Q.    And did you bring your partner?

15   A.    Yes, sir.

16   Q.    And the name of your K-9?

17   A.    Justice.

18   Q.    And that dog, did it accompany you to the apartment

19   complex that day?

20   A.    Yes, sir.

21   Q.    And were you assigned a specific task?

22   A.    Yes, sir.

23   Q.    Do you recall what it was?

24   A.    During the initial phase of the arrest part of the

25   operation, I was assigned to cover the rear of the apartment

1  building.  So I took Justice on leash to the back of the

2  apartment building to ensure that nobody fled out the

3  third-floor balcony.

4  Q.   Okay.  Did you understand that the -- I guess if we call

5  it the target apartment was on the third floor of this

6  apartment complex?

7  A.   Yes.

8  Q.   Directing your attention to the notebook in front of

9  you -- we've been having some technical difficulties this

10  morning.  There is a notebook there, and if you could look at

11  tab 5F and 5G.  And the judge has the same notebook in front of

12  him, and it's two photographs.

13         And once you get to those, F and G, if you can tell

14  us if you can recognize what those photographs depict.

15  A.   They depict the rear of the target apartment.

16  Q.   And was that -- you indicated that you were assigned, I

17  guess, the out-back perimeter to ensure that no one left --

18  A.   Yes, sir.

19  Q.   -- the third floor?

20  A.   Yes, sir.

21  Q.   And do you recall, when you went to that location, did you

22  notice anything -- did you know specifically, when you're in

23  the back looking at, you know, this -- the pictures that we

24  have, did you know which windows were, I guess, for the target

25  apartment?

1  A.    Yes.

2  Q.    And did you look at those windows?  Was there something

3  you were noticing during your time behind that apartment

4  complex?

5  A.    Yes.  The blinds were closed, but I noticed that the

6  blinds were kind of rhythmically moving.  In my opinion, it was

7  like somebody had a ceiling fan on inside the apartment.  I

8  could see --

9  Q.    And --

10  A.    -- the blinds moving.

11  Q.    And these blinds, what type of blinds would these be?

12  A.    They were vertical blinds.

13  Q.    All right.  And from your experience, does that -- did

14  that leave you with any concerns?

15  A.    Yeah.  It appeared to me that somebody would have been

16  inside if the ceiling fans were on.

17  Q.    And did you make any notification of that fact to any

18  other members of the marshals fugitive task force?

19  A.    Yeah.  I told them via radio that I could see the blinds

20  moving.

21  Q.    All right.  Once you positioned yourself behind this

22  complex that's three stories high -- were there multiple

23  buildings?

24  A.    Yes, sir.

25  Q.    All right.  But you're looking at specifically one

1  building and actually one unit on the third floor.

2  A.    Yes, sir.

3  Q.    All right.  Do you recall, was it daytime, nighttime?

4  A.    Daytime.

5  Q.    Do you recall approximately when, sir?

6  A.    It was sometime, I guess, between lunch and the time I get

7  off around 4 o'clock.

8  Q.    All right.  And what -- do you recall how long you were

9  back there?

10  A.    I would say it was probably 15 or 20 minutes.

11  Q.    And was it fairly early on you indicated that you made a

12  radio transmission about the blinds at least moving and what

13  your belief was because of that.  Correct?

14  A.    Yes.  It was fairly early on.

15  Q.    And did there come a point in time when your assistance

16  was requested?

17  A.    Yes.

18  Q.    And what were you asked to do and what occurred?

19  A.    I responded to the -- to the front door of the apartment

20  and was advised by some of the task force members that they

21  believed that somebody was inside the apartment and possibly

22  had climbed up into the attic, because they had conducted a

23  search for the target subject, Mr. Richardson, and weren't able

24  to locate him.  And the only spot they believed he could have

25  been was possibly he entered the attic.

1    Q.    All right.  And so what action did you take at that time,

2    sir?

3    A.    I got to the -- to a rear bedroom and was advised that

4    that door had been locked and they had forced it open, further

5    leading me to believe that if somebody was in that apartment,

6    they were probably in that room.

7               So I gave a verbal K-9 announcement and --

8    Q.    Okay.  And did you have -- your K-9 accompanied you?

9    A.    Yes, sir.

10   Q.    All right.  And when you make this announcement, are

11   there -- the other task force officers, are they next to you,

12   standing next to you?

13   A.    Yes.

14   Q.    Even with your K-9?

15   A.    Yes.  I have him on leash and I have a good hold of him,

16   and then they're kind of covering me while I'm giving the

17   announcement.

18   Q.    All right.  And what's the nature of the announcement you

19   make?  Is it something that's standard in your protocol?

20   A.    Yes, sir.  It's "Police K-9.  Come out now or I'll release

21   my dog and he'll bite you."

22   Q.    And did you make that statement in a loud voice or in a

23   low voice?

24   A.    A loud voice.

25   Q.    And did you make it on more than one occasion?

1  A.    Yes, sir.

2  Q.    Did you wait any period of time?  Is there a standard

3  period of time, or is this up to your discretion under the

4  circumstances?

5  A.    It's up to my discretion, but I wait a significant -- or a

6  sufficient amount of time where if somebody did voice back

7  their intention to surrender, I'd be able to hear them.

8  Q.    Do you recall on that date approximately how many times

9  you made yourself known, that you would release your K-9 if the

10  individual within that room didn't identify themselves?

11  A.    It was twice.

12  Q.    And do you recall approximately how many -- how much time

13  elapsed, sir?

14  A.    Total between the -- both announcements and my pause for

15  waiting on a response, I would say it was probably 30 seconds.

16  Q.    And when -- before you decided to let your dog in there --

17  I mean, we've had, all through the news, different types of

18  situations where K-9s actually get killed, and so I would

19  assume you're concerned also about your K-9, correct?

20  A.    Yes.

21  Q.    Now --

22  A.    Potential for an ambush is always there.

23  Q.    -- when you were looking into the room, were there

24  certain -- was there anything, I guess, pointed out to you in

25  connection with the ceiling that you were concerned about?

1   A.   Yes.  They -- I'd been advised that the attic access was

2   located in a closet.  I couldn't see all the way into the

3   closet from where I was, so my intention was to let the dog go

4   search that area.

5          And if somebody had, in fact, climbed into the attic

6   access, my hope would be that the dog would indicate that the

7   person was hiding there.

8   Q.   When we're talking -- when we talk about the time, we're

9   talking June of 2013.

10          Was there something that you were aware of that had

11   happened in connection with an attic access and a fugitive

12   being apprehended at that time?

13   A.   Yes.  There was a K-9 handler and a U.S. marshal that were

14   killed in Tampa by a subject that was in the attic.

15   Q.   And based upon -- I mean, was that fairly near that time

16   frame?

17   A.   Yes.

18   Q.   And so that was in your mind when you're being told that

19   this individual could be up in the attic?

20   A.   Yes.  Also -- also we had trained.  We have discussed many

21   times in briefings and actually have trained since that

22   incident that we -- we're not going to go up in attics or get

23   near the attic access, if possible.

24   Q.   All right.  So if the dog had just barked, then, at the

25   attic hole, if we call it, the ceiling entry point, what would

1  you have done then?

2  A.    I would have recalled the dog and then advised them I had

3  a positive indication, and then I would have let them make the

4  decision, but I would have advised that we call the JSO SWAT

5  team.

6  Q.    All right.  Now, then, you said you released your dog, and

7  what occurred?

8  A.    Justice entered the -- he was still on leash.  I just

9  dropped the leash.  He went up into the closet, and my thought

10  was that he would begin searching up high.

11        He immediately plunged into a bunch of clothing and

12  shoes that were on the left side of the closet as I faced into

13  it.  He plunged deep in there and started rooting around.  And

14  then I saw him come up with -- he had an arm in his mouth.

15  Q.    And at that point in time, what action did you take?

16  A.    Well, I froze for a brief second wondering why the person

17  that he had ahold of wasn't yelling, and almost simultaneously

18  the person later identified as Mr. Richardson stood up out of

19  all the clothes and started screaming and yelling that the dog

20  had him.

21        So I ordered Mr. Richardson to come towards me,

22  towards the entrance of the room.  He complied with all of my

23  commands.  And I told him to lay down.  I could see that he had

24  nothing in his hands.  So I approached him, took control of the

25  dog, and ordered the dog to release.

1  Q.    All right.  So while Mr. Richardson is -- I guess was --

2  from your understanding, was he hiding under those clothes?

3  A.    Yes, sir.

4  Q.    And your dog found him.

5  A.    Yes, sir.

6  Q.    And when Mr. Richardson jumps up, is the dog on his arm?

7  A.    Yes, sir.

8  Q.    And then you ended up having the dog release him.

9  A.    Yes.

10 Q.    After that occurred was there any kind of basic medical

11 care provided to Mr. Richardson?

12 A.    Yes.  We requested rescue, and actually one of the

13 officers actually -- one of the law enforcement personnel at

14 the scene actually wrapped his arm up.

15 Q.    And was he made to stand, or what was his situation before

16 being transported from that scene?

17 A.    We -- we put him in a chair.  He was handcuffed in the

18 front.  We put him in a chair in the living room, and Detective

19 Pinckney got him some water.

20 Q.    Now, sir, you have -- you actually wrote a report

21 regarding this K-9 incident, correct?

22 A.    Yes, sir.

23 Q.    Is that standard operating procedure for you?

24 A.    Yes, sir.

25            MR. DEVEREAUX:  And that's actually been offered and

1  accepted into court here.  It's Exhibit No. 4, Your Honor.

2  BY MR. DEVEREAUX:

3  Q.    And in that report, on the second page, it has some

4  information -- it provides some information stating, quote --

5  and if you look -- if you want to refer to it yourself,

6  Officer, it's behind tab -- should be behind tab 4.

7  A.    Okay.  I have it.

8  Q.    And on the second page, sir -- is that two-page document,

9  was that created by yourself?

10  A.    Yes, sir.

11  Q.    And on the end, at the -- on the paragraph that says, "I

12  spoke with the suspect, who advised me that he had hid in the

13  closet because he was scared.  He did acknowledge that he heard

14  my K-9 announcement but he was too scared to surrender," did

15  you -- other than, I guess, talking to Mr. Richardson about

16  just that incident that's reflected here in your report, did

17  you interview him in any way?

18  A.    No.

19  Q.    You didn't question him about anything that was found or

20  not found within the apartment?

21  A.    No, sir.

22  Q.    All right.  Did there come a point in time that -- I guess

23  it would -- Jacksonville rescue came?  Was it the Jacksonville

24  fire department rescue?

25  A.    Yes, sir.

1  Q.   And did they come upon the scene and take Mr. Richardson
2  away?
3  A.   Yes.
4  Q.   At that time -- is there another standard operating
5  procedure in connection with your department's procedures
6  whenever there is a K-9 bite?
7  A.   Yes.  They -- the person that's bitten by the dog needs to
8  be photographed by a street supervisor.
9  Q.   And that street supervisor, would that be a rank generally
10 of a sergeant?
11 A.   Yes, sir.
12 Q.   And in this instance did that occur?
13 A.   Yes.
14 Q.   And directing your attention to -- if we look at
15 Government's Exhibits 21A and 21B, so it's going to be pretty
16 close to the end of your stack there, sir.
17 A.   Okay.  I have them.
18 Q.   All right.  Those photographs, did you, in fact, provide
19 those to, in fact, myself and to Mr. Heavener?
20 A.   Yes.
21 Q.   And those photographs, the two that we have here, 21A and
22 21B, who are those photographs of?
23 A.   Mr. Richardson.
24 Q.   And do you see Mr. Richardson in this courtroom today?
25 A.   Yes.

1    Q.    And can you identify him?

2    A.    He's the gentleman at the table to my left in the glasses

3    and the red shirt.

4    Q.    Thank you.

5          The photograph that you have as 21B, did you actually

6    take that, or did your sergeant take that?

7    A.    A street sergeant took it.

8    Q.    And when you look at that photograph -- I have just a

9    thumbnail of it in front of me, but if you look at that, do you

10   see any injury on the face, on the head of Mr. Richardson?

11   A.    Yes.

12   Q.    What do you see?

13   A.    I see a crescent-shaped wound above his right eyebrow.

14   Q.    And from your time and experience with law enforcement,

15   seeing a crescent over an eye like that, over a right eye, do

16   you have any, I guess, reason to suspect what that would be

17   from?

18   A.    My suspicion is that it was -- he got his head too close

19   to a scope, and the scope -- we call that getting kissed by the

20   scope.

21   Q.    Have you seen that before?

22   A.    Yes.

23   Q.    And does that look identical to the different cuts or the

24   kiss from the scope that you've seen in your career?

25   A.    Yes.

1   Q.   But you didn't ask him anything about that, did you?

2   A.   No, sir.

3           MR. DEVEREAUX:   Thank you very much, Your Honor.

4           THE COURT:   Mr. Ossick?

5                       CROSS-EXAMINATION

6   BY MR. OSSICK:

7   Q.   Did you discuss with anyone your conclusion about the

8   scope bite or I think you said scope kiss?

9   A.   Not initially.

10  Q.   When did you?

11  A.   Several days later, after I discovered that he was

12  possibly being looked at as a suspect in that case, I looked

13  back at my photos and saw it and said, "Oh, that must be what

14  it is."

15  Q.   Okay.  So nothing that day.

16  A.   No, sir.

17          MR. OSSICK:   That's all.  Thank you.

18          THE WITNESS:   Thank you, sir.

19          THE COURT:   May this witness be excused?

20          MR. DEVEREAUX:   Yes, sir.

21          THE COURT:   Any redirect?

22          MR. DEVEREAUX:   No, sir.

23          THE COURT:   May he be excused?

24          MR. DEVEREAUX:   Yes, sir.

25          THE COURT:   Officer Bowen, you may be excused.

1        THE WITNESS:  Thank you, sir.

2     (Witness excused.)

3        THE COURT:  Call your next witness.

4        MR. DEVEREAUX:  United States calls FBI Special Agent

5  Steven Burros.

6        THE COURT:  Burroughs?

7        MR. DEVEREAUX:  Burros, B-u-r-r-o-s, Your Honor.

8        THE COURT:  Agent Burros, if you can come have a seat

9  at the witness stand, please.

10        THE WITNESS:  Yes, sir.

11        THE COURT:  You may proceed.

12     SPECIAL AGENT STEVEN BURROS, GOVERNMENT'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14  BY MR. DEVEREAUX:

15  Q.   Would you please state your full name.

16  A.   Steve Burros.

17  Q.   And your occupation?

18  A.   I'm a special agent with the FBI.

19  Q.   And currently your position within the FBI?

20  A.   Supervisory special agent.

21  Q.   I'd like to direct your attention back to the 25th -- it's

22  a Tuesday, the 25th of June, 2013.

23  A.   Yes, sir.

24  Q.   And do you recall whether or not you were assigned here in

25  Jacksonville at that date?

1    A.    Yes, sir, I was.

2    Q.    And do you recall what your attention was regarding that

3    date, what your attention and your duties were calling you to

4    perform?

5    A.    Yes, sir.

6    Q.    And what was that?

7    A.    We were to go assist at Collins Avenue at an apartment

8    complex.

9    Q.    And what was that in connection with, Special Agent?

10   A.    The judge shooting case.

11   Q.    And were you assigned to that case --

12   A.    Yes.

13   Q.    -- at that point in time?

14   A.    I was assigned -- I wasn't the lead agent, but I was the

15   one helping out, yes, sir.

16   Q.    Would it be fair to say that the entire FBI office here in

17   Jacksonville was probably directing their attention towards

18   that at that time?

19   A.    Yes, sir, they were.

20   Q.    All right.  That Tuesday, would it be fair to say that

21   that was fairly early on in the investigation?

22   A.    Yes, sir.

23   Q.    All right.  You indicated that you were responding to a

24   specific apartment complex.

25              Why was that and how did that come about?

1   A.    There was a subject of interest that they were looking to

2   have interviewed, but then we found out that there was an

3   arrest taking place, that the marshals had served a warrant --

4   Q.    All right.

5   A.    -- and we went there to assist.

6   Q.    If I back up just a moment, you said there was a person of

7   interest?

8   A.    Yes, sir.

9   Q.    On that Tuesday were you part of, I guess, the law

10  enforcement team that was, I guess, involved in investigating

11  the shooting or attempted assassination of Judge Corrigan?

12  A.    Yes.

13  Q.    And how was that proceeding?  Can you tell us basically

14  what type of investigative activities were occurring that

15  Tuesday?

16  A.    We were -- there was people scattered everywhere.  We were

17  conducting interviews, following up with -- just trying to find

18  certain people and interview them.

19  Q.    Was there any, I guess, attempt to identify persons --

20  we've heard that many times on TV, if we just watch the news,

21  that there would be a person of interest, and you used that

22  term yourself.

23  A.    Uh-huh.

24  Q.    In this situation on that day, on Tuesday, the 25th of

25  June, if we turn the clock back, how many people of interest

1    were there, and how was that somewhat identified?

2           Do you recall?

3    A.    I wasn't part of that part of it.

4    Q.    Okay.

5    A.    Those -- we had a command post set up, and all those were

6    identified.  And then they were giving out packages of people

7    with their names and their criminal histories, and we would go

8    out and interview.  I was part of interview teams --

9    Q.    All right.

10   A.    -- that were setting out to go out and do interviews.

11   Q.    All right.  So the command post is delegating to interview

12   teams, and you were on one of many interview teams?

13   A.    Yes, sir.

14   Q.    All right.  And so on this occasion, then, you're then

15   tasked by the command post to report to this Collins Road

16   apartment?

17   A.    Yes, sir, to some degree.  I'm not sure if it was the

18   command post that actually called us, but we would have been

19   covering all kinds of leads that day.  And I believe that this

20   came up as one of the addresses, and then we started responding

21   to that address.

22   Q.    At the time that you're responding, what's your

23   understanding, if any, in connection with Mr. Aaron

24   Richardson's status at that time?  Did you know whether or not

25   he was on the lam, a fugitive, if he's arrested?  What was your

1  understanding?

2  A.    At the time I knew that he was a subject of interest and

3  that he had a local warrant that they had just served.

4  Q.    And when you say had just served, had -- did you know,

5  then -- when you're in your vehicle proceeding to Collins Road,

6  the apartment complex, did you know, in fact, that he had been

7  arrested?

8  A.    Yes.

9  Q.    All right.  So who -- who did you go with, if anyone?

10  A.    I went with Special Agent Bill Logan.

11  Q.    And that's the agent sitting here that's the case agent?

12  A.    Yes, sir.

13  Q.    And when you arrived at that location, do you recall

14  approximately when -- and if you could just somewhat describe

15  the atmosphere for us.

16  A.    It was -- it was still during the daytime.  It was

17  daylight.

18  Q.    All right.

19  A.    When we had showed up, there was a couple of marshals and

20  task force members that were there that met us.  We saw them in

21  the parking lot, and we spoke to them, and then they briefly

22  told us what they had.

23  Q.    All right.  And who did you -- who did you speak with,

24  people of the marshals task force?

25  A.    Yes, sir.

1  Q.    And who were you with at that time?  Was Special Agent
2  Logan with you?
3  A.    Yes, sir.
4  Q.    We understand that Mr. Richardson had been taken into
5  custody and at some point was transported by Jacksonville Fire
6  & Rescue to a local hospital.
7          At the time that you arrived with Special Agent
8  Logan, had Mr. Richardson already departed, or was he still
9  there?
10 A.    He had already departed.
11 Q.    And when you arrived there, what action, if any, did you
12 take, after being -- other than just learning what had
13 transpired?
14 A.    We basically asked them what they had, if they saw
15 anything of interest.  They advised us, when they did the
16 protective sweep, some things that they saw that were
17 interesting.
18          We then waited for the mother of Mr. Richardson to
19 arrive to ask for consent.
20 Q.    Okay.  So let me ask this.  Now, you've got the apartment
21 complex.
22          Do you recall what -- there were -- we understand
23 there are three stories.
24 A.    Yes, sir.
25 Q.    Do you recall what floor or story this target apartment

1    was --

2    A.   I believe they were on the third floor.

3    Q.   And did you enter that apartment even before

4    Ms. Richardson appeared?

5    A.   No, sir.

6    Q.   So -- and did Mr. Logan or Agent Logan?

7    A.   I don't believe so.

8    Q.   All right.  And so you waited.

9         Why were you -- did you know that Ms. Richardson, the

10   defendant's mother, was on her way?

11   A.   Yes.  We had heard that she was already en route and on

12   the way.

13   Q.   You had learned that from someone.

14   A.   Yes.

15   Q.   All right.  So did you, in fact, at some point in time

16   come in contact with Ms. Richardson?

17   A.   Yes.

18   Q.   And where was that?

19   A.   In the parking lot.

20   Q.   Can you describe how she got there?

21   A.   She pulled up in a car.

22   Q.   And was she with anyone?

23   A.   Her daughter.

24   Q.   And is this an adult daughter, or is this a minor

25   daughter?

1  A.    I believe she -- I believe her to be an adult daughter.

2  Q.    All right.  And did you speak with Ms. Richardson?

3  A.    Yes.

4  Q.    Was anyone with you?

5  A.    Special Agent Logan.

6  Q.    And when you spoke with Ms. Richardson, what

7  information -- what were you doing?  Can you tell us what was

8  said so I'm not putting words in your mouth at all?  Just tell

9  us what you recall, from that date, happening.

10  A.    It was myself, Special Agent Logan, and one of the task

11  force members on the marshals task force.  I believe it was

12  Detective Calhoun.  We were all three present.

13         We basically explained to her that Mr. Richardson was

14  taken into custody --

15  Q.    Is this -- is this in the parking lot?

16  A.    Yes, in the parking lot by the cars.

17  Q.    Okay.

18  A.    Explained that her -- Mr. Richardson was taken into

19  custody and that there was a rifle that was found in the

20  bedroom.

21  Q.    Okay.  When you told that to Ms. Richardson, did she have

22  a reaction?

23  A.    She was surprised.

24  Q.    And how do you -- when you say here today testifying

25  two-and-a-half years later -- when you say she was surprised,

1  why are you saying that?

2  A.   Just by her actions and demeanor, and then she basically

3  advised that she didn't believe that there was any guns in the

4  residence.

5  Q.   All right.  And so at that point in time, can you tell us

6  what her demeanor was?  I mean, you've just told her that her

7  son has been arrested, and there's a -- there was a -- did you

8  tell her what type of weapon that was found, that it was either

9  a handgun or a rifle?

10 A.   That it was a rifle.

11 Q.   And what did she tell you about that?

12 A.   That she didn't know anything about the rifle, that -- how

13 it got there or why it was even in her apartment.

14 Q.   All right.  Did you tell -- did you identify yourself just

15 verbally, or did you actually show your credentials?

16 A.   We showed our credentials and told her who we were.

17 Q.   And did you tell her why you were there?

18 A.   Yes, that -- to take him into custody, and then we

19 asked -- we actually asked to speak -- well, when we spoke with

20 her, we asked if we could actually search that room.

21 Q.   And when you say that room, what room are you talking

22 about?

23 A.   His room, Mr. Richardson's room.

24 Q.   All right.  Now, we end up -- we've got a drawing that is

25 Government Exhibit No. 10 -- I think it should be behind tab 10

1  that's in front of you -- that we're all using as our diagram

2  of that apartment complex.

3  A.    Okay.

4  Q.    All right.  Now, you just stated that you had asked

5  permission to search -- was it a room, or can you recall, what

6  were you asking permission to search when you're speaking with

7  Ms. Richardson?

8  A.    It was the first bedroom on the right --

9  Q.    All right.

10  A.    -- as you went inside the door.

11  Q.    All right.  Now, you had -- you tell us that before she

12  got there, you had never gone into the apartment, correct?

13  A.    Correct.

14  Q.    Did you talk to Ms. Richardson?  Did you explain to her,

15  from your understanding -- and I know at that point it would

16  have been hearsay.

17        Somebody told you where they found a rifle, correct?

18  A.    Correct.

19  Q.    All right.  Now, did you relay that information to

20  Ms. Richardson?

21  A.    Yes.  We were there with the marshal task force who was

22  there who saw it.

23        And I may be mistaken.  I may -- we may have -- he

24  may have showed us the weapon, the way it was laid out on the

25  bed, where he was arrested and everything else, and these were

1    the items that -- that they saw.  We may have gone in.  I'm not

2    100 percent on that.

3    Q.    Okay.

4    A.    But he may have actually showed it to us prior to her

5    getting there --

6    Q.    Okay.

7    A.    -- and then we explained to her that this is where the

8    items were, and there was an item that was on the bed.

9    Q.    All right.  Did Ms. Richardson give you any idea of --

10   first, did Ms. Richardson state or relay to you in any way that

11   the apartment that is the target apartment, 2519, on the third

12   floor of that building on Collins Road, that that was her

13   apartment?

14   A.    She did.

15   Q.    How did you know that she knew that that was her

16   apartment?

17   A.    Because --

18   Q.    Or not that she knew, but how did you know you're talking

19   to the right person, that it's not somebody else just saying,

20   "Yeah, that's my apartment"?  How did you know?

21   A.    She identified herself as Ms. Richardson and Aaron's

22   mother.

23   Q.    All right.  And from there she did indicate that that was

24   her apartment?

25   A.    She said that that is her apartment, in her name and her

1  name only --

2  Q.   All right.

3  A.   -- and that she basically had the only key to that

4  apartment.

5  Q.   All right.  I'm certain it would be, if not impossible,

6  virtually impossible to relate chronologically exactly what was

7  said exactly when two-and-a-half years later, correct?

8  A.   Correct.

9  Q.   All right.  But if we just, then, first limit ourself to

10  information regarding Ms. Richardson's connection to that

11  apartment, can you tell us what information she gave you that

12  would lead you to believe that, yes, in fact, it was

13  Ms. Richardson, the woman that you were speaking to, that had

14  driven up and identified herself as Ms. Richardson, as

15  Mr. Aaron Richardson's mother, that that was her apartment?

16  What are the facts she told you?

17  A.   That she moved into that apartment after, I guess, her

18  other residence was in foreclosure and that she had obtained

19  that apartment for her and her sons and that she had actually

20  moved in there.

21       She had actually moved all of Aaron's belongings, set

22  up the bedroom for him, put his clothes in the closet, blew up

23  the air mattress --

24  Q.   When you say --

25  A.   -- set up the furniture.

1  Q.   I'm sorry to have interrupted you, but when you say moved

2  it, moved --

3  A.   Moved it from the other house that they had -- I believe

4  it was off of Marsala Drive -- to that apartment.

5  Q.   All right.  So Mom moved the defendant's items, clothing.

6  A.   Clothing.

7  Q.   Furniture?

8  A.   Furniture.

9  Q.   Anything else in the room?

10 A.   There was an air mattress that she had that she had blew

11 up --

12 Q.   All right.

13 A.   -- that she said set up for him.

14 Q.   Did she tell you, once she moved the furniture from the

15 Marsala address that's in foreclosure to this third-floor

16 apartment, who, I guess, placed the furniture in the room?

17 A.   She did.

18 Q.   How about with regard to clothing?

19 A.   That she set the -- she put his clothing in the closet and

20 that she also would go in there and get his dirty clothes and

21 wash them and put them back in there.

22 Q.   Okay.  We're moving a little bit.

23       But, okay, so we know that she set up the room, and

24 then that would have been when they first moved in, correct?

25 A.   Uh-huh.

1  Q.   Or at least when Mr. Aaron Richardson first started to

2  live there.

3  A.   That's correct.

4  Q.   Then did she describe having any access to that specific

5  room that she identified as her son Aaron Richardson, the

6  defendant's room?

7  A.   She said that she has full access.

8  Q.   And how -- what did she tell you?  Did she describe the

9  level of access she had to that room?

10  A.   She said it's her apartment and it's her room.  It's where

11  her son sleeps and where she allows him to be, but it's still

12  her apartment and she has full access.  She goes in there

13  constantly to get his clothes, to put his clothes back away.

14  It's her place.

15  Q.   Did she indicate that she would actually clean up when it

16  started to smell in the room?

17  A.   Yes.  She said when his clothes would be really dirty and

18  stink, that she would go in and get them, wash them, fold them,

19  and put them back.

20  Q.   And did she indicate that -- who had, I guess, a key or

21  access to the front door?

22  A.   She did.

23  Q.   Did anyone else have access?

24  A.   No.

25  Q.   And she told you that while you were in the parking lot?

1   A.   Yes.

2   Q.   Did she tell you why -- if her son is living there and

3   he's an adult son, why didn't Mr. Aaron Richardson have a key?

4   Did she tell you that?

5   A.   That she didn't trust him.

6   Q.   All right.  And other than, I guess, her having almost

7   daily access to that room -- is that correct?

8   A.   Correct.

9   Q.   She rented it, the --

10  A.   She --

11  Q.   -- apartment, the entire apartment?

12  A.   She rented the apartment.  It was in her name.

13  Q.   Did she indicate that Mr. Richardson paid any rent for the

14  room?

15  A.   No.

16  Q.   How about paying for any electricity or anything like

17  that?

18  A.   No.

19  Q.   He just -- she allowed him to stay there.

20  A.   Yes.

21  Q.   All right.  At some point in time, then, did you ask for

22  permission to search?

23  A.   Yes.

24  Q.   When did you ask that?  Were you still in the parking lot?

25  A.   Yes.

1   Q.   And what occurred?  Can you -- do you recall the

2   give-and-take when you're asking for this permission and

3   authority?

4   A.   We asked for permission.  I presented her with a consent

5   to search form.  We explained it to her.  I asked -- I went

6   through everything that we've pretty much already spoke about,

7   which was her access and does she have the legal authority to

8   give that, which she did.

9        We also told her that there was a phone located

10  inside the room that we would like to search that she advised

11  was hers but she allowed him to use.

12  Q.   Okay.  Let me direct your attention to Government Exhibit

13  No. 9, and if you'd look at that tab, please.

14       No. 7.  I apologize.

15  A.   Okay.

16  Q.   We've got two of them.  No. 7, Government Exhibit 7, and

17  it's actually comprised of three separate pages.

18       Do you see that document, sir?

19  A.   Yes, sir.

20  Q.   All right.  Now, the document there, did you have anything

21  to do with executing this document or filling it out?

22  A.   I did.

23  Q.   And what part did you fill out?

24  A.   I filled out --

25  Q.   If we look at the handwriting, I'm not going to ask you --

1  you didn't type any of it there, did you?

2  A.    No.  It was handwritten.  It was filled out pretty much

3  all by me except for two of the signatures and where the -- the

4  HP, which is a Hewlett-Packard laptop, serial number, that was

5  put on there by one of the other agents.

6  Q.    All right.  Would it be fair to say this three-page

7  document, it wasn't all signed, if we sat down at a table, all

8  at one time.  I mean, it wasn't -- when I say signed, executed.

9  All the writing didn't occur at one time, did it?

10  A.    No.

11  Q.    Okay.  If we go through and at the beginning, the consent

12  to search, it says "I have been asked by special agents of the

13  Federal Bureau of Investigation to permit a complete search

14  of," and then it puts in parens "Describe the place or things

15  to be searched," and then it has an address "6710 Collins Road,

16  Apartment 2519, Jacksonville, Florida," and it says "The first

17  room on the right when entering the apartment."

18  A.    That's correct.

19  Q.    Okay.  Now, why was it that you were asking just for the

20  authority or consent to search that room?

21  A.    Because that was the -- his room.

22  Q.    And who identified it as his -- when you say his, is that

23  the defendant, Mr. Aaron Richardson?

24  A.    Yes.

25  Q.    And who identified it as being his room, that first one to

1    the right?

2    A.    The marshals, the mother.

3    Q.    Okay.  Ms. Richardson specifically told you that was her

4    son's room --

5    A.    Yes.

6    Q.    -- Aaron Richardson?

7    A.    Uh-huh.

8    Q.    All right.  Now, then we end up having a signature down on

9    the bottom across from the date 6/25/2013.

10         Do you know who put that signature there?

11   A.    Ms. Richardson.

12   Q.    And where -- where would she have signed that?  If I'm

13   just trying to picture ourselves down in a parking lot, I mean,

14   is she having to stand up and sign it on a clipboard?  How is

15   this being executed, if you can tell us that?

16   A.    I believe it was on the hood of a car.

17   Q.    All right.  And then we have two witnesses.

18         Who are those witness signatures there?

19   A.    The first one is mine.

20   Q.    And the second one, sir?

21   A.    Is --

22   Q.    The detective?

23   A.    Yes, Detective Calhoun with the marshals task force.

24   Q.    All right.  When she signed it, would it be fair to say

25   the only thing on there at that point, though, was the -- we

1    would stop after "The first room on the right"?

2           In other words, Samsung Verizon smartphone wasn't on

3    there and also HP and then a serial number, that wasn't on

4    there either, was it?

5    A.    I don't believe so, no.

6    Q.    Okay.  That was added later?

7    A.    Yes, sir.

8    Q.    Okay.  We'll get to that.

9           So once this consent to search is signed, what is

10   Ms. Richardson's demeanor?  Did she -- did she ever tell you

11   something that you asked about and she told you no?

12   A.    No, but she did -- she did come off as very hesitant.

13   Q.    Okay.  Well, let me ask you this.  At a point didn't you

14   ask her about who her employer was?

15   A.    Yes.

16   Q.    And didn't she refuse to tell you who that was?

17   A.    Yes.

18   Q.    Okay.  So that's the area of questioning I'd like to talk

19   about just for a second.

20          In other words, for you to be able to tell us, from

21   your recollection of that day in that parking lot, did

22   Ms. Richardson -- did she -- in other words, did she know she

23   could say no?

24   A.    Yes.

25   Q.    Now, you said that very quickly when I said -- made that

1    question.

2           So when -- you asked several questions, correct, that

3    Ms. Richardson --

4    A.   Uh-huh.

5           THE COURT:  You need to answer yes or no, not uh-huh

6    or uh-uh.

7           THE WITNESS:  Okay.

8    BY MR. DEVEREAUX:

9    Q.   Well, okay is better, but yes is even better than that.

10   A.   Got it.

11   Q.   Okay.  So -- I just said okay.

12          Now, if we just concentrate on Ms. Richardson, of

13   whether or not she knew she could say, "No, you can't search

14   that room," if I ask you that question right now here today and

15   ask you to draw upon facts and circumstances you observed at

16   that time, what facts can you tell us, the reason that you

17   would say, "Yes, I know she knew that she could have declined

18   to give consent"?

19   A.   She -- she gave the response no when we asked what her

20   son's name was, the youngest son.  She gave us the answer no

21   when we asked what her employment was.  I felt -- I believed

22   and felt that she could tell us -- that she understood that she

23   could tell us no if she wanted to.

24          And she -- we explained to her during the consent

25   that she had the right to refuse it.  If she was willing to

1    sign it at the time, it was "Sign the form if you're willing to

2    let us go forward with it."

3           I believe she was also told if she did not want to

4    sign the form that we would be securing the residence and we

5    were trying to obtain a search warrant, that we were already in

6    contact with the attorneys.

7           So she knew that she did have a right to refuse

8    signing the form, but we were going to be there.

9    Q.   All right.

10   A.   So she did have that right.

11          She did sign it, and she -- I think her daughter even

12   helped convince her to "Just let them do it.  Just go ahead and

13   sign the form, let them search, and you can come stay with me."

14   Q.   Okay.  Now, this -- it's very limited.  I mean, when we

15   looked at the drawing and the diagram of the apartment, there

16   was different rooms, a living room, a kitchen, bedrooms, and

17   this.

18          But this is just for one bedroom and very limited,

19   correct?

20   A.   You're talking about the diagram?

21   Q.   The consent, the consent form.

22   A.   Yes.  The consent was just for the one room.  That's why

23   it was written out just the first room on the right.

24   Q.   Okay.  And then at some point in time it's added the

25   Samsung Verizon phone.

1           Is that your handwriting?

2   A.   Yes, Samsung.

3   Q.   Then it has some -- it's squiggles, but I'm going to guess

4   it's somebody's initials there at the end.

5   A.   Yes.

6   Q.   Now, whose initials are those?

7   A.   Ms. Richardson's.

8   Q.   All right.  Now, did Ms. Richardson -- you've told us

9   the -- I guess the dominion and control, basically, that she

10  had of the apartment, that she had the only key, that she paid

11  the rent, that she could, you know, have -- go everywhere

12  throughout the apartment.

13          Did you tell -- did she tell you any kind of control

14  that she had for the cell phone here identified as the Samsung,

15  and then -- that's, I guess, the brand, Verizon being the

16  carrier?

17  A.   Yes.

18  Q.   Did she tell you whose phone that was?

19  A.   Yes.

20  Q.   Whose phone was it?

21  A.   Hers.

22  Q.   She told you that?

23  A.   She obtained the phone.  It was in her name.  She paid the

24  bill.  But she did give it to her son and allowed him to use

25  it.

1   Q.    And did she tell you that you could search that phone?

2   A.    She did.

3   Q.    And you asked specific permission to search the phone?

4   A.    Yes, sir.

5   Q.    All right.  And then we see here an HP for -- I would

6   assume that stands for Hewlett-Packard?

7   A.    Yes, sir.

8   Q.    And then we have a Social Security -- or, excuse me, a

9   serial number.

10  A.    Yes.

11  Q.    And what was that regarding?

12  A.    That was the laptop which I believe belongs to her son

13  who's 14.  That's Roneill.

14  Q.    Okay.  And do you recall who wrote that?

15  A.    No, sir.

16  Q.    All right.  The initials there at the end --

17  A.    Are Ms. Richardson's.

18  Q.    All right.  Now, when we turn the pages, we end up seeing

19  that on the third page there's a list of 1 through 8 items just

20  written out.

21        What is that?

22  A.    Those are the items that were seized from the room.

23  Q.    And whose writing is that?

24  A.    That is mine.

25  Q.    And how did you know what to write there?

1   A.   Because we -- I was one of the ones that searched the

2 room.

3   Q.   All right.  And did you take custody and control of those

4 items?

5   A.   No, sir.

6   Q.   All right.

7   A.   We seized them, the bureau, but they were transported by

8 someone else.

9   Q.   All right.  And how did you, I guess, get all the

10 information with the serial numbers?  I mean, it's fairly

11 detailed here.

12   A.   Yes, sir.

13   Q.   How did you get all that information?

14   A.   When we -- as we categorized each item of what we were

15 going to take, we then listed each one of them out one at a

16 time onto the property receipt.

17   Q.   And that's done there on site?

18   A.   Yes, sir.

19   Q.   Okay.  So that's not after you get back to the

20 Jacksonville office.

21   A.   No, sir.

22   Q.   Okay.  During -- do you recall -- were you there during

23 the entire search of that room --

24   A.   Yes, sir.

25   Q.   -- that first room to the right that has been identified

1   as the defendant's, Aaron Richardson's bedroom?

2   A.   Yes, sir.

3   Q.   You were there?

4   A.   Uh-huh.

5   Q.   Do you recall approximately how long that took?  A

6   guesstimation's good enough at this point.

7   A.   I would say a couple hours.

8   Q.   And was Ms. Richardson there?

9   A.   Yes.

10  Q.   At any point in time did Ms. Richardson revoke her

11  consent?

12  A.   No, sir.

13  Q.   Directing your attention to -- it's a series of

14  photographs.  It starts with 8A and it goes through 8G.

15         Do you see those?

16  A.   Yes, sir.

17  Q.   Now, those photographs -- we might have questions, if I

18  don't ask them now, of when those photographs were taken.

19         So do you recall when those photographs were taken?

20  A.   These photographs were taken that night in the room.

21  Q.   Okay.  So when we say that night, that would be --

22  A.   The --

23  Q.   -- the evening of Tuesday --

24  A.   The 25th --

25  Q.   -- the 25th of June, 2013.

1  A.    Yes, sir.

2  Q.    All right.  Now, when those pictures are taken, are those

3  how the room looked, or is that any bit staged, if we would use

4  that word?

5  A.    It's how the room looked, but as things and items were

6  searched, some things may have been moved, as far as, like,

7  clothing out of the closet may have been moved and may be in

8  the photo not as it was originally.

9  Q.    And it ends up you took a rifle, correct?

10 A.    Yes, sir.

11 Q.    You took a couple pairs of shoes?

12 A.    Yes, sir.

13 Q.    Actually three pairs?

14 A.    I believe it was two pair, a gold pair of Nikes and a

15 black pair of dress shoes.

16 Q.    Did you take -- and some other identification, some

17 identification from a college?

18 A.    I'm sorry?

19 Q.    If you look at 8G, 8 gulf.

20 A.    G.  I think we photoed that.  I don't know if it was

21 actually taken.

22 Q.    Okay.  And did you have any other involvement in this

23 investigation other than your involvement that Tuesday?

24 A.    We -- I was there when we did a follow-on search that was

25 conducted.

1    Q.    All right.

2    A.    I believe it was on Friday --

3    Q.    All right.

4    A.    -- a few days after.  And then I also was -- I also

5    assisted one of our CART examiners when we went back to do a

6    forensic review of the computer.

7    Q.    Okay.  The second search, that would be that Friday?

8    A.    I believe so.

9    Q.    Were you the individual that obtained consent from

10   Ms. Richardson on that day?

11   A.    No, sir.

12   Q.    All right.

13              MR. DEVEREAUX:  No further questions.  Thank you.

14              THE COURT:  Mr. Ossick?

15                        CROSS-EXAMINATION

16   BY MR. OSSICK:

17   Q.    Good morning, Agent Burros.

18   A.    Good morning.

19   Q.    Let me get you to look back at Government Exhibit 7.  I

20   think it's the consent to search three-page exhibit.

21   A.    Yes, sir.

22   Q.    Now, if I understood your testimony correctly, and please

23   let me know if I'm wrong in phrasing this question, when page 1

24   was first signed, the two entries Samsung and HP were not --

25   first signed by Ms. Richardson, the two entries Samsung and HP

1  weren't on that sheet of paper.

2  A.   No, sir.

3  Q.   You added one later.  Some other law enforcement person

4  added another later.

5  A.   Correct.

6  Q.   And she then initialed your addition.

7  A.   Yes, sir.

8  Q.   Did you see her do the initialing?

9  A.   Yes, sir.

10 Q.   Now, the HP computer was not in the first bedroom to the

11 right, was it?

12 A.   I don't believe so.

13 Q.   Somebody was able to list it by serial number, and that's

14 not an obvious thing if I look around this room and see a

15 computer, is it?

16 A.   I'm sorry.  What do you mean an obvious thing?

17 Q.   Well, was the number on that HP computer that's listed in

18 Exhibit 9 -- or, excuse me, 7 such that the serial number was

19 obvious from a distance in looking at it, without handling it,

20 without picking it up, without examining it?

21 A.   No, sir.

22 Q.   Who did that handling, picking up, seizing of that item?

23 A.   I don't think we seized it.

24 Q.   Well, somebody got it, looked at it, identified it, and

25 added it later to this document, correct?

1   A.   That's correct.

2   Q.   They had to know the number to write the number --

3   A.   Yes, sir.

4   Q.   -- correct?

5   A.   Yes, sir.

6   Q.   And it was not part of the room that this search warrant

7   consent form dealt with, was it?

8   A.   No, sir.  But if you look at the original 302 that was

9   written, when she was asked for permission, that was also asked

10   for at the beginning.  It wasn't put on here until we had a

11   serial number, but it was actually listed in what she was asked

12   for permission to search.

13   Q.   Well, now, I thought that you were explaining that she

14   signed this after you explained her ability to refuse to her.

15   A.   We did.  We did explain this part to her, but we also

16   asked her -- when we asked for the consent, it was the consent

17   for the first room on the right, the cellular telephone, and a

18   laptop that she said was contained inside the apartment.

19   Q.   How did someone identify the laptop before they'd been in

20   there?

21   A.   She told us that there was a laptop in the residence that

22   belonged to her son.

23   Q.   Well, why wasn't it put in at the same time as the first

24   room to the right?

25   A.   Because we didn't -- because that's located in a different

1    room, and when we asked her for that, we didn't know what the

2    make was, what the brand was, or what the serial number was.

3    So that was put on after the fact so she could initial it, that

4    that was the laptop.

5    Q.    Who retrieved it from the other room?

6    A.    I'm not 100 percent on that, sir.

7    Q.    Was it you?

8    A.    No, sir.

9    Q.    Does -- do you have enough familiarity with that

10    handwriting to have an idea who made the entry?

11    A.    No, sir, not -- I don't --

12    Q.    Who's your best guess?

13    A.    Maybe Special Agent Logan.

14    Q.    Okay.  I just don't want to try to ask everybody that

15    might come up, if you know.

16           Okay.  Now, the discussion about consent was in the

17    parking lot, not in the apartment.

18    A.    That's correct.

19    Q.    What time did you get to the apartment, 4:30-ish?

20    A.    Somewhere around there.  It was in the -- it was still

21    daylight, and it was daylight when she arrived.

22    Q.    And I believe you indicated you had been in the apartment

23    having the task force officers show you some things of interest

24    to them before she arrived.

25    A.    I believe so.  I'm not 100 percent on that.  We definitely

1    were in the apartment for a while doing the search.

2         It's been two-and-a-half years.  We may have

3    actually -- they showed us where he was located, where he was

4    arrested at, and the items that they had already previously

5    observed.

6    Q.    Okay.  The only item that was related to the violation

7    from a person who's on supervised release is a weapon; is that

8    correct?

9    A.    I believe so.

10   Q.    Okay.  So any other item wasn't obvious as evidence of

11   some violation, was it?

12   A.    No, sir.

13   Q.    But there was yet some effort to collect things from other

14   parts of the apartment and bring them together or get consent

15   or ask the mother about them before -- at the time of her

16   arrival.

17   A.    I don't think that's correct.

18   Q.    Okay.  Now, you say there was an oral consent of some sort

19   before the written consent.

20        Is that your testimony?

21   A.    We explained everything to her prior to her signing the

22   form.  Once she advised that there was a laptop computer

23   located inside the residence, we asked for consent with that as

24   well.

25        We initiated the form, and then we wrote down the

1   other two items to make sure that they were correct, because

2   there were several phones in the bedroom.

3   Q.   Now, the consent was signed at around 7 o'clock; is that

4   correct?

5   A.   7:06 p.m.

6   Q.   So that's some several hours after the 4:30 time, correct?

7   A.   We had to wait for her to arrive, yes, sir.

8   Q.   Well, how long had she been there -- about when did she

9   arrive?

10  A.   I would say roughly 30 minutes prior to this being signed.

11  Q.   So you think she arrived around 6:30.

12  A.   Somewhere around there, yes, sir.

13  Q.   You got there around 4:30.  She got there a couple hours

14  later?

15  A.   Yes, sir.

16  Q.   And for two hours you didn't go in other than where those

17  agents said, "These are the items of interest."

18  A.   We waited outside.

19  Q.   Now, you wouldn't let her go in at all, would you?

20  A.   I don't think she asked to go in.

21  Q.   She didn't request to go in.  You told her that she

22  couldn't go in unless she consented to the search?

23  A.   No, sir.  That is not what I said to her.

24  Q.   Didn't you tell her that she's not permitted in there?

25  A.   No, sir.

1  Q.    Didn't you tell her that if she doesn't consent, "You

2  can't go in.  You're going to have to wait till we get this

3  before a judge and get a warrant, and he won't like that very

4  much"?

5  A.    No, sir.  That's not what --

6  Q.    That didn't occur.

7  A.    No, sir.  That's not what I said at all.

8  Q.    So that --

9  A.    Those are your words.

10 Q.    And you didn't hear any other agent say that.

11 A.    Any other agent tell her that?

12 Q.    Tell her that she would not be able to go into that

13 apartment unless and until consent or a search warrant had been

14 obtained.

15 A.    I did not hear anybody tell her that exact phrase, no.

16 Q.    Exact phrase.

17       Did anybody tell her that the common understanding

18 that a normal, rational person would have is that "You either

19 sign this and let them do it or you're not going in your

20 apartment"?  Is that a fair assessment of the position she was

21 left in?

22 A.    I believe that's -- that's your assessment, sir.  What our

23 position was, was we asked for consent, and she was somewhat

24 hesitant.  She was on the fence with it.

25       Her daughter spoke to her, and then we basically told

1    her if she did not want to sign consent, which she has a right

2    to, that we would be obtaining a warrant for it.

3    Q.    So --

4    A.    But I don't believe one person told her that "You're not

5    allowed in your apartment."

6    Q.    Well, when she first arrived, you didn't know who she was,

7    did you?

8    A.    No.

9    Q.    And there were other spectators out there, were there not,

10   in the parking lot?

11   A.    No.  There was people coming and going from their

12   apartments, but not --

13   Q.    Nobody was interested in all these agents around?

14   A.    No.  We'd been there long enough, they'd lost interest.

15   Q.    Okay.  So when she arrived she had some interest in it,

16   obviously.

17   A.    People --

18   Q.    Somebody stopped her in the parking lot.

19             Who was that?

20   A.    No.  She pulled up into a parking place, stopped herself.

21   Q.    Right.  Well --

22   A.    And then she got out, and I said, "Are you

23   Ms. Richardson?"

24             "Yes, I am."

25   Q.    Okay.  And did you, in fact, make her show you her

1  driver's license?

2  A.    Yes, sir.

3  Q.    And you took a picture of her driver's license?

4  A.    I don't think we did.  We may have.  I'm not -- I'm not

5  100 percent that we took a picture of her driver's license.

6  Q.    Did you not include a picture of the driver's license in

7  one of your incident reports?

8  A.    I don't need to take a picture of it to do that.

9           MR. OSSICK:  Your Honor, may I -- I only have one

10  copy of this report.  May I approach the witness, show it to

11  him?

12          THE COURT:  Yeah.  You can question him right there

13  if you want, if that makes it easier.

14          MR. OSSICK:  Yeah.  That might.

15  BY MR. OSSICK:

16  Q.    Give you a chance to just take a look at that if you

17  would.

18          Do you recognize that to be an official report in

19  connection with this case?

20  A.    Uh-huh.  Yes, sir.

21  Q.    Feel free to take your time with it, but I'm going to ask

22  you just to go to the second page.  I've got some parts

23  highlighted in blue.  I don't know if reading that refreshes

24  you or helps you in any way.

25  A.    Okay.  Yes, sir.

1   Q.   Does it help you in any way?

2   A.   Yes, sir.

3   Q.   Okay.  Did you then subsequently get the driver's license?

4   A.   Yes, sir.

5   Q.   Okay.  So you didn't take it at that date.

6   A.   We did not take a photo of it, no.

7   Q.   Okay.  Did you make notations of it so that you could

8   obtain it?

9   A.   Yes.

10  Q.   Okay.  And it was in your possession.  She had surrendered

11  it to you.

12  A.   Her driver's license?

13  Q.   Yeah.

14  A.   She'd surrendered it to me for a brief moment while I

15  wrote down the information from it and then provided it back to

16  her --

17  Q.   Okay.

18  A.   -- yes, sir.

19  Q.   Now, you indicated that she refused to tell you

20  information about her other son's name?

21  A.   Yes.

22  Q.   And where she worked?

23  A.   Yes, sir.

24  Q.   Okay.  Now, who else was present at the time these

25  subsequent initial items were done by Ms. Richardson?

1  A.    Which other agent was present?

2  Q.    Yeah.  I mean, you know, it appears to someone reading

3  this, I would suggest, that yourself and Agent Logan are

4  certifying that they witnessed everything on this paper being

5  signed.

6         What I want to know is since things were added

7  seriatim if, in fact, that's correct or not.

8  A.    What other agent was present -- are you talking about the

9  consent to search form?

10 Q.    Yes.  Yes, sir.  Excuse me.  Government's 7, yes.

11 A.    Detective Calhoun was present.  He witnessed it --

12 Q.    Yeah.

13 A.    -- but then there was also Special Agent Logan.

14 Q.    I'm sorry.  I misspoke.  I misspoke.

15         Okay.  So was Detective Calhoun there for each item

16 as it was added, or did he witness her signing it the first

17 time before the second two entries were even on it?

18 A.    He -- I know he witnessed her signing it because he was

19 present for that part of it.  If he witnessed the other two --

20 I'm not sure if it was him or if it was Special Agent Logan

21 that was present when that was done.

22 Q.    Okay.  So the witnessing doesn't reflect necessarily every

23 item as having been witnessed, does it?

24 A.    You're talking about the signing of the form?

25 Q.    The witnesses' certification of witnessing the act of the

1    signing.

2    A.    I'm -- I guess I'm not following you, because at the

3    beginning of the conversation to the consent form, both were

4    present for what was asked for to be searched, which she agreed

5    to and signed and advised where the laptop was.  So I'm not

6    sure what you're asking.

7    Q.    That's okay.

8          So did anyone, other than you, tell her about your

9    intention to obtain a warrant if she refused to sign?

10   A.    Not that I'm aware of.  I believe all three of us were

11   still standing there during the entire conversation.

12   Q.    So is there -- this conversation with Ms. Richardson lasts

13   approximately an hour and 15 minutes?

14   A.    No.  No, sir.  It was signed at 7:06.

15   Q.    Okay.  And she got there when?

16   A.    I would say roughly 30 minutes prior to that.

17   Q.    Okay.  Now, why was the HP computer not listed in the

18   inventory?

19   A.    Because it was not seized.

20   Q.    Because it was what?

21   A.    It was not seized.

22   Q.    I'm sorry.  I just didn't hear what you said.

23   A.    It was not seized, taken.

24   Q.    Wasn't seized?

25   A.    Seized.  We did not seize that property.  We did not take

1    it.

2    Q.    Okay.  Was it searched?

3    A.    I don't believe it was that night.  I went back the

4    following morning with a CART examiner that did the forensics

5    on it that she allowed and agreed to.

6    Q.    You were back at the apartment the next day?

7    A.    I believe so.

8    Q.    Do you have any report of that?

9    A.    The CART examiner may.  It was only just to have the CART

10   examiner review the computer, since he was not available that

11   night.

12   Q.    And he conducted that review at her apartment?

13   A.    I believe so.

14   Q.    Okay.

15            MR. OSSICK:  That's all I have.  Thank you.

16            THE COURT:  Redirect?

17            MR. DEVEREAUX:  Nothing, Your Honor.  Thank you.

18            THE COURT:  May he be excused?

19            MR. DEVEREAUX:  Yes, sir.

20            MR. OSSICK:  Yes.

21            THE COURT:  All right.  Agent Burros, you may be

22   excused.

23        (Witness excused.)

24            THE COURT:  We will now recess.  It's 12:21.  Let's

25   recess until 1:30.

1          MR. DEVEREAUX:  Yes, sir.

2          THE COURT:  You mentioned earlier that you had

3    intentions of showing some videos.

4          MR. DEVEREAUX:  It will only -- the actual entire

5    video is about an hour and 20 minutes -- excuse me, two hours

6    and 20 minutes.  We've got a seven-minute section to show.

7          THE COURT:  Okay.  Thank you.

8          MR. DEVEREAUX:  Yes, sir.

9          THE COURT:  We'll be in recess.

10         COURT SECURITY OFFICER:  All rise.

11        (Recess from 12:22 p.m. until 1:32 p.m.; all parties

12   present.)

13         COURT SECURITY OFFICER:  All rise.  This Honorable

14   Court is now back in session.

15         Please be seated.

16         THE COURT:  All right.  Call your next witness.

17         MR. DEVEREAUX:  United States calls Special Agent

18   Scott Waters.

19         THE COURT:  How many additional witnesses do you

20   anticipate calling?

21         MR. DEVEREAUX:  One after this witness, Your Honor.

22         THE COURT:  All right.

23         You may proceed.

24      SPECIAL AGENT SCOTT WATERS, GOVERNMENT'S WITNESS, SWORN

25                      DIRECT EXAMINATION

1  BY MR. DEVEREAUX:

2  Q.   Agent, will you please spell your first and last name.

3  A.   Yes.  First name is Scott, S-c-o-t-t, last name is Waters,

4  W-a-t-e-r-s.

5  Q.   And how long have you been with the FBI?

6  A.   I've been with the FBI for almost seven years now.

7  Q.   And what squad are you assigned to?

8  A.   Currently I am assigned to the joint terrorism task force.

9  I just recently got reassigned.  I used to be on the violent

10  crimes squad, which is Squad 4.

11  Q.   I'd like to direct your attention to June of 2013,

12  specifically June 25th, a Tuesday, of 2013, and ask whether or

13  not you recall being involved in the investigation of the

14  attempted assassination of Judge Corrigan on that date.

15  A.   Yes, I do remember.

16  Q.   And on that date did you receive a call regarding an Aaron

17  Richardson?

18  A.   Yes, I did.

19  Q.   And can you describe the circumstances?  What was

20  happening on that day at the FBI first and then what role, I

21  guess, you individually or with another agent were playing?

22  A.   Yes.  During that time we were investigating the attempted

23  assassination attempt on the judge, on Judge Corrigan, and so

24  because of that, the -- really the entire Jacksonville Division

25  was ramped up.  We had a command post.  We had a lot of things

1    going in and out as far as information.

2            And due to the type of crime, with it being a violent

3    crime, my squad at the time had the -- had the lead when it

4    came to the investigative efforts.

5            So at that -- you know, every -- it had actually

6    begun Saturday to Sunday.  Sunday I was a part of the crime

7    scene, if you will.  I was able to see the crime scene, and the

8    investigation took off from there.

9            By Tuesday we had a pretty lengthy list of

10   individuals that needed to be investigated further.  They

11   needed to be looked at, just to, you know, either -- to either

12   fully vet or to -- to make sure that they either weren't in the

13   area or that they had some type of alibi or just to get them

14   off the board.

15           But we had to look at every lead and follow each lead

16   as thoroughly as we could.

17   Q.   Would it be fair to say that there were somewhat tiers,

18   three tiers of individuals?  People were somewhat categorized

19   as, like, a level 1, 2, or 3 as a potential suspect or person

20   of interest?

21   A.   Yes.  Due -- because of the manpower, you have to, in

22   essence, rank the possibility that -- each individual that we

23   had on the board, just how likely it might have been that they

24   were the person that did the crime.

25           So because of that -- and it wasn't something that

1    was just done with me or any of the folks in our squad.  It --

2    everybody kind of had their input in where the different names

3    would go.

4          So tier 1, tier 2, tier 3, we had to look at all of

5    those names.  The tier 1 names were the ones that seemed to be

6    more -- it was more of a possibility.  Tier 3, not so much but

7    still worth a look so that we could make sure that we weren't

8    letting anything slip by.

9    Q.   All right.  Would it be fair to say that on Tuesday, that

10   date, it was still fairly early in the investigative stages?

11   A.   Yes, it was.  We were still waiting on several results to

12   come back when it came to things that had been sent to the lab,

13   so because of that, we were working on information that was not

14   necessarily complete.

15         We were going by things that -- that pointed us in a

16   certain direction, but it didn't necessarily mean that it was

17   in stone and we knew exactly what we had and where we were

18   going.  So we just had to follow, like I said, every lead.

19   Q.   All right.  At some point on Tuesday afternoon, did you

20   respond to the hospital here, formerly Shands Hospital, the

21   University -- University of Florida Hospital here off of I-95?

22   A.   Yes, sir, I did.

23   Q.   And why did you respond there and who did you go there

24   with?

25   A.   I responded to the hospital because one of the people, the

1    defendant, had been apprehended by the U.S. Marshals.

2            There were connections between him and Judge

3    Corrigan.  The connection was very slim.  You know, there

4    wasn't a whole lot there, but because of that connection, his

5    name had made it onto the board.  Mr. Richardson's name had

6    made it onto the board.

7            We had gotten a briefing that morning on some of the

8    preliminary information that had come in, and so we knew -- we

9    thought we had a little bit of a bead on what it was we were

10   looking for.

11           At the time we had information that the bullet that

12   was used, that was found, came from a large-caliber handgun.

13   Q.   Would it be fair to say that you have firearms experts

14   here in Jacksonville as well as you were also seeking the

15   assistance of ATF, Alcohol, Tobacco and Firearms?

16   A.   Yes.  We were getting help from anywhere that we could.

17   We had our evidence folks come in.  They're very good at the

18   job that they do.  ATF, of course, is very good at the job that

19   they do.

20           And so all of the combined knowledge had looked at

21   some of the -- the fragmentation of the bullet, and they had --

22   you know, again, it was preliminary, but they had said that it

23   was a handgun.  So we were looking at anything possible that

24   might connect that.

25           Now, when it came to Mr. Richardson, he was

1  apprehended by the marshals.  The marshals had found a rifle

2  within the home where he was at.

3        Because of that, even though it's not a large-caliber

4  handgun, it's still something -- and along with the connection

5  between him and Judge Corrigan, we had to go talk to him.  So

6  that's why myself and Agent Silverstein responded to the

7  hospital to speak to Mr. Richardson.

8  Q.   Did you, in fact, have the opportunity to speak with

9  Mr. Richardson?

10 A.   Yes, we did.

11 Q.   If you had to say the purpose of your seeing

12 Mr. Richardson that day, having at least a belief at that

13 level, at that point -- early time in the investigation that

14 the weapon used had been a large-caliber handgun, when you were

15 responding with Special Agent Silverstein, did you believe that

16 Mr. Richardson -- the defendant, Aaron Richardson -- had been

17 the individual that attempted to assassinate Judge Corrigan?

18 A.   No, we did not.

19 Q.   Did you, in fact, even have that type of conversation with

20 Special Agent Silverstein?

21 A.   Yes.  As we were heading to the hospital, of course we're

22 going through the different scenarios on -- and this had been

23 happening for days on the different scenarios that would have

24 made somebody do something like this, what type of planning.

25 You know, is there one person involved, multiple people

1     involved?  You're going through all types of scenarios.

2            Because of the difference in what we believed the

3     weapon to be versus the weapon that was found at the household

4     with Mr. Richardson, because of those things, we really did not

5     believe that he was a true suspect of this.

6            So our main purpose in responding to the hospital

7     really was to vet him out and make sure that we could pull one

8     more name off the board.

9     Q.    So would it be fair to say that your purpose was to

10    eliminate him so you could move on and further the

11    investigation with what else was on the board?

12    A.    Absolutely.  Because you don't want to focus on something

13    that's not -- that's really not necessary.  So our main purpose

14    was to get his name off of the board.

15           You know, we did not believe him to be the person, so

16    when we went in there, that's -- that's how we approached the

17    interview.

18    Q.    All right.  Do you recall vividly, because of the nature

19    of the investigation, the events of that evening?

20    A.    Yes.

21    Q.    Can you tell us, where did you, in fact, meet

22    Mr. Richardson?

23    A.    Mr. Richardson was actually in the hallway of the

24    hospital.  He was still on the -- I guess the rolling --

25    Q.    Gurney?

A.   -- the rolling bed, yeah, the gurney.  He had taken some
injuries from -- I think it was dog bites.

        And so we -- I mean, we approached it basically as
soft as we could, and we just kind of engaged Mr. Richardson in
conversation, not talking about why the marshals had gotten him
or even going into the investigation dealing with the shooting
of the judge.

        All we were really trying to figure out is what he
had been doing and where -- you know, where he was, which would
establish an alibi for him and be able to remove his name from
the wall.

Q.   And you mentioned that that's part of what you were
attempting to do, contact different people that are on the list
to eliminate them or move them appropriately on the list,
correct?

A.   Absolutely.  Yes, sir.

Q.   So when you were asking questions -- did you, in fact, ask
questions of Mr. Richardson?

A.   We absolutely did, yes.

Q.   All right.  At that time would it be fair to say that he
clearly was under arrest on the violation of supervised
release?

A.   Yes.  He was arrested for the violation.

Q.   Was he read his rights?

A.   No, he was not.

1    Q.    Did you ask him anything about the gun?

2    A.    No, we did not.

3    Q.    What questions did you ask and why?

4    A.    Okay.  Again, our purpose was to get his name off of the

5    list, so the questions in that first interview that we had with

6    him, they weren't really -- they weren't accusatory in nature.

7          What we were trying to do is establish an alibi.  We

8    were trying to establish, you know, what his mode of

9    transportation was.

10         So when we began the conversation, we talked about,

11   you know, where he worked, how did he arrive at work.  During

12   that time he told us that his mother normally would bring him

13   to work or he would catch the bus.  You know, that's one more

14   thing for us to investigate as far as, you know, his ability to

15   even get to that part of the town where the judge lived.

16         The other thing we asked about was where he was over

17   that weekend, the Saturday and Sunday, and he --

18   Q.    And what did he tell you?  Do you recall?

19   A.    Yes, I do, and it's actually on the report that we did.

20         He told us that he -- he had eaten some food from --

21   I want to get this right.  He had ate a sandwich from Tijuana

22   Flats on Saturday which made him sick, so he was very ill over

23   Saturday and into Sunday.

24   Q.    Did he say where he was?

25   A.    He said that he was home with his mother and that his

1  mother could verify.

2  Q.   All right.  Now, at that time had you spoken with his

3  mother?

4  A.   No, I had not.

5  Q.   Did you have any information that you might have -- if you

6  were going to go out to interview a subject, you might get some

7  background information so if an individual provided you

8  information, you might be able to challenge them.

9        Do you understand what I'm saying?

10 A.   Yes, sir.  Absolutely.

11 Q.   Did you have any of that type of information?

12 A.   No, I did not.  I mean, I knew -- we did have other agents

13 that were at the home, that was, you know, basically occupying

14 the scene, and they were on that -- at that level.  And they

15 were doing -- you know, basically trying to either get consent

16 or they had already gotten consent for the search.

17       But at that time I had not gotten any kind of --

18 myself nor Agent Silverstein had gotten any kind of call from

19 those agents at that scene giving us any information to be able

20 to verify what it was Mr. Richardson was saying.

21 Q.   Before our lunch hour, we ended up having one officer show

22 us a photograph and describe a cut that was above

23 Mr. Richardson's eye, his right eye.

24 A.   Yes, sir.

25 Q.   Do you recall seeing any type of injury and asking about

1  that?

2  A.   Yes, we did.  I did specifically ask him about it, and

3  what he had told me was that during his time of being sick,

4  when he was throwing up because of the apparent food poisoning

5  that he got from the sandwich, that as he was going to the

6  toilet, he had slipped, fell, and that's what caused the scrape

7  over his eye.

8  Q.   Were you in any way -- when you're asking him these

9  questions, you never asked about the firearm.

10 A.   No, sir.

11 Q.   Did you even mention the name Judge Corrigan?

12 A.   No.

13 Q.   Were you in any way trying to trick him?

14 A.   Not at all.

15 Q.   When you -- how long was your discussion and interview

16 with Mr. Richardson?

17 A.   It's hard for me to remember, but I know that it wasn't

18 very long.  It had to have been less than 30 minutes.

19 Q.   When you left the hospital, did you think he was

20 eliminated off the chart?

21 A.   When we left the hospital, we -- we felt that he had -- he

22 was not the one.

23      The only thing that basically changed our mind is

24 when we finally got in contact with the agents that were at the

25 home with the mother, the alibi broke down.  His mother said

1    that he was not there.

2          And so at that point, even though we still felt that

3    it wasn't him, it made it so that we could not remove his name

4    from the board.

5          He did not go up into -- you know, into the first

6    tier or the second tier, but he had to remain on the board

7    because that alibi was not sound, and some of the story that he

8    told was not as tight as we would have liked.

9    Q.   All right.  So there was still a question and he remained

10   on the board.

11   A.   Yes, sir.

12   Q.   That evening, did you learn whether or not Mr. Richardson

13   was interviewed again?

14   A.   We did get called back in later to do the interview.  I

15   was not a part of the subsequent interview --

16   Q.   Okay.

17   A.   -- but I do know he was interviewed later that night.

18   Q.   All right.  I'd like to direct your attention now to

19   February -- excuse me, Friday, June 28th, the Friday of that

20   same week -- we were talking about Tuesday evening, now Friday

21   evening -- and ask whether or not you participated in a search

22   of a residence on that date.

23   A.   I did.

24   Q.   And which residence was that?

25   A.   It was the home where Mr. Richardson was apprehended by

1    the marshals.

2    Q.    And were you the agent that gained permission or -- either

3    permission from the occupant or court authority to conduct a

4    search of that residence?

5    A.    Yes.   There was a -- there was consent to search.

6    Q.    But were you the agent that obtained that?

7    A.    No.   I did not get the actual search warrant or consent.

8    Q.    Okay.   Did you participate in the search?

9    A.    Yes, I did.

10   Q.    During your participation in the search, did you identify

11   anything that you brought to the attention of other agents and,

12   I guess, the individual maintaining a log of items seized?

13   A.    Yes, sir, I did.

14   Q.    I'd like to direct your attention to the screen.

15              MR. DEVEREAUX:   And, Your Honor, if we could see if

16   our computer's back running.   We're going to test that on 20A.

17   BY MR. DEVEREAUX:

18   Q.    Should come across the screen, and also, if you can't see

19   the screen very well, Agent, there's a notebook in front of

20   you, and behind 20A there should be that same picture that's

21   depicted on the screen here.

22   A.    The screen is up.

23   Q.    Okay.   Do you -- can you recognize what is depicted there

24   in Government Exhibit 20A?

25   A.    Yes.   This is the space, the cabinet, that's underneath

1   the sink in the kitchen, and it's the -- it's a red bucket.  It

2   had -- it had a bag --

3   Q.   Did you open that?  Did you actually open that?  Did you

4   search that area?

5   A.   Yes, I did.

6   Q.   All right.  And look at Government Exhibit 20B, please.

7   A.   Yes, sir.

8   Q.   What is happening here?  There's a series of photos that

9   we're going to go through, and you have those in front of you.

10          Can you tell us what's happening here, these --

11  A.   Well, what we -- what we try to do is whenever we find,

12  you know, some evidence or something that looks like it could

13  be important, we try to photograph it.  And I say we, but it's

14  more our evidence folks.

15          We try to photograph the picture as it was, or we

16  photograph the evidence as it is.

17  Q.   Okay.

18  A.   So what's happening here, you had the first picture with

19  the bucket and everything as it was laid inside.

20  Q.   Now, is this being -- if I call it a reenactment of it,

21  being put back?  Have you already looked into it and then

22  called attention, or is somebody taking a picture sort of

23  somewhat over your shoulder?

24  A.   Okay.  What happened -- or in this specific incident --

25  Q.   Yes, this --

1   A.   -- what had happened is I looked inside of the orange

2   bucket but I hadn't taken anything out.  Once I'm able to kind

3   of -- look at it kind of like going into a file cabinet.  You

4   don't necessarily pull the paper out.  What you do is flip

5   through, you find what you need, and then you start going into

6   it, but you can kind of tell what it is already.

7            So as I -- I was doing, in essence, the same thing

8   here.  As I'm looking into the bucket, I'm starting to see

9   documents and other things that look like they're fairly

10  important.  So that's when I call the photograph guy over to --

11  to, in essence, take photographs as I'm emptying the bucket.

12  Q.   Okay.  So more you did somewhat of a peek.  You saw -- you

13  hadn't actually removed it from the bucket?

14  A.   Correct.

15  Q.   Okay.  And so what is here?  What is this black material

16  that we're looking at here in 20B?

17  A.   I'm -- I don't -- I don't remember what exactly --

18  Q.   All right.

19  A.   -- that black piece was --

20  Q.   Okay.

21  A.   -- but it wasn't the black piece that I looked at that

22  necessarily needed the photograph.  It was the -- the things

23  underneath it.

24  Q.   Okay.  So if we go to 20C, we see a plastic bag with an

25  item?

1  A.    Yes.

2  Q.    And then we go to 20 delta, D?

3  A.    Uh-huh.

4  Q.    And then we have removed a manila type of envelope,

5  business type envelope, from that plastic bag?

6  A.    Yes, sir.

7  Q.    And, now, would it be fair -- at this point in time, had

8  you opened that?

9  A.    At this point, yes.  I go and I look into it.

10  Q.    Okay.  And then we look at 20E.

11         MR. DEVEREAUX:  And can we zoom in some on this, on

12  the very top so we can see what this says.

13         Maybe just even on the caption, Melita, please.

14         Thank you.

15  BY MR. DEVEREAUX:

16  Q.    Okay.  We have order, exoneration of prior charges; order,

17  charges dropped all pending; order, reset/restore driving

18  record; order, reset/restore credit/finances; and then it has a

19  case number under it, and it's United States of America versus

20  Aaron Marcus Richardson.

21         Did you look through this document?

22  A.    Yes, I did.

23  Q.    Upon looking at this -- have you had some experience with

24  federal criminal orders by courts?

25  A.    Yes.

1  Q.    And from your review of that, just even at the residence,

2  did you make any conclusions?

3  A.    Yes.  It did not look like a good document to me, but just

4  to -- just to point out, this -- you know, the main thing that

5  really stood out to start with was the fact that this is under

6  the kitchen sink.

7          You know, that's not normally where you're going to

8  find court documents, and going through the multiple searches

9  that I've had, you know, throughout my experience, this

10  definitely stood out, which is why the evidence folks were

11  called over.

12          MR. DEVEREAUX:  Can we look at 20F, please.

13  BY MR. DEVEREAUX:

14  Q.    And it's the full document.

15          20G is page 2.

16          20H, page 3.

17          20I, and another alleged order.

18          And then we have 20J.

19          MR. DEVEREAUX:  If we could zoom in on just -- so we

20  can figure out what this handwriting is.

21          THE COURT:  Does this --

22          MR. DEVEREAUX:  Yes, sir.

23          THE COURT:  Does this have anything to do with

24  admissibility of the documentation or things found?

25          MR. DEVEREAUX:  No, sir.

1   THE COURT:  Isn't that what the issue is in this

2   matter?

3   MR. DEVEREAUX:  It is, sir.  I will turn on the

4   power.

5   BY MR. DEVEREAUX:

6   Q.   So was this document also found at the same location --

7   A.   Yes, sir.

8   Q.   -- in the same packaging?

9   Okay.  And were you present when these photographs

10  were taken?

11  A.   Yes, I was.

12  MR. DEVEREAUX:  No further questions.  Thank you,

13  Your Honor.

14  THE COURT:  Mr. Ossick?

15  CROSS-EXAMINATION

16  BY MS. KINGSLEY:

17  Q.   Hi, Agent Logan [verbatim], I'm -- sorry.  I'm Meredith

18  Kingsley.  I just have a few questions.

19  I want to go back to what you were talking about at

20  the beginning of your testimony, which was the time you spent

21  with Mr. Richardson at the hospital --

22  A.   Yes, ma'am.

23  Q.   -- so if we can transfer back to that.

24  A.   Yes.

25  Q.   You said that when you arrived with Mr. Silverstein, you

1    saw him in the hallway?

2    A.    Yes.  He was on the gurney.  He was still on the gurney.

3    Q.    And was he in handcuffs at that time?

4    A.    You know, I don't remember.  I think he -- I don't want to

5    guess.  I'm pretty sure he was still restrained, but I'm not

6    sure -- I'm really not sure if he was or not.

7    Q.    But there was law enforcement surrounding him or

8    accompanying him at that time.

9    A.    Yes, ma'am.  He was in the custody of the marshals.

10   Q.    And he was not free to leave.

11   A.    No, he was not.

12   Q.    So you would agree that he was in custody at the time that

13   you first met him.

14   A.    Yes.

15   Q.    And you've been trained on custodial interrogations?

16   A.    Yes.

17   Q.    And you know that if someone's in custody, you have to

18   apprise them of certain rights that they have?

19   A.    I know that if someone is in custody for the charge that

20   I'm asking them about, they need to be -- they need to be read

21   their rights.  That's not what we were there to do.

22   Q.    So there's an exception if you are not asking them

23   questions about something specific?

24   A.    It has to do with the intent, my understanding.  It has to

25   do with the intent of the interview, okay?

1  My questions had nothing to do with the custody that

2  he was in for the U.S. Marshals.  So when I went in, it had to

3  do with the -- basically trying to vet him.  He was not a

4  suspect in our -- in our investigation.  We were trying to get

5  his name off the board.

6  Q.  But you said that he was in one of the tiers of your --

7  individuals that you were tracking information on.

8  A.  Correct.  There was a lot of people on those tiers.

9  Q.  And that's -- is it different than being a suspect?

10  A.  Absolutely.

11  Q.  And that matters for purposes of Mirandizing someone?

12  A.  In our eyes what makes the difference is whether we're

13  going in to -- with the intent on arresting the person or if

14  we're just having an interview.

15  We do a lot of interviews, and on occasion the people

16  that we interview ends up being the person that we're looking

17  for, but unless we have some reason to believe that they're the

18  ones that did it, then we -- we don't.

19  Q.  Even when someone is in custody.

20  A.  If someone is in our custody, the FBI custody, we will

21  read the rights.  If they're not in our custody, we don't have

22  that -- we, in essence, don't feel like we need to read their

23  rights to them.

24  Q.  So you didn't -- you didn't tell him that he had the right

25  to remain silent?

1    A.    Not at that point, no.

2    Q.    And that he had the right to an attorney?

3    A.    Not at that point, no.

4    Q.    And that anything he said could be used against him?

5    A.    Not at that point, no.

6    Q.    And that if he decided not to answer questions at that

7    time without a lawyer present that you would stop asking him

8    questions?

9    A.    We did not feel that we needed to ask -- to Mirandize him

10   because of the reason we were there for.

11            MS. KINGSLEY:  Just one second, Your Honor.

12            Thank you.  No further questions, Your Honor.

13            THE COURT:  Any redirect?

14            MR. DEVEREAUX:  Just one quick question.

15                        REDIRECT EXAMINATION

16   BY MR. DEVEREAUX:

17   Q.    Agent, when you left that hospital, when you walked out

18   the front before you got on the phone after interviewing

19   Mr. Richardson, did you have any intent to have a second

20   interview?

21   A.    No, I did not.

22            MR. DEVEREAUX:  Thank you.

23            THE COURT:  Recross?

24        (No response.)

25            THE COURT:  You may step down.

1          Can he be excused?

2          MR. DEVEREAUX:  Yes, sir.

3          THE COURT:  You can be excused, Agent Waters.

4     (Witness excused.)

5          THE COURT:  Call your next witness.

6          MR. HEAVENER:  Your Honor, the United States would

7    call Special Agent Bill Logan.

8          THE COURT:  Do you expect to call any other

9    witnesses?  You said you had two more?

10         MR. HEAVENER:  Not after this, Your Honor.

11         THE COURT:  Are you going to call any?

12         MR. OSSICK:  Yes, Your Honor.

13         THE COURT:  Are they law enforcement witnesses?

14         MR. OSSICK:  No, sir.

15         MS. KINGSLEY:  Yes.

16         MR. OSSICK:  Yes, we are.  I'm sorry, we are.

17         THE COURT:  Okay.

18         MR. HEAVENER:  Your Honor, I don't mean to pry into

19   defense strategy, but if there's any that they don't intend to

20   call, can they be released?

21         THE COURT:  Sure.

22         MR. OSSICK:  We'll pare down the list and hand it to

23   you.

24         MR. HEAVENER:  Okay.

25         THE COURT:  Okay.

1    SPECIAL AGENT WILLIAM LOGAN, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. HEAVENER:

4    Q.   Would you tell us your full name.

5    A.   Yes.  William Logan.

6    Q.   And how are you employed?

7    A.   I'm a special agent with the FBI.

8    Q.   How long have you worked for the FBI?

9    A.   Approximately eight years.

10   Q.   And how long have you been a special agent with the FBI?

11   A.   Approximately seven years.

12   Q.   What did you do before you were a special agent?

13   A.   I was an intelligence analyst for the FBI at headquarters.

14   Q.   And tell us what you were doing in that capacity.

15   A.   I worked in the criminal investigative division where I

16   worked with human sources, vetting human sources.

17   Q.   All right.  And you had your agent training after being an

18   intelligence analyst at Quantico?

19   A.   I did.

20   Q.   Okay.  Tell us a little bit about your educational

21   background.  What -- what is your educational background?

22   A.   I have a bachelor's in criminal justice from the

23   University of Maryland and a juris doctorate also from the

24   University of Maryland.

25   Q.   So you have a law degree?

1  A.   Yes.

2  Q.   And in your law school you studied Fourth Amendment

3  issues?  You're familiar with that body of law?

4  A.   Yes.

5  Q.   Okay.  All right.  And you're also familiar with Aaron

6  Richardson; is that right?

7  A.   I am.

8  Q.   And your -- what would your role be with regard to the

9  Aaron Richardson case?

10 A.   I was the primary case agent.

11 Q.   Okay.  Is that also a lead case agent?

12 A.   Yes.

13 Q.   All right.  I want to -- I'm going to bounce around to a

14 number of different topics.  I'm not going to try to rehash

15 things that we've already heard, but I'd like to start with the

16 initial search of Aaron Richardson's bedroom on June 25th of

17 2013.

18         Were you involved in that search?

19 A.   I was.

20 Q.   Okay.  Tell us what your role was.

21 A.   We received information on that afternoon that

22 Mr. Richardson had been arrested for an open charge unrelated

23 to our investigation.

24         As such, two agents, myself and Steve Burros,

25 traveled to the apartment, went there to speak to the marshals

1   who actually conducted the arrest to hear how that process had

2   gone for them, and to meet with the owner of the apartment.

3   Q.   Okay.  And you've been sitting here.  You heard Agent

4   Waters give this testimony about trying to come up with people

5   of interest or potential suspects.

6            Were you involved in that process at all?

7   A.   Yes, sir.

8   Q.   Can you describe how difficult it is to try to determine

9   potential suspects when the victim is a federal district judge?

10  A.   Yes, sir.  The early stages were very difficult.  The

11  remark was made multiple times in our command post that a

12  federal judge has roughly 50 percent of the people who've sat

13  in front of him as potential suspects who might have a motive.

14  Q.   Okay.  All right.  So you get this call.  Mr. Richardson

15  somehow has made it to the board.  I'm going to use the phrase

16  that Agent Waters used.

17           Do you know how Mr. Richardson made it to the board?

18  A.   At the time, actually, that I traveled to the apartment, I

19  did not -- I didn't recognize the name.  He had recently been

20  added, as I understand it, by the U.S. Marshals because they

21  had been contacted by the federal probation office.

22  Q.   All right.  So somehow -- would it be fair -- that's what

23  you knew going out there, was that the probation office had

24  asked them, the marshals, to put him on the list?

25  A.   Yes.

1  Q.   Okay.  All right.  And do you have a recollection of when

2  you went out there -- and we're talking "there" meaning

3  Apartment 2519 on 6710 Collins Road.

4          Do you recall how you got there?

5  A.   Yes.  Agent Steve Burros and I drove in separate vehicles.

6  Q.   And do you have a distinct recollection of that afternoon?

7  A.   I do.

8  Q.   And do you recall approximately what time of day it was

9  that you were driving out there?

10  A.   It was approximately rush hour.  There was heavy traffic,

11  and we had to cross the Buckman Bridge.

12  Q.   Okay.  And can you describe some geography for us

13  exclusive to Jacksonville?

14          The FBI office, where is that located?  What part of

15  town in Jacksonville is that?

16  A.   It is, I guess I would say, south and east of city main.

17  Q.   Okay.  The St. Johns Town Center is a big shopping

18  district?

19  A.   Yes.

20  Q.   Is it close to that area?

21  A.   Yes.

22  Q.   And the Buckman Bridge you're describing, that's

23  Interstate 295 going into kind of the Orange Park area of town?

24  A.   Yes, sir.

25  Q.   Westside of town?

1  A.    Yes.

2  Q.    And without rush-hour traffic, how long of a commute is

3  that normally?

4  A.    Without traffic I would estimate 20 minutes.

5  Q.    Okay.  And with rush-hour traffic, do you have a

6  recollection of how long it took you to get from the FBI

7  headquarters to Aaron Richardson's apartment that day?

8  A.    I believe while we were traveling around vehicles and

9  under code with siren, it took us more than that.

10  Q.    I'm sorry.  Did I hear you say you had your sirens on?

11  A.    Yes.

12  Q.    Okay.  All right.  So you arrive at the apartment, and

13  give us a description of the scene, what you're seeing there.

14  A.    As we arrived we located the building in the apartment

15  complex, found the members of the marshals task force standing

16  outside the front of that apartment with the door open.

17  Q.    And I'm not going to go through all these pictures, but

18  you have a notebook in front of you that has Government's 5A

19  through Government's 5G so a series of photographs of the

20  apartment complex?

21  A.    Yes, sir.

22  Q.    Can you tell us how those photographs came into existence?

23  A.    Yes.  I took these photographs approximately a month or

24  two ago.

25  Q.    Okay.  And the -- just so there's -- it's absolutely

1    clear, the apartment number is Apartment No. 2519 but there's

2    been some confusion as to whether it's a second-floor apartment

3    or a third-floor apartment.

4              Can you elaborate on which floor of the apartment

5    complex it is?

6    A.   Yes, it's a third-floor apartment.  The mistake, I

7    believe, is due to the first digit being a 2, but the way that

8    the apartments are laid out, 2519 is on the third floor.

9    Q.   All right.  So when you got to the apartment complex, what

10   did you become aware of?  Who -- who did you talk to and what

11   did they tell you?

12   A.   Speaking with the marshals, we learned that Aaron

13   Richardson had been located and arrested, that he had been

14   bitten and therefore was transported to the hospital for

15   attention to his injuries.

16             And in the course of going to effect that arrest, the

17   marshals had seized and recognized a weapon in the apartment.

18   Q.   Okay.  Do you know what kind of weapon it was?

19   A.   Yes.  It was a bolt action rifle.

20   Q.   All right.  And did you have the same understanding when

21   you arrived there on the scene, that -- with regard to the

22   weapon that was actually used in the murder attempt of Judge

23   Corrigan?

24   A.   I'm sorry.  I don't understand the question.

25   Q.   Okay.  What was your understanding -- when you're driving

1  out to Mr. Richardson's apartment, what was your

2  understanding -- without any ballistics being done, what was

3  your understanding of the likely calibration or type of weapon

4  that was used in the murder attempt?

5  A.   Our briefing that day suggested that the preliminary view

6  was that the weapon that had been used to shoot at Judge

7  Corrigan was a handgun, a large-caliber handgun round.

8  Q.   Okay.  All right.  So tell us a little bit about how it

9  was that you got access into the apartment.

10        Did you go into the apartment when you immediately

11  got there?

12  A.   When we first arrived, the marshals told us what had

13  occurred, what they had seen, and not knowing whether or not

14  they were going to need to respond to something else or had

15  to -- were going to have to leave, Agent Burros and I saw what

16  it was that they had seen.  They showed us the room quickly

17  where he had been arrested and the room where the rifle was

18  found so that we would know where pertinent parts of the scene

19  were.

20        After that we left the apartment and awaited

21  Ms. Richardson's return.

22  Q.   All right.  And did Ms. Richardson return?

23  A.   She did.

24  Q.   And do you have a recollection about what time she

25  returned?

1  A.    I don't recall.

2  Q.    Okay.  Do you recall -- have a recollection about how long

3  you were there on the scene waiting for her to return?

4  A.    I would estimate at least a half hour.  I wouldn't want to

5  speculate beyond that.

6  Q.    All right.  And so you -- when she gets there, do you have

7  a recollection of how she arrived?

8  A.    She arrived by her vehicle.

9  Q.    Okay.  And who made the initial approach to her?

10  A.    Both Agent Burros and I approached Ms. Richardson as she

11  arrived.

12  Q.    All right.  Now, did you have the opportunity to interact

13  with Ms. Richardson?

14  A.    I did.

15  Q.    Okay.  On the consent form --

16         MR. HEAVENER:   If we can see Government's Exhibit 7.

17  BY MR. HEAVENER:

18  Q.    You're not listed as the witness to the consent.

19  A.    Correct.

20  Q.    Can you explain why you're not listed as the witness?

21  A.    Yes.  In the original -- in the beginning of our

22  interaction with Ms. Richardson, we wanted to let her know what

23  had occurred, that her son had been arrested, why we were

24  there, what our interest was, to make sure that she was okay.

25         In the process of explaining that to her, being that

1   there were only two agents from our office, Agent Burros and I

2   periodically were receiving phone calls either from our

3   headquarters or from the U.S. Attorney's Office, just updates

4   and trying to share information.

5          As a result of that, at different points we were

6   both -- Agent Burros and I were both talking to her, as well as

7   Detective Calhoun from the task force.

8   Q.   Okay.  And as the lead case agent, would you have been

9   receiving more of those phone calls than Agent Burros was?

10  A.   Yes, sir.

11  Q.   Okay.  All right.  I'm going to ask you about some topics,

12  and if you don't remember or you weren't there for this, then

13  tell me.

14         But what do you recall Ms. Richardson saying about

15  why she was living in this apartment?

16  A.   Ms. Richardson explained that the house that she had been

17  living in with her family on Marsala Lane had been foreclosed

18  or was in foreclosure process.

19         As a result of that, she had obtained this apartment

20  for herself and for at least one of her children to live with

21  her.  At some point she ended up not -- having her minor son as

22  well as Aaron Richardson living with her.

23  Q.   And did you ask her who her minor son was?

24  A.   I did.  I asked if Aaron had siblings and what her minor

25  son's name was.

1  Q.    And what did she say?

2  A.    She said she would prefer not to tell me.

3  Q.    And did you press it further?

4  A.    I did not.

5  Q.    How about her husband, her former husband?  Did you ask

6  her who he was?

7  A.    I did.

8  Q.    And what did she say in response to that?

9  A.    She did not explain further.  Stated that he was still

10  staying at the residence on Marsala Lane.

11  Q.    Did you ask her his name?

12  A.    I did not.

13  Q.    Okay.  How about -- I mean, did you try to get some

14  background information from her in terms of what her job was?

15  A.    I did ask her for background.

16  Q.    And what did she say?

17  A.    She said she would prefer not to tell me her employer.

18  Q.    Okay.  So each of these times that she told you she'd

19  prefer not to tell you, did you draw any conclusions about

20  whether she understood what her rights were with regard to

21  interacting with law enforcement?

22  A.    Yes.  I understood that I had made it clear to her that

23  she had the right to talk to us or not to talk to us and she

24  could tell us whatever she was comfortable telling us.

25          She was -- at that point we were interviewing her for

1   information, and in no way was she in any trouble.

2   Q.    Okay.  Did she -- did you ask her about how long Aaron

3   Richardson had been living there?

4   A.    We did.

5   Q.    And what did she say?

6   A.    I don't recall off the top of my head.

7   Q.    Is there something you can refer to that will refresh your

8   recollection?

9   A.    Can I refresh my recollection here?

10  Q.    What are you referring to?

11  A.    My 302 interview notes.

12          MR. HEAVENER:  Any objection?

13          MR. OSSICK:  No.  Is it an exhibit though?

14          MR. HEAVENER:  It's not an exhibit.  We can make it

15  one if you prefer.

16          MR. OSSICK:  No.  I just wanted to be able to see if

17  I could see it and save time.

18  BY MR. HEAVENER:

19  Q.    What -- would you identify which 302 report you're

20  referring to, Agent?

21  A.    I'm referring to the June 26th -- is that correct?  No.

22  I'm sorry.  That's a later interview.

23  Q.    Tell us what it says at the top right-hand corner of the

24  302 report.

25  A.    The date?

1  Q.   Yes.

2  A.   June 26th.

3  Q.   Okay.  And it reflects an investigation that was done on

4  June 25th?  Bottom left-hand corner.

5  A.   That actually states June 26th, but I believe that's a

6  typo.

7  Q.   Okay.  Does that refresh your recollection?

8  A.   Yes.  Ms. Richardson stated that Aaron had been staying

9  with her in her apartment on a temporary basis starting in May,

10 approximately one month earlier.

11 Q.   Okay.  And did you ask her questions about her having

12 access to Mr. Richardson's bedroom?

13 A.   I did.

14 Q.   And what did she tell you about how the clothing and the

15 furniture got into that bedroom?

16 A.   She stated that she had moved that clothing and furniture

17 from the house on Marsala Lane to that bedroom.

18 Q.   And did she make any statements about how the clothes got

19 from the house into the actual closet within the bedroom?

20 A.   Yes.  She stated that she had actually placed the clothing

21 into the -- onto the hangers and onto the rods in the closet.

22 Q.   And you subsequently searched.  You saw whatever furniture

23 was in there.

24      Did she make any statements about how the furniture

25 had been arranged or how the room was decorated?

1   A.   She stated that she had placed those items in there,

2   including an air mattress which she inflated herself, and

3   clothing around -- dirty clothing, for instance, that she said

4   she had access to.  She would do the cleaning and replace the

5   clothing once cleaned.

6   Q.   All right.  And what about his laundry itself?  I mean,

7   she would wash it and fold it and put it away?

8   A.   Yes, sir.

9   Q.   Okay.  All right.  Did she say anything about keys to the

10  apartment, who had keys to that apartment?

11  A.   Yes.  She stated there was one key, and she had the single

12  key.

13  Q.   Okay.  And did you ask her if she had access to the entire

14  apartment?

15  A.   Yes.

16  Q.   And what did she say?

17  A.   She stated it was her apartment.  She had her two sons

18  living with her but that it was her apartment.  She paid for

19  it.  Neither of them assisted in the bills or anything of that

20  nature.

21  Q.   Okay.  And with regard to the firearm, at what point does

22  Ms. Richardson get told that the marshals had arrested her son

23  and there was a firearm found in the house?

24  A.   My recollection is that after having talked to her and

25  Ms. Richardson consenting to us searching one bedroom in the

1  apartment, that we explained that there had been a rifle

2  located in that house, at which point that -- my recollection

3  is that is the first time she was aware of the rifle.

4  Q.    Okay.  Let me -- let me direct your attention back to this

5  written consent form.

6          Were you present when she actually signed it?

7  A.    I was not present when she signed at the bottom.  I was

8  present for the initials next to the two items.

9  Q.    All right.  And -- well, that brings me up to my next

10  question.

11          Do you have a recollection of how -- the two specific

12  items with bullet points, the Samsung Verizon smartphone and

13  the HP with the serial number, how those got written onto the

14  consent form?

15  A.    Yes.  When we first arrived -- again, to explain our

16  position, we arrived knowing that there was a weapon, that

17  Mr. Richardson was a felon.  He had been named on our list of

18  persons of interest, but some things did not match up to make

19  him a full suspect yet.

20          As a result, when we found this weapon, or heard that

21  this weapon had been located in this one bedroom, that was the

22  only bedroom we were interested in searching.  We didn't

23  believe there was likely to be further information of value

24  that we needed.

25          So we mentioned specifically to her that that was

1    what we were interested in looking in was the first bedroom on

2    the right.  She agreed to that, consented to that.

3           In the process, we were having an ongoing dialogue

4    with Ms. Richardson.  She actually came into the apartment.  We

5    had her sit in the living room, not in the room with us,

6    although she was at different times called in or we brought

7    items to her to see.

8           As a result, in the -- when we were doing the search

9    in that first bedroom, we located a phone, a smartphone.

10   Because that was not specifically delineated in the consent to

11   search, we hadn't talked at that point about looking in the

12   phone.

13          We asked her about it.  She stated that it was her

14   phone, that Aaron was using it but she was paying the bill, and

15   she consented to us searching that phone.

16   Q.   Okay.  And who actually wrote Samsung Verizon smartphone?

17   Do you know whose handwriting that is?

18   A.   That's Agent Burros'.

19   Q.   And then there looks to be some initials next to it.

20          Whose are those?

21   A.   Those are Ms. Richardson's.

22   Q.   And did you observe her initial that?

23   A.   Yes.

24   Q.   Okay.  Was it explained to her that when you're putting

25   this phone on the form that you were going to be searching it?

1  A.    Yes.

2  Q.    Okay.  And she said she was okay with that?

3  A.    Yes.

4  Q.    Okay.  And the HP language, who put that on the form?

5  A.    I wrote that language down.  Ms. Richardson actually told

6  us about a laptop that was in the house.  We asked her, when we

7  found the phone, if there were other devices, computers or

8  computer-like devices, phones, in the house that Aaron used.

9         She told us that there was a laptop that she did not

10  know whether Aaron used.  She stated it was her younger son's

11  and that he used it for school.  Out of an abundance of caution

12  we asked if it was okay for us to image that, to check it to

13  see if there had been anything related to any of this criminal

14  activity on it.

15         She got the laptop, brought it to us, and consented

16  to us searching it, but because it was her younger son's and he

17  was using it for school, she didn't want us to take it, to

18  physically remove it from the house because he wouldn't have

19  access to it.

20         So we at that point discussed having one of our CART

21  examiners, a computer examiner from our office, return to be

22  able to image the computer on site and leave it with her so she

23  would not lose custody to it.

24  Q.    Okay.  And the CART examiner, I'm assuming that you didn't

25  have one of those at the standby when you went out to talk with

1    Ms. Richardson?

2    A.    Unfortunately not.

3    Q.    Okay.  So that imaging of the computer disk actually took

4    place the next morning?

5    A.    Yes, as I understand it.

6    Q.    All right.  My question is this.  You're investigating the

7    attempted murder of a federal judge.  Mr. Richardson, for

8    whatever reason, has shown up on this board, and you go talk to

9    Ms. Richardson.

10          Why do you limit your search just to Aaron

11   Richardson's room, and why are you willing to wait until the

12   next morning to have a CART examiner come out and examine the

13   computer?

14   A.    At this point there were not many factors that had arrived

15   that we were aware of that made him a higher suspect in the

16   shooting of the judge.

17          The agents who had interviewed Mr. Richardson did

18   not -- you know, did not indicate that there was any kind of

19   major information that had come out of them talking to him.  He

20   hadn't, you know, immediately stated that he was involved in

21   something related to this.

22          The weapon didn't match what at that point we thought

23   was the likely caliber of the weapon that was used.  As a

24   result, we were trying to do as complete a job as we could for

25   potentially a possession by a felon of a firearm case without

1    knowing that it might be related to something larger.

2    Q.    And you knew that -- when you went out to see

3    Mr. Richardson's room in the apartment, you knew he was a

4    convicted felon because of his federal charge, correct?

5    A.    Yes.

6    Q.    All right.  So at some point did you convey what -- well,

7    did you inquire of Ms. Richardson about her understanding of

8    where her son had been during the weekend when the shooting

9    took place?

10   A.    Yes.

11   Q.    Okay.

12   A.    During the course of the discussion with her, she stated

13   she had not seen him from approximately June 23rd through June

14   25th, the entire weekend.

15   Q.    Actually, is that what she said on the 25th?

16   A.    Let me refresh my recollection here, referring to the same

17   302.

18          Excuse me.  I'm sorry.  I mistook my dates.  She

19   stated she had not seen Aaron between Thursday, June 20th, and

20   approximately midday June 23rd.

21   Q.    Okay.  And June 23rd would have been a Sunday afternoon?

22   A.    Yes.

23   Q.    So between June 20th and June 23rd, she said that she

24   didn't know where he was?

25   A.    Correct.

1  Q.   Okay.  And that information -- how consistent was that

2  with what Aaron Richardson told the agents at the hospital?

3  A.   We later learned that it was different than the

4  information Aaron Richardson had stated.

5  Q.   Okay.  And then did a second interview of Mr. Richardson

6  take place that evening, after he was released from the

7  hospital?

8  A.   It did.

9  Q.   And where did that interview take place?

10  A.   That took place at Jacksonville Sheriff's Office robbery

11  office.

12  Q.   All right.  And if you would take a look --

13      MR. HEAVENER:  If we could see Government's Exhibit

14  3.

15  BY MR. HEAVENER:

16  Q.   This is the marshals' report.

17  A.   Yes, sir.

18  Q.   And according to their report, in the third paragraph,

19  it --

20      MR. HEAVENER:  Actually, I'm on the second page.  If

21  you go to the next to the last paragraph, Ms. Ganoe, where it

22  starts "Due to being bit."

23  BY MR. HEAVENER:

24  Q.   All right.  According to their report, Mr. Richardson was

25  released from the hospital about 11 p.m., and at 1 o'clock a.m.

1    he was checked into the Duval County Jail.

2            Do you know what was happening between that 11:00 and

3    1 p.m. -- or 1 a.m. --

4    A.    Yes.

5    Q.    -- in the report?

6    A.    Yes.  A second interview of Aaron Richardson was being

7    conducted.

8    Q.    All right.  And where within the Jacksonville Sheriff's

9    Office did that interview take place?

10   A.    At the Jacksonville Sheriff's Office robbery unit.

11   Q.    Okay.  Why was it at the robbery unit?

12   A.    At the time Agent Silverstein from my squad had a good

13   relationship with JSO robbery, had used their interview

14   facilities before.  We were comfortable with those facilities

15   and knew where they were and knew how to get in contact with

16   someone who could make them available to us.

17   Q.    Okay.  And with regard to those facilities, do those

18   facilities come equipped with audio and video recording

19   equipment?

20   A.    They do.

21   Q.    And was there an audio and video recording made of the

22   entire interview of Mr. Richardson that took place at the

23   Jacksonville Sheriff's Office?

24   A.    There was.

25   Q.    Okay.  Now, if someone were to suggest that the FBI had a

1   plan to do an un-Mirandized interview of Mr. Richardson and

2   then follow it up with a Mirandized interview of

3   Mr. Richardson, how would you respond to that?

4   A.   That is absolutely not the case.

5   Q.   Okay.  Did you -- did you have any plans on going down to

6   the Jacksonville Sheriff's Office and doing an interview with

7   Mr. Richardson that evening?

8   A.   No.  Upon completing the search, I expected to be able to

9   go home and get a little bit of rest.

10  Q.   Okay.  The attempted murder took place on the early

11  morning hours of June 23rd of 2013.

12        Can you give us a little bit of an idea of how long

13  you'd been up chasing down leads, chasing down evidence,

14  between then and June 25th when you were searching

15  Mr. Richardson's apartment?

16  A.   Yes.  From the early morning hours of Sunday when I

17  received the phone call until -- well, most of that week, I

18  probably received -- was able to get no more than about four

19  hours of sleep per night.

20  Q.   Okay.  And would it be fair to say that going down to the

21  sheriff's office and conducting an interview of Aaron

22  Richardson was the last thing you really wanted to do?

23  A.   Yes.

24  Q.   All right.  But you did do that interview?

25  A.   Yes.

1  Q.   And who else participated with you?

2  A.   Special Agent Silverstein.

3  Q.   And did you use the JSO audio and video recording

4  equipment to make a recording of that interview?

5  A.   We did.

6  Q.   And we've already introduced Government's Exhibit 24 and

7  24A -- 24 and 24A.

8       And 24 is the complete copy of the interview?

9  A.   Is that in here?

10 Q.   Or the videotaped interview.

11 A.   Okay.

12 Q.   And 24A are some snippets that you've pulled out and we've

13 reviewed?

14 A.   Yes, sir.

15 Q.   Okay.  The complete interview, how long did it take?

16 A.   Approximately two hours.

17 Q.   Okay.  And these snippets that we've pulled out, how long

18 are they?

19 A.   As I understand, they're approximately seven minutes.

20 Q.   All right.

21      MR. HEAVENER:  And I'm going to publish at this time,

22 Your Honor, Government's 24A and ask the agent some questions

23 about some of these snippets.

24      THE COURT:  Do they deal with admissibility?

25      MR. HEAVENER:  They deal with the voluntariness of

1   Mr. Richardson's statements.

2          THE COURT:   Okay.

3      (Video played.)

4          MR. HEAVENER:   Can you stop it for a second?

5   BY MR. HEAVENER:

6   Q.   The law enforcement officer that's present in that video,

7   who is that?

8   A.   It's Rod Pinckney.

9   Q.   Okay.   The task force officer?

10  A.   Yes, sir.

11  Q.   Okay.   And can you tell us what steps you took, or Agent

12  Silverstein with you took, to determine what kind of medical

13  condition Mr. Richardson was in after he'd come from the

14  hospital?

15  A.   Yes.   Agent Silverstein had been at the hospital and in

16  contact with the marshals who were there with him as well.

17          But also Agent Silverstein, who is a medic, spoke

18  with Task Force Officer Pinckney about whether or not he was --

19  it seemed like he was okay, clear of mind, what medications he

20  was on.   Officer Pinckney relayed that he was only on

21  ibuprofen.

22  Q.   Okay.   And then it's at least some point after 11 o'clock,

23  if we take the marshals' timeline of 11:00 as when he got

24  discharged from the hospital.

25          What's this bag and this cup that we're looking at in

1   the photograph?

2   A.   Recognizing that it had been a long day and that

3   Mr. Richardson probably hadn't had an opportunity to eat or

4   been given any food previously at the hospital, we asked

5   whether or not there might be something he would like to eat

6   before we had an interview with him.

7            He indicated McDonald's and gave us an order of what

8   he would like to have for dinner, so we picked that up on the

9   way to the interview.

10  Q.   Okay.   We see Task Force Officer Pinckney bringing him

11  into this interview room.

12           Had there been any interviews of him -- other than

13  the interview that Agent Waters and Agent Silverstein did at

14  the hospital, had there been any interviews of him that are not

15  captured on the video recording?

16  A.   No.

17  Q.   Okay.

18           MR. HEAVENER:   Go ahead.   You may play it, Ms. Ganoe.

19       (Video played.)

20           MR. HEAVENER:   Stop for a moment.

21  BY MR. HEAVENER:

22  Q.   The person doing the talking now, who is that?

23  A.   Special Agent Silverstein.

24  Q.   All right.

25           MR. HEAVENER:   Go ahead, Ms. Ganoe.

1      (Video played.)

2           MR. HEAVENER:   Can you stop it, Ms. Ganoe?

3   BY MR. HEAVENER:

4   Q.   What is Mr. -- it's hard to hear Mr. Richardson in this

5   audio.

6           Do you have a recollection of what he was talking

7   about?

8   A.   Yes.   At the beginning of the point where Agent

9   Silverstein begins to read his rights, Aaron Richardson asked

10  if we were going to hit him.

11          Alex immediately said "No."   He said, "That is not

12  why we're here.   That's not a purpose of our being here."

13          Mr. Richardson talked a bit about an experience he

14  had in Clay County where he had felt like he had been

15  mistreated and injured.

16  Q.   Okay.   In the bottom left-hand corner of the screen,

17  there's an arm present.   Is that your arm?

18  A.   It is.

19  Q.   Okay.   And you and Agent Silverstein, can you describe how

20  you were dressed?

21  A.   Yes.   We were both dressed in sort of a standard outfit

22  for going out and conducting interviews in the process of a

23  mass investigation --

24  Q.   Okay.

25  A.   -- polo shirts and khaki pants.

1   Q.   Do you have any weapons with you in that interview room?

2   A.   We do.  We both, I believe, had our sidearms on at that

3   time, which is standard.

4   Q.   And we're not going to watch the entire video, but just so

5   there's a record, at any point during this interview, did

6   either of you pull a weapon out on Mr. --

7   A.   Absolutely not.

8   Q.   At any point during this interview, did anyone use any

9   kind of physical force or violence against Mr. Richardson?

10  A.   No.

11  Q.   At any point in this interview, did anyone make any

12  threats to Mr. Richardson that if he didn't talk, something bad

13  was going to happen to him?

14  A.   No.

15  Q.   Okay.  At any point during this interview, did anyone make

16  any promises to Mr. Richardson that he would receive any better

17  treatment?

18  A.   No.

19       MR. HEAVENER:  Okay.  All right.  Go ahead,

20  Ms. Ganoe.

21    (Video played.)

22       MR. HEAVENER:  You can stop it.

23  BY MR. HEAVENER:

24  Q.   Can you give us a -- do you have a recollection of what

25  Mr. Richardson was talking about when Agent Silverstein --

1    while he's been reading his rights?

2    A.   My recollection, and I could not hear everything clearly

3    this last frame, but my recollection was that they were

4    discussing what Miranda meant and, again, Aaron Richardson's

5    previous experience with Clay County.

6    Q.   Okay.

7              MR. HEAVENER:  Go ahead.

8         (Video played.)

9              MR. HEAVENER:  Stop it there.

10   BY MR. HEAVENER:

11   Q.   Can you elaborate?  We see you stand up in this video,

12   reach across the table, shake Mr. Richardson's hand.  Do you

13   have a recollection of what -- then we saw Agent Silverstein

14   shake his hand.

15             Do you have a recollection of what prompted that?

16   A.   Yes.  Mr. Richardson mentioned that looking someone in the

17   eye and shaking their hand was something that you could build a

18   trust bond by.  Those are my words, not his.  But that was a

19   way to build trust between people.

20   Q.   All right.  And is that what you did?

21   A.   Yes.

22   Q.   Okay.

23             MR. HEAVENER:  Go ahead.

24        (Video played.)

25             MR. HEAVENER:  You can stop it.

1    BY MR. HEAVENER:

2    Q.    All right.  Agent, if I could show you -- well, let's

3    finish watching the video.

4            But Government's 19, if you take a look at it in the

5    notebook in front of you, is that the actual advice of rights

6    form that Agent Silverstein was reading Mr. Richardson his

7    rights from?

8    A.    Sorry.  Just a moment.

9            Yes.  This is a copy of that document.

10   Q.    All right.  And we've got even a better timeline on your

11   document.  It says that you started at 2259.

12           What time is that?

13   A.    That would be 10:59 p.m.

14   Q.    All right.  And then it said that the rights were read at

15   what time?

16   A.    11:03.

17   Q.    Okay.  And then we see the -- where it says, "Signed:

18   "Would not sign," we just witnessed that in the video?

19   A.    Yes.

20   Q.    And then there's two signatures.  Whose are those?

21   A.    Agent Silverstein's and my own.

22   Q.    All right.

23           MR. HEAVENER:  Okay.  You can go back to the video if

24   you would, Ms. Ganoe.

25       (Video played.)

1         MR. HEAVENER:  Stop it there.

2    BY MR. HEAVENER:

3    Q.   That last clip that we just watched, it was very brief.

4         Is that clip -- chronologically, does that occur

5    toward the beginning of the interview or at the very end of the

6    interview?

7    A.   Near the end.

8    Q.   Okay.  And what -- and I understand you're not a tape

9    recorder the way the video is, but what was the summary of what

10   Mr. Richardson said in that last clip?

11   A.   In the end Mr. Richardson said, "I understand I can ask

12   for an attorney but I haven't said anything incriminating."

13   Q.   Okay.  All right, sir.  And the entire interview is on the

14   video that the Court can watch --

15   A.   Yes.

16   Q.   -- if it's convenient?

17        Let me direct your attention to the second search of

18   Ms. Sharon Richardson's apartment on June 28th of 2013.

19   A.   Yes.

20   Q.   Can you explain to us what happened between June 25th,

21   when you're only interested in searching Mr. Richardson's

22   bedroom, and then June 28th of 2013, when you go back to search

23   the entire apartment?

24   A.   One major piece of information was that ballistic tests

25   indicated that the bullet that went through the window in Judge

1    Corrigan's -- the attempted assassination of Judge Corrigan was

2    from a .30-caliber rifle.

3    Q.    Okay.  And do you have a recollection of the calibration

4    of the rifle that you took from Mr. Richardson's bedroom?

5    A.    Yes.  It was a .30-06 rifle, which is also a .30-caliber.

6    Q.    All right.  So did you make an effort to go back and

7    search Mr. Richardson's apartment again?

8    A.    We did.

9    Q.    Okay.  And how did that search take place?

10   A.    Again, we asked Ms. Richardson for her consent to look

11   into the apartment beyond what we had looked before.  We were

12   interested in anything -- any information that might relate to

13   specifically this crime, which might be anywhere in the

14   apartment that Aaron might have had access.

15        Ms. Richardson again agreed to meet with us and

16   provided consent.

17   Q.    Okay.  When you first arrived at the apartment complex,

18   was she present?

19   A.    She was not.

20   Q.    How long did you have to wait around for her to get there?

21   A.    I don't remember exactly, but I believe it was at least an

22   hour.

23   Q.    Okay.  And who were the agents this time that were

24   speaking with Ms. Richardson?

25   A.    Speaking with Ms. Richardson that evening were myself and

1  Agent Jon Soares.

2  Q.    Okay.  And if I show you Government's Exhibit 9, is this

3  the written consent that she signed that evening?

4  A.    It is.

5  Q.    Okay.  And this was for the entire apartment?

6  A.    It is.

7  Q.    Okay.  And how -- how long did you speak with her before

8  she actually signed this consent?

9  A.    Again, two-and-a-half years ago, I don't remember

10 completely, but I would estimate 10 to 15 minutes.

11 Q.    Okay.  And do you recall anything specifically that you

12 talked about during that 10 to 15 minutes?

13 A.    We did explain, again, sort of where we were in terms of

14 an investigation.  We did not explain what the investigation

15 was of.

16        We stated that her son Aaron Richardson's name had

17 come up again as someone who we were interested in learning

18 more information about, and as a result, we would like to see

19 more information out of his apartment that might link him to

20 this crime or might remove him from our list.

21 Q.    Now, did you have an understanding, as you went out there

22 that evening, about what kind of search this was going to be,

23 how -- how exhaustive of a search this one was going to be?

24 A.    We certainly expected it to be more exhaustive.  The first

25 search was Agent Burros and myself searching one room, which

1   took quite a while just because of the fact that there were

2   only two of us and the number of other things we were trying to

3   do, reaching back to other entities at our headquarters and at

4   the U.S. Attorney's Office.

5             This time we expected, first off, that it's a larger

6   space.  It was going to require more manpower, but also that

7   some of the searching that was going to be done included things

8   that took longer, things that might help place Mr. Richardson

9   at the actual scene of the crime or show that he had not been

10  there, maybe.

11  Q.   Okay.  And did you have an understanding that that was

12  going to be a very time-intensive type of search?

13  A.   Yes.

14  Q.   Did you have a discussion with Ms. Richardson about her

15  needing to probably find someplace to sleep that night?

16  A.   We did.  We had learned earlier that her daughter lived in

17  the apartment complex in a different apartment, and we

18  discussed that she would be able to stay there to be more

19  comfortable while we completed the search.

20  Q.   Okay.  And did she express any concerns to you on this

21  occasion about wanting to go back inside the apartment?

22  A.   She asked about her access to it.  At that point I did --

23  I told her that based on the information we thought we would

24  potentially find inside that we could not let her go in

25  immediately.  We would need to discuss with our legal team in

1    the U.S. Attorney's Office if we could file for a search

2    warrant, and pending that decision, we did not allow her to

3    re-enter her apartment.

4    Q.    All right.  And the consent to search form, did you

5    actually read it to her?

6    A.    Yes.

7    Q.    And each of these paragraphs in the form, it tells her

8    certain rights that she has, such as the right to refuse

9    consent?

10   A.    Yes.

11   Q.    Okay.  And how soon after you read this form to her did

12   she sign it and indicate that she was giving consent?

13   A.    Shortly after completing the document.

14   Q.    Okay.  Do you have a recollection of where this -- this

15   one was signed?

16   A.    This was, again, signed in a parking lot adjacent to the

17   apartment building, her apartment.

18   Q.    And when the -- when the FBI does a search, do you -- does

19   the FBI normally prepare a diagram of the premises where it's

20   searching?

21   A.    When possible.

22   Q.    Okay.  So Government's Exhibit 10, I just want to have you

23   explain this for us.  We've referred to it several times.

24         This was actually the diagram that was prepared on

25   June 28th, the evening of the search?

1  A.    Yes.

2  Q.    And when we see letters with circles around them, are

3  those different rooms that were searched?

4  A.    Yes.

5  Q.    And does that relate to the FBI's evidence handling

6  procedures?

7  A.    Yes.  Specifically, when our evidence response team is

8  involved, they letter each room and draw a diagram for as much

9  clarity as possible about where items are found and recognized.

10 Q.    All right.  And then showing you Government's Exhibit 15,

11 just the first page, it is titled Evidence Recovery Log.

12 A.    Yes, sir.

13 Q.    Can you explain what this is?

14 A.    Yes.  Upon completion and -- well, and throughout the

15 search, items that are identified as possibly relevant to the

16 crime are logged.  This log, I believe, is actually done on

17 site by the evidence response team.  As an item is found, it is

18 processed and then that is a record of who found it and where

19 it was found --

20 Q.    Okay.

21 A.    -- for future reference.

22 Q.    And then --

23        MR. HEAVENER:  Ms. Ganoe, if you would just enlarge

24 the very top right-hand corner.

25        All right.

1    BY MR. HEAVENER:

2    Q.   And you'll see that there's the date of June 28th of 2013

3    and a time of 9:46 p.m.

4            Do you have any understanding of what that

5    references?

6    A.   That was the day of the search.  I don't remember exactly

7    at what point during the search this document was completed or

8    if that was the beginning of the document.  Again, not wanting

9    to speculate, I'm not certain, but I believe that may be -- it

10   may have been approximately the beginning of the time that the

11   log was started.

12   Q.   All right.  And just so there's a record of this, there's

13   a whole series of photographs under tab 20.

14           Those are all the photographs that were taken to

15   document the search that evening?

16   A.   Yes.

17   Q.   Okay.  And if I could direct your attention to

18   Government's 20A.

19           This was the bucket where the order was found.

20   A.   Yes.

21   Q.   I don't want to go through the order itself, but what I do

22   want to ask you is, when you were in Mr. Richardson's bedroom

23   on June 25th, that first search that you and Agent Burros

24   did --

25   A.   Yes.

1  Q.    -- did you see anything that's in that bucket in

2  Mr. Richardson's bedroom?

3  A.    I did.  The bag tied the way it was later found and the

4  folded manila envelope with legal documents in it were in

5  Mr. Richardson's room when we conducted the first search, in

6  the -- off to -- towards the front of the apartment in that

7  room.

8           In the course of that search, I found that document,

9  the initial search.  I saw the document and recognized that it

10 appeared to be legal paperwork, but I did not believe that it

11 was at that time relevant to our investigation, and I did not

12 seize it.  I stopped looking at it because I thought it might

13 be legal product.

14 Q.    All right.  And then when you saw it under

15 Ms. Richardson's sink, did you have any discussions with her

16 about that?

17 A.    Yes.  We asked Ms. Richardson when and why she had moved

18 that document.

19 Q.    And what did she say?

20 A.    She stated that after we left the last time, we had

21 allowed her to do some cleaning, and she decided to move that

22 and some other items out of his room.

23           And this item she had decided to place because it had

24 this -- I believe it was some sort of a belly band and gloves

25 with it, that she felt that under the sink was appropriate.

1  Q.   Okay.  And would it be -- would you -- would you describe

2  that as another example of Ms. Richardson having access to the

3  room that she had given you consent to on June 25th?

4  A.   Yes.

5  Q.   Okay.  All right.  I'd like to take you away from the

6  search on June 28th and direct your attention to interactions

7  with three witnesses, specifically an individual named Erik

8  Markiewicz --

9  A.   Yes, sir.

10  Q.   -- an individual named Joshua Sizemore, and an individual

11  name Jahbari Hall.

12        Are you familiar with all three of those names?

13  A.   I am.

14  Q.   And have you done interviews with all three of those

15  witnesses?

16  A.   I have.

17  Q.   Okay.  Let me begin with Mr. Erik Markiewicz.

18        Can you explain how it came about that you were

19  interested in speaking with Mr. Erik Markiewicz?

20  A.   Yes.  In the course of this investigation, after this

21  rifle was located by the marshals, an ATF trace was done.  That

22  trace showed that that weapon belonged to the Sports Authority

23  near Regency Mall.

24        Contact was made with that Sports Authority.  At

25  first that store did not know that that weapon was missing from

1　their inventory.  They believed it was still in inventory.  And

2　thereafter, multiple interviews of their staff, including a

3　manager, Erik Markiewicz, were completed.

4　Q.　Okay.  And did -- the Sports Authority, did they cooperate

5　with the investigation, for lack of a better term?

6　A.　Yes.

7　Q.　Okay.  And by cooperating, did they provide the FBI with

8　video surveillance on various dates?

9　A.　They did.

10　Q.　Okay.  And the dates that they provided, June 20th and

11　21st and then also June 15th, I'd like to direct your attention

12　to that June 15th date.

13　　　　　Do you have an understanding of why the Sports

14　Authority store provided video on June 15th?

15　A.　Yes.

16　Q.　And what was that?

17　A.　Upon seeing -- upon recognizing that the weapon had gone

18　missing, the Sports Authority staff, particularly including the

19　manager, Markiewicz, reviewed some of their surveillance video

20　from inside the store.

21　　　　　At that point they recognized that an alarm had gone

22　off, had not been -- it had been reported to an acting manager

23　but had not been responded to because their -- the alarm seemed

24　to shut itself off after a period of time.

25　　　　　In that process Mr. Markiewicz went and reviewed

1  surveillance video from the night of June 20th into the morning

2  of June 21st and seeing that, recognized that the person that

3  appeared in some of that surveillance video was someone he

4  recognized that he had had a prior interaction with on June

5  15th.

6  Q.   And the person he recognized was Aaron Richardson?

7  A.   It was.

8  Q.   All right.  And showing you Government's Exhibit 13 and

9  13A, those are video recordings of the June 15th surveillance

10 video that the Sports Authority provided?

11 A.   Will that be in the book?

12 Q.   Yes, 13 and 13A.  There's two discs in front of you.

13 A.   Yes.

14 Q.   Okay.  And 13 is the entire surveillance video?

15 A.   Yes.

16 Q.   And then 13A is just some snippets?

17 A.   Yes.

18 Q.   All right.  Let us -- let me publish the snippets for you.

19      (Video playing.)

20 BY MR. HEAVENER:

21 Q.   All right.  What are we looking at?

22 A.   This is a view of an interior surveillance camera from

23 Sports Authority, this one particularly overlooking the gun

24 counter.

25 Q.   And this -- this video has no audio; is that right?

1   A.    Correct.

2   Q.    Okay.  And who is the individual now that's approaching

3   the gun counter?

4   A.    Aaron Richardson.

5   Q.    And what does he appear to be doing?

6   A.    He's reviewing weapons, leaning over the counter and

7   looking at the rifles.

8   Q.    And up at the top, we see the date stamp on the video as

9   June 15th, and the -- it's not visible on the court's system.

10  There's a sound button, but that's of 2013?

11  A.    Yes.

12  Q.    And this goes -- the time stamp is 19:31.

13         What would you understand that to be?

14  A.    7:30 p.m., 7:31 p.m.

15  Q.    Okay.  Let me -- just in the interest of time, Agent

16  Logan, there's a period of this video from 7:29 until 7:51

17  where Mr. Richardson is the only person back in the store?

18  A.    Yes.

19  Q.    Okay.  And then at 7:51 another individual enters the

20  scene.

21         Would that be correct?

22  A.    Yes.

23         MR. HEAVENER:  Can you fast-forward it to 7:51?

24         Fast-forward just a little.

25  BY MR. HEAVENER:

1    Q.    All right.  We're having a little bit of trouble seeing it

2    at the very top, but do you see Mr. Richardson interacting with

3    someone at the very top of the video?

4    A.    I do.

5    Q.    Okay.  And the big screen we're looking at, it looks

6    like -- and there's Mr. Markiewicz now.  I'm at 19:54 and 21

7    seconds.

8              Is that Mr. Markiewicz?

9    A.    Yes.

10   Q.    Okay.  On the Court's screen it looks like he's got a blue

11   shirt.

12             On your screen what color is the shirt?

13   A.    It's red.

14   Q.    All right.  Can you give us a description?  I mean, we

15   don't hear anything, but for the next 23 minutes or so of this

16   video, what's going on?

17   A.    In an interview with Mr. Markiewicz, he stated that he had

18   a conversation with Mr. Richardson about rifles, specifically

19   hunting rifles.  He remembered talking to him about two

20   different specific weapons, a .270-caliber Savage Arms rifle,

21   and a .30-06 Savage Arms rifle.

22             That weapon, the .30-06 that he remembered speaking

23   to Aaron Richardson about in the store at length, was the

24   weapon that later was stolen from the store.

25   Q.    Okay.  And let me take you to that interview of

1  Mr. Markiewicz.

2       That interview took place on actually June 28th of

3  2013; is that right?

4  A.   May I --

5  Q.   Yes.  It's Government's Exhibit 16 in evidence.

6  A.   Oh, okay.

7       Yes, June 28th.

8  Q.   All right.  And do you have a recollection of where that

9  interview took place?

10 A.   It -- it was at our office.

11 Q.   In the FBI building?

12 A.   Yes.

13 Q.   And Government's Exhibit 16, is that a report of the

14 interview?

15 A.   Yes.

16 Q.   Okay.  And I don't want to go through the entire report,

17 but I do want to ask you, when Mr. Markiewicz met with you, was

18 he able to give a description of the person that he had

19 interacted with on June the 15th?

20 A.   He was.

21 Q.   And how did he describe him?

22 A.   He described the person as a black male, approximately

23 5'10", in his estimation, with very white teeth and a muscular

24 build.

25 Q.   Okay.  Did you ask him anything about tattoos?

1    A.   I asked if there were any other visible marks, scars, or

2    anything else noticeable about him.  He mentioned that he did

3    not see any visible tattoos.

4    Q.   Okay.  And in the surveillance video -- it's still on the

5    screen -- we see what appears to be a hat.

6         Did you have any discussion with Mr. Markiewicz about

7    a hat?

8    A.   Yes.  Mr. Markiewicz recalled the person also having a hat

9    on.

10   Q.   Okay.  And the discussions themselves -- even though the

11   surveillance video has no audio --

12        MR. HEAVENER:  And you can stop it, Ms. Ganoe.

13   (Video stopped.)

14   BY MR. HEAVENER:

15   Q.   Even though the surveillance video has no audio, did

16   Mr. Markiewicz have a recollection of his interactions with the

17   person, Mr. Richardson, in the video?

18   A.   He did.  He stated that Mr. Richardson claimed to have

19   been in special forces in the military on leave from

20   deployment, that he had been shot twice, that his father was a

21   well-known sniper, and in fact the movie had been -- excuse me,

22   his grandfather was a well-known sniper and a movie had been

23   made about him.

24   Q.   Did Mr. Markiewicz convey to you whether or not the things

25   Mr. Richardson was saying about his military experience seemed

1  consistent with the knowledge he was exhibiting about firearms

2  there at the counter of Sports Authority?

3  A.   Mr. Markiewicz stated that the questions he was asking

4  about the weapons were not consistent with an active-duty

5  military or special forces.

6  Q.   Did Mr. Markiewicz say if he ever permitted Mr. Richardson

7  to handle any of the firearms, any of the rifles or pistols we

8  see in the surveillance video on the screen?

9  A.   Mr. Markiewicz stated that generally he would allow

10  customers to handle weapons, but Mr. Richardson, based on the

11  types of questions he was asking and his demeanor, did not seem

12  like someone he felt it was safe to hand one of the firearms

13  to.

14  Q.   Okay.  And you asked Mr. Markiewicz about his recollection

15  of these events.

16      Did he tell you specific reasons why he recalled

17  these events better than, say, any other customer that came in

18  the store?

19  A.   For one thing Mr. Markiewicz stated as a manager at the

20  store, he's one of the few people on shift anytime that's

21  allowed to show weapons and have access to the weapons area,

22  and he does not show or sell many weapons from the store, so

23  that makes it easier to differentiate this interaction from

24  other customers.

25      As well, Mr. Markiewicz recalled, upon seeing the

1   later footage, that Mr. Richardson was wearing the same or very

2   similar clothing during both incidents when he was inside the

3   Sports Authority store.

4   Q.   And you're talking about the footage from June 20th and

5   21st that doesn't really pertain to this issue.

6   A.   I am.

7   Q.   Okay.  All right.  So the -- during your interview, did

8   you end up showing Mr. Markiewicz a photograph of

9   Mr. Richardson?

10  A.   I did.

11  Q.   And what kind of photograph was that?

12  A.   It was a Florida driver's license photograph.

13  Q.   And showing you Government's Exhibit 11, is that the

14  photograph you showed Mr. Markiewicz?

15  A.   It is.

16  Q.   Okay.  And when you showed him that photograph, what did

17  he say?

18  A.   He said that is the person who he interacted with on June

19  15th.

20  Q.   Did he indicate how certain he was that that was the

21  person?

22  A.   He stated 100 percent positive.

23  Q.   Okay.  And would it be fair to say that the interaction

24  that Mr. Markiewicz described having with Mr. Richardson, that

25  entire interaction is captured on the videotape that's been

1    introduced as Government's Exhibit 13?

2    A.    Yes.

3    Q.    All right.  Let me turn your attention to -- let me turn

4    your attention to an individual named Joshua Sizemore.

5    A.    Yes.

6    Q.    How did you become aware or how did you determine to

7    interview an individual named Joshua Sizemore?

8    A.    Through the course of our investigation, after multiple

9    interviews with Ms. Richardson, she eventually stated that she

10   had received a phone call on late the morning of June 21st.

11   That phone call was from a phone number she didn't recognize.

12   It was from her son Aaron asking her to come pick him up.

13         We pulled phone records of Ms. Richardson's phone and

14   located that phone call, and through database checks,

15   determined who actually was the subscriber and user of that

16   phone.

17   Q.    Okay.  Let me --

18   A.    That was Joshua Sizemore.

19   Q.    Let me back up a minute --

20   A.    Sure.

21   Q.    -- just to give you the background of this.

22         You had -- you interviewed Ms. Richardson on June the

23   25th there at her apartment, correct?

24   A.    Yes.

25   Q.    You had another sit-down interview with Ms. Richardson

1    sometime in July?

2    A.   As well as June the 28th for the consent.

3    Q.   June the 28th.

4    A.   Yes.

5    Q.   July.

6    A.   Yes.

7    Q.   And then you had an interview of Ms. Richardson where you

8    found out that she had gone and picked Aaron Richardson up the

9    same night that the alarm was triggered at the Sports

10   Authority.

11   A.   Yes, on approximately the fourth or later interview.

12   Q.   Okay.  And that fourth interview was actually in Orlando,

13   Florida; is that right?

14   A.   Yes.

15   Q.   Okay.  All right.  So showing you Government's Exhibit 23.

16            MR. HEAVENER:  And if we could go to the -- should be

17   page 1 of 2, Ms. Ganoe.

18            Next page.

19            All right.  And if you could highlight the top ten or

20   so.

21   BY MR. HEAVENER:

22   Q.   All right.  You obtained Ms. Sharon Richardson's phone

23   records?

24   A.   Yes.

25   Q.   And when you reviewed Ms. Sharon Richardson's phone

1   records, you noted a call on June 21st at 1:18 in the morning?

2   A.   Yes.

3   Q.   Do you see -- do you see where it changes from June 20th

4   to 21st?

5   A.   I do.

6        MR. HEAVENER:  Okay.  Can you highlight that?

7        THE COURT:  I can see it.

8        MR. HEAVENER:  All right.

9   BY MR. HEAVENER:

10  Q.   So that number that called Ms. Richardson's phone at 1:18

11  a.m. on June 21st, did you -- were you able to figure out who

12  that number belonged to?

13  A.   Yes.  That number is subscribed to and used by Joshua

14  Sizemore.

15  Q.   Okay.  And did you do any analysis to determine if that

16  phone number had made any other calls to Sharon Richardson's

17  phone number?

18  A.   We did, and it did not.  This was the only time that

19  number contacted Ms. Richardson's number.

20  Q.   All right.  Did you determine to go and interview

21  Mr. Joshua Sizemore?

22  A.   We did.

23  Q.   And when did that interview take place?

24  A.   If I might --

25  Q.   Exhibit 17.

1   A.    Okay.

2         My report shows that interview was on July 25th.

3   Q.    I'm sorry.  July 25th.

4         Where was that interview?

5   A.    It was at Joshua Sizemore's residence.

6   Q.    And who participated in that interview?

7   A.    Myself and Agent Silverstein.

8   Q.    Okay.  And what was your purpose for doing that interview?

9   A.    The purpose was to identify Mr. Sizemore, confirm that

10  that was his phone number, and determine whether he had made

11  this call to Ms. Richardson or if he remembered who had used

12  his phone to make such a call.

13  Q.    Okay.  And Government's 17, that's your report from that

14  interview?

15  A.    It is.

16  Q.    Okay.  And can you give us a summary of what Mr. Sizemore

17  said?  I don't want to read the whole report, but what did he

18  say about what he had done that night and whether someone had

19  used his phone?

20  A.    Mr. Sizemore had been on a date that evening.  He'd gone

21  to the movies with his date.

22        Afterwards they had gone to a local restaurant,

23  returned to his vehicle and were sitting on the back of the

24  vehicle, he and his date, when a black male approached them as

25  if -- I don't recall exactly the direction.  It's in the

1    report.  But asked to use Mr. Sizemore's cell phone to call his

2    mom for a ride, stating he had just gotten off of work.

3    Q.   Okay.  And the person that talked to Mr. Sizemore used the

4    term "call my mom for a ride"?

5    A.   Yes.

6    Q.   Okay.  And that person also -- that's the person's

7    language?  They said they'd just gotten off of work?

8    A.   Yes.

9    Q.   Okay.  The location where they're sitting on the vehicle,

10   did you inquire as to where that happened?

11   A.   We did.  If I can . . .

12        Yes.  Mr. Sizemore stated that his car was parked on

13   the west side of the Regency Square Mall near the door to the

14   movie theater.

15   Q.   Okay.  And you've been to that theater?

16   A.   I have.

17   Q.   And there's adequate lighting in that parking lot of that

18   theater?

19   A.   Yes.

20   Q.   Okay.  All right.  Did Mr. Sizemore give you any

21   description of what the person -- any other descriptions other

22   than a black male who said, "I need to call my mom.  I just got

23   off work"?

24   A.   He did.  He described -- if I might refer.

25        Mr. Sizemore stated that Richardson looked like he

1    had just come from a construction site, that he appeared to

2    have paint or concrete on his clothes and was wearing a baggy

3    top shirt and work boots.

4    Q.    Okay.  And based on the phone records, were you able to

5    determine how long that phone conversation took place?

6    A.    Yes.  The records show it was a two-minute phone call.

7    Q.    And did Mr. Sizemore -- was he able to overhear the

8    conversation?

9    A.    He was, at least in part.

10   Q.    Okay.  And in terms of Mr. Sizemore letting someone use

11   his phone at 1:18 a.m. in the morning, did -- do you have any

12   understanding, based on your training and experience, on

13   whether someone's -- their attention level when they put their

14   portable cell phone in someone else's hand?

15   A.    Yes.  I mean, certainly from my personal experience,

16   lending someone my phone, I pay closer attention to them and

17   what they are doing with my phone.

18   Q.    Okay.  Did you display any photographs to Mr. Sizemore?

19   A.    I did.

20   Q.    And what -- let me show you Government's 11.  That's his

21   driver's license photo.

22   A.    Yes.

23   Q.    Was that the first photograph you showed Mr. Sizemore?

24   A.    It was.

25   Q.    And what did he say about Government's 11?

1  A.    Joshua Sizemore recognized that that was the individual

2  who had used his phone that evening --

3  Q.    Okay.

4  A.    -- that morning.

5  Q.    And can you describe for us how soon after you displayed

6  that photograph to him he said, "That's the same guy that used

7  my phone"?

8  A.    Quickly.

9  Q.    Okay.  Did you make any observations of his demeanor or

10 his appearance when he was looking at the photograph and making

11 that identification?

12 A.    I did.

13 Q.    And did he appear to you to be hesitant, doubtful?  Any

14 bodily indications of pause or doubt?

15 A.    No.  In fact, we had mentioned before showing him the

16 photograph, asking him about that, and it seemed to -- seeing

17 the photograph seemed to jog his memory that that was the

18 individual.

19 Q.    Prior to showing him the photograph, did you tell him that

20 "This may be the individual, may not be the individual"?  Did

21 you give him any instructions?

22 A.    We didn't describe why we were interested in him looking

23 at this or what this person might have -- why we might be

24 bringing this person up to him.

25 Q.    Would it be fair to say that the only information you

1    conveyed to Mr. Sizemore was that you were interested in

2    whoever had used his car -- used his phone at 1:18 a.m. on June

3    21st?

4    A.    Yes.

5    Q.    Okay.  You didn't disclose to him what you were

6    investigating or why you were investigating it?

7    A.    No.

8    Q.    Okay.  Did you -- subsequent to that photograph, did you

9    show him another photograph of Aaron Richardson, Government's

10   Exhibit 12?

11   A.    Yes.

12   Q.    And why were you showing him Government's Exhibit 12?

13   A.    We brought with us two photographs.  There's some change

14   in Mr. Richardson's appearance in the photographs, and -- in

15   terms of the amount of beard or hair growth, and a scar above

16   Mr. Richardson's right eye.

17          For identification purposes we brought it with us.

18   That was not the photograph that Mr. Sizemore identified

19   Richardson from.

20   Q.    Okay.  When he looked at this -- did he look at this

21   photograph?

22   A.    He did.

23   Q.    And did he make any other comments?

24   A.    He didn't.

25   Q.    Okay.  You know from reviewing the video, the surveillance

1  video, on June the 20th and 21st, that the store's motion

2  surveillance activates at 12:52 a.m.?

3  A.    Yes.

4  Q.    And then there's an actual physical alarm at 12:59 a.m. on

5  the 21st, correct?

6  A.    Yes.

7  Q.    Okay.  Did you do any investigation into how close the

8  store is from the Sports -- how close the movie theater where

9  Mr. Sizemore was located is to that Sports Authority store?

10 A.    I did.  I subsequently walked that distance with a

11 measurement device.

12 Q.    And how far was it?

13 A.    If I might refresh my recollection, I have a note I made

14 myself of that interaction.

15 Q.    All right.  So the device you're using is one of those

16 wheels that you walk with?

17 A.    Yes.

18 Q.    Okay.  So how far was it?

19 A.    The distance from the Sports Authority to the theater was

20 approximately .598 miles.

21 Q.    How long did it take you to walk there?

22 A.    Approximately ten minutes.

23 Q.    Okay.  All right.  I want to move your attention now to an

24 individual named Jahbari Hall.

25 A.    Yes.

1    Q.    How did you become aware of Mr. Jahbari Hall?

2    A.    In review of Ms. Richardson's phone records, we determined

3    that a phone call made the morning of the attempted

4    assassination of the judge to her phone from an unknown other

5    number was that of Jahbari Hall.

6    Q.    Okay.  And specifically, did you become aware -- did

7    Ms. Richardson tell you that the night that Judge Corrigan was

8    shot at, she had actually driven to the south side of

9    Jacksonville and picked her son up?

10   A.    Yes.  Again, approximately the fourth or later interview

11   with Ms. Richardson, she admitted that she received a phone

12   call from an unknown number, that it was Aaron, and she

13   subsequently went and picked Aaron up after that phone call.

14           MR. HEAVENER:  All right.  If we could take a look

15   back at 23.

16           Go to the very last page, Ms. Ganoe.  And it's the --

17   about ten down.  It's 2:02 a.m.

18   BY MR. HEAVENER:

19   Q.    All right.  We see a phone call on June 23rd at 2:02 a.m.

20           How long did that phone call last?

21   A.    The record shows six minutes.

22   Q.    And whose -- do you recognize the phone number that made

23   that call to Ms. Richardson's phone?

24   A.    I do.

25   Q.    And whose phone number was that?

1    A.    That is Jahbari Hall's phone.

2    Q.    And how did you determine that that was Jahbari Hall's

3    phone number?

4    A.    Through database checks.

5    Q.    Okay.  And did you have the opportunity to interview

6    Mr. Jahbari Hall?

7    A.    I did.

8    Q.    And before we get to his interview, did you conduct any

9    analysis on Ms. Richardson's phone records to determine if she

10   had any other calls from Mr. Jahbari Hall?

11   A.    We did, and this was the only instance of that phone

12   number contacting Ms. Richardson's phone.

13   Q.    All right.  Taking you to Government's 18 --

14        MR. HEAVENER:  You don't need to display it,

15   Ms. Ganoe.

16   BY MR. HEAVENER:

17   Q.    -- that's the 302, your report of the interview you did

18   with Mr. Jahbari Hall?

19   A.    What was the number again?

20   Q.    Government's Exhibit 18.

21   A.    Yes.

22   Q.    Okay.  All right.  So do you recall where you met with

23   Mr. Jahbari Hall for this interview?

24   A.    I do.  We met at his place of work, which was the

25   Jacksonville Miller's Ale House on Southside.

1    Q.    And when you say "we," who else was with you?

2    A.    Special Agent Silverstein.

3    Q.    Okay.  And by meeting at the Jacksonville Ale House over

4    on the south side of Jacksonville, did you -- were you able to

5    make any observations about the lighting, the conditions in

6    that establishment?

7    A.    I was.  I would say it was normal restaurant lighting.

8    Q.    Okay.  Were you able to see Mr. Hall okay?

9    A.    Yes.

10   Q.    Okay.  And you were able to hear him okay?

11   A.    Yes.

12   Q.    Okay.  So when you interviewed Mr. Hall, what did he tell

13   you?

14   A.    Mr. Hall stated that the evening of the 22nd into the

15   morning of the 23rd of June, he was working at the same

16   Miller's Ale House.

17          It was approximately 2 a.m., around closing time for

18   them, when a black male he later identified as Richardson came

19   into the building, sat down at the bar.  They were still

20   cleaning, closing up -- you know, cleaning for the night.

21          Mr. Richardson asked Mr. Hall to use his cell phone

22   to call for a ride.  Mr. Hall provided his cell phone.

23   Mr. Richardson also then asked Mr. Hall for the address of the

24   restaurant where they were.  Again, Mr. Hall provided him the

25   address.

1  Q.   Okay.  And did Mr. Hall say how long Mr. Richardson

2  actually stayed there in the Southside Ale House?

3  A.   Mr. Hall estimated it was approximately 30 minutes.

4  Q.   Okay.  And did -- did he give you any physical description

5  of what Mr. Richardson -- what he was wearing, what he looked

6  like?

7  A.   Yes.  If I might refresh.

8        Mr. Hall's words were Mr. Richardson appeared dirty

9  and looked like he had just come out of the woods.  Mr. Hall

10  did not recall any clothing except that Mr. Richardson might

11  have been wearing a white T-shirt.

12  Q.   Okay.  And he said he was a black male?

13  A.   Yes.

14  Q.   Okay.  All right.  Did you show Mr. Hall the same two

15  photographs that you showed Mr. Sizemore?

16  A.   We did.

17  Q.   And you showed him the driver's license photograph first?

18  A.   Yes.

19  Q.   And did he make an identification?

20  A.   He did.

21  Q.   Okay.  And then when you showed him the second photograph,

22  the booking photograph which is Government's Exhibit 12, did he

23  make any statements when he looked at that photograph?

24  A.   Yes.  Mr. Hall pointed at the scar above Mr. Richardson's

25  eye, right eye, and stated, "He looked just like that,"

1  referring to the scar, stating that Mr. Richardson had the scar

2  when he came into the restaurant.

3  Q.   Okay.  Had you asked him any questions about the scar over

4  his eye?

5  A.   We had not.

6  Q.   Okay.  The -- the phone that Mr. Richardson was using or

7  that Mr. Hall said he was using, that was Mr. Hall's personal

8  cell phone?

9  A.   Yes.

10  Q.   And according to the phone records, if Mr. Richardson was

11  using that phone, it was a six-minute duration that he was

12  using the phone?

13  A.   Yes.

14  Q.   And when you showed Mr. Jahbari Hall these photographs,

15  the driver's license photograph and then -- well, let's stay

16  with the driver's license photograph.

17       When you showed him the photograph, can you describe

18  how quickly after you showed him the photograph he said,

19  "That's the person I saw"?

20  A.   Yes, quickly.  He recognized him.

21  Q.   Okay.  And when he recognized him, did you observe

22  anything about his body, his posture, his demeanor that would

23  indicate any doubt, apprehension, or anything of that nature?

24  A.   No.

25  Q.   In your interactions with Mr. Markiewicz, Mr. Sizemore,

1   and Mr. Hall, with any of them, did you or Agent Silverstein --

2   and in the case of Mr. Markiewicz it was Agent Soares -- did

3   anyone ever make any threats that something would happen to

4   these witnesses if they didn't identify the person?

5   A.   No.

6   Q.   Okay.  And did anyone make any promises to them to get

7   them to identify the person?

8   A.   No.

9   Q.   Okay.  Going back to Mr. Hall, the Southside Ale House --

10  just if you could give us a little bit of a timeline.

11        Judge Corrigan was shot at shortly after midnight on

12  June 23rd; is that right?

13  A.   Yes.  I believe it was shortly after 12:30 --

14  Q.   Around --

15  A.   -- was the time.

16  Q.   Around midnight.

17  A.   Yes.

18  Q.   Okay.  Did you measure the distance from Judge Corrigan's

19  home to the Southside Ale House where Mr. Jahbari Hall was

20  located?

21  A.   I did.

22  Q.   And what was the distance -- are you using that same wheel

23  to measure?

24  A.   I am.  And this is the same note of that --

25  Q.   What was the distance?

1  A.    It was approximately 1.542 miles from Judge Corrigan's
2  home to the Miller Ale House.
3  Q.    And how long did it take you to walk from Judge Corrigan's
4  home to the Miller Ale House?
5  A.    Approximately 27 minutes.
6  Q.    Okay.  The individuals that you showed single photographs
7  to, can you explain what you were -- why you were showing
8  single photographs to these witnesses versus doing photo
9  spreads?
10 A.    Yes.  At this point we were essentially trying to put the
11 pieces of the puzzle together.  We did not recognize these
12 people as victims of or direct witnesses to any criminal
13 activity.  That was our approach.
14 Q.    The three people we talked about, none of them were
15 eyewitnesses to the criminal episode; is that right?
16 A.    Correct.
17 Q.    All right.  And with regard to -- you said -- you used the
18 term victims.
19        Are any of these three people victims of crimes?
20 A.    No.  Outside of Mr. Markiewicz working for the Sports
21 Authority, which was robbed, he is not a victim of anything.
22 Q.    Okay.  And when you had these -- when you showed these
23 individuals the photographs, at any point did you discuss with
24 these individuals what it was that you were investigating?
25 A.    No.

```
 1   Q.   Okay.  At any point did you tell them that this was an

 2   investigation in which we think this person has done

 3   something --

 4   A.   No.

 5   Q.   -- whatever it is?

 6   A.   No.

 7   Q.   Okay.

 8            MR. HEAVENER:  Just a moment, Your Honor.

 9            No further questions, Your Honor.

10            THE COURT:  Mr. Ossick?

11            MR. OSSICK:  Ms. Kingsley.

12            THE COURT:  Ms. Kingsley?

13                         CROSS-EXAMINATION

14   BY MS. KINGSLEY:

15   Q.   Agent Logan, I realize you've been up here for a while.

16   We've covered a lot of territory, so I think it makes the most

17   sense to start with what you just talked about, which was the

18   identifications --

19   A.   Okay.

20   Q.   -- and then we'll sort of work backwards from there --

21   A.   Okay.

22   Q.   -- if that's okay for you.

23   A.   Yes.

24   Q.   Okay.  Great.

25            You said that you've been with the FBI for how long?
```

1  A.   Approximately eight years.

2  Q.   And I assume you went through training at Quantico?

3  A.   I did.

4  Q.   And you've been through all kinds of training since then,

5  I'm sure.

6  A.   Yes.

7  Q.   And part of that training, I assume, was learning about a

8  six-pack photo array?

9  A.   Yes.

10  Q.   And that's a term for, like, a photo lineup?

11  A.   Yes.  That's not a term, I think, that -- I don't know if

12  the FBI uses it.  It's not a term I know from the FBI, but I am

13  familiar with that, and that is something that I'm aware of.

14  Q.   What's the term that the FBI uses?

15  A.   A photo array.

16  Q.   A photo array?

17         And so the term "array" suggests that's more than one

18  photo, correct?

19  A.   Yes.

20  Q.   And that's a typical practice?  You would put together a

21  pack of photos of more than one person?

22  A.   Yes.

23  Q.   And show that to an identification witness?

24  A.   Yes.

25  Q.   But you did not do that here.

1    A.    No.

2    Q.    For any of the three witnesses that we've talked about

3    today.

4    A.    No.

5    Q.    Okay.  There are sort of general rules that you would

6    follow, and I assume that you would typically use a photo array

7    when you're going to an identification witness.

8    A.    I'm not sure I understand the question.

9    Q.    Is it typical for you to use a photo array when you're

10   going to an identification witness?

11   A.    Generally, when we're speaking with someone who was the

12   victim of or directly involved in a criminal act, yes, that

13   would be the best way to ensure their identification.

14         In this case we did not believe that any of these

15   individuals was a direct witness to a criminal act or a victim

16   of that crime.

17   Q.    So you pick -- you select an array of pictures of people

18   who look similar?

19   A.    Yes.

20   Q.    And it's important that the other suspects or the other

21   individuals look like the suspect?

22   A.    Yes.

23   Q.    And the whole purpose is so that the witness can pick out

24   one person out of the group, correct?

25   A.    Yes.

1  Q.   And you want to make sure the witness is recognizing the

2  person that they experienced, not just picking a photo or

3  agreeing to a photo.

4  A.   Yes.

5  Q.   And you're suggesting that there's an exception to the

6  rule or the general practice of using a photo array.

7  A.   I'm not suggesting there's a standard exception.  In this

8  case I'm explaining that our approach to this, these three

9  interviews, was that these people were not people who were

10  direct victims of or witnesses to criminal acts, and so our --

11  our approach upon interviewing them was a little different.

12  Q.   So there's an exception if you are telling a witness that

13  you're doing an investigation.  You would use a photo array.

14  A.   Not necessarily.  It depends on circumstances.

15  Q.   And if it's an eyewitness to a crime, you would use a

16  photo array.

17  A.   In the case of an eyewitness to a crime or a direct

18  victim, I would say the standard practice would be to use a

19  photo array.

20  Q.   Okay.  When you went to these witnesses -- I want to

21  understand, and we can take them one at a time if that's more

22  helpful.

23  A.   Sure.

24  Q.   Did you give them a general set of instructions before you

25  showed them the single or sometimes two pictures?  For example,

1  did you tell them that they didn't have to make an

2  identification?

3  A.   So when we approached each of these people, we asked them

4  if they remembered their phone being used on this particular

5  date -- excuse me, for the two, for -- speaking of Hall and

6  Sizemore.

7          After them saying, yeah, vaguely that they remembered

8  that or, you know, their memory of that time approximately a

9  month earlier, then we asked if a photograph might help.  When

10 they stated a photograph might help, we showed them that

11 driver's license photo.

12 Q.   Okay.  I think I want to answer the question a little bit

13 more directly if you can.

14 A.   Sure.

15 Q.   Did you instruct your witnesses that they did not have to

16 make a positive identification when you showed them one

17 picture?

18 A.   We didn't instruct them anything.

19 Q.   Did you tell them that the identification procedure is an

20 important part of an investigation, whether or not that they

21 can confirm it, or that it didn't matter whether they were able

22 to positively identify the person or not?

23 A.   We explained that -- in this course of investigation, this

24 was an interview that was related to an investigation.  We

25 didn't provide them more info than that.

1    Their recognition or nonrecognition of any of the

2   photographs was not something that we discussed.  They -- in

3   the course of the interview, we didn't provide them an

4   instruction or tell them they should or should not say anything

5   to us, if that's what you mean.

6   Q.   Did you tell them that the picture of the person you were

7   showing them might not be the person that they experienced or

8   that they remembered from the call?

9   A.   We didn't specifically state that.

10   Q.   Did you begin your questions -- let's start with Erik

11   Markiewicz.

12    When you began asking him about his encounter with

13   who he thought was the defendant, did you ask open-ended

14   questions, or did you ask specific questions at the beginning?

15   A.   Mr. Markiewicz came to us, so at the beginning I was just

16   asking him for whatever information he had.  He essentially led

17   the interview by providing information he knew.

18   Q.   And what about Joshua Sizemore?

19   A.   In the case of Joshua Sizemore, we asked him specifically

20   about that date, about what he was doing that night.

21    Once he sort of put a mental picture of where he was

22   that evening, then we asked him about whether or not anyone

23   used his phone, at which point we asked if he thought he might

24   be able to identify that person via a photograph.

25   Q.   Maybe I should ask the question better.

1    Did you ask him open-ended questions about his

2  recollection of Mr. Richardson specifically or the person that

3  he encountered specifically, or did you ask pointed questions

4  about that person?

5        THE COURT:  Do you know the difference between

6  open-ended and pointed?

7        THE WITNESS:  I do.  I hadn't ever thought of it in

8  those terms.  We asked him pointed questions about what his

9  memory was of that night, if that's what you mean.

10  BY MS. KINGSLEY:

11  Q.   Did you, for example, say, "What was -- could you give an

12  estimate of the person's height?"  "Could you give an estimate

13  of their weight?"  "Could you give a description of what they

14  were wearing?"  Or did you let them start and begin with a

15  description without any prodding by you?

16  A.   Prior to providing any information about the person, we

17  asked if they remembered anything about the person, what

18  descriptors they might remember.  In that sense, I guess it was

19  open-ended, the beginning questions.

20  Q.   And the same with Jahbari Hall?

21  A.   Yes.

22  Q.   Okay.  Did you ask each of the witnesses their experience

23  or how they were feeling that day when they encountered Mr. --

24  or they encountered the person that you were asking them about?

25  A.   No.

1  Q.    For example, Joshua Sizemore encountered a person late at

2  night and after a movie and after he'd had a drink.

3        Did you ask him about that?

4  A.    We did ask him about what he remembered of the experience,

5  what -- how comfortable he felt with the identification.  He

6  did not indicate that he was unable for any reason to make such

7  an identification.

8  Q.    And Mr. Hall was at the end of his shift, at the end of an

9  evening, in the early morning hours as well?

10 A.    Yes.

11 Q.    Okay.  There was a significant amount of time between at

12 least some of the witness identifications and the time that

13 they encountered the person that they were describing.

14        Did you probe into that at all?

15 A.    Beyond asking them how comfortable they were actually

16 stating that they recognized the person, no.

17 Q.    Okay.  Let's have you turn in your book to the -- to the

18 actual exhibits that we talked about that were the photo

19 identifications that you used.  I think those were No. -- they

20 were Government's 11 and 12.

21 A.    Yes.

22 Q.    Okay.  I want to be clear that you showed each of the

23 witnesses this picture after they provided the descriptions

24 that you've told us here today.

25 A.    Yes.  The -- any descriptors that provided to us were

1  provided before we showed them any photographs.  The -- I don't

2  know how else to answer that.

3  Q.    Okay.  Did you -- you mentioned that Joshua Sizemore had

4  someone with him -- that he had been on a date -- that was

5  around him when the person approached them and asked for a

6  phone.

7  A.    Yes.

8  Q.    Did you ever follow up with that person for a positive

9  identification?

10  A.    We attempted to.  He was unable to give us a last name.

11  He gave us a phone number for that person, and it was no longer

12  connected.  We were not able to identify that person.

13  Q.    Okay.  You also mentioned, with Joshua Sizemore, that you

14  showed two pictures.  The first was what is marked as

15  Government's Exhibit 11?

16  A.    Uh-huh.

17  Q.    And this -- and you said that Joshua Sizemore provided a

18  positive identification then?

19  A.    Yes.

20  Q.    And then later you showed what is marked as Government's

21  Exhibit 12.

22  A.    Yes.

23  Q.    And that is a more recent-in-time picture, correct?

24  A.    Yes.

25  Q.    And Mr. Sizemore was not able to give a positive

1  identification for that picture?

2  A.    No.  He just didn't add anything when he saw the picture.

3  He didn't state any additional information regarding the longer

4  hair or anything.

5  Q.    Okay.  Did you ask anyone, other than these three

6  witnesses, to try to identify Mr. Richardson with the two

7  photos, Exhibit 11 and 12?

8  A.    Anyone else in the investigation?

9  Q.    Yes.

10 A.    Not that I recall.

11 Q.    We've heard lots today, and you've been in the courtroom,

12 about a board that was developed at the FBI facility and that

13 there were tiers of suspects as you sort of took in information

14 in the investigation and moved people around.

15        We heard that oftentimes there were packets of

16 information that agents were given to go conduct interviews; is

17 that correct?

18 A.    Yes.

19 Q.    And those interviews were of the people that were on the

20 board in different tiers?

21 A.    Yes.

22 Q.    Were there photos included in those packets?

23 A.    Yes.

24 Q.    Always?

25 A.    As often as could be found.

1  Q.   So there could have been other photos from -- which you

2  had readily available to make a photo array.

3  A.   I think you're mistaking the way we came across potential

4  suspects, persons of interest.  Just because they are persons

5  of interest did not mean they looked anything alike, and as you

6  stated before, the point of a photo array would be to have

7  similar-looking people.

8       The people that were -- potentially had the motive to

9  attempt to assassinate Judge Corrigan looked like a

10  cross-section of society, all different types of people.

11  Q.   How many people would you say were on the board around,

12  you know, the beginning of July?

13  A.   I wouldn't want to speculate.  I would estimate dozens at

14  minimum.

15  Q.   Were there other males on the board?

16  A.   Yes.

17  Q.   Were there other African-American males on the board?

18  A.   I'd have to think.

19       I'm certain there were.  In at least one case I can

20  think of an African-American male who was on the board because

21  he was dating a female who was on the board.

22  Q.   But you had a picture of that person?

23  A.   I'm sure we did.

24  Q.   And were there other African-American males who were, you

25  know, 20 or 30 years old?

1   A.    I don't recall.

2   Q.    Okay.  So even though you had pictures available of other

3   African-American males, you did not create a photo array to

4   show to these three witnesses that you've talked about today.

5   A.    Again, I would disagree that we had a pool of photographs

6   from which to choose that would match the purpose of a photo

7   array.

8   Q.    Does the FBI maintain a database of photos that they can

9   use for a photo array?

10  A.    I imagine they do.  I do not know.

11  Q.    From where would you typically draw your photos for a

12  photo array?

13  A.    In the past when I've used them, it has been from the

14  Jacksonville Sheriff's Office.

15  Q.    Okay.  So even if not -- there were not other matching

16  folks on the board that fit the same description, perhaps you

17  could have used the Jacksonville Sheriff's Office bank of

18  photos?

19  A.    Perhaps.

20  Q.    Okay.

21        MS. KINGSLEY:  Just one second, Your Honor.

22  BY MS. KINGSLEY:

23  Q.    Okay.  So I think we can wrap up the photo identification,

24  and let's move on to the issue with the interview the night of

25  the arrest.

1  A.   Okay.

2  Q.   Okay.  So if you need to mentally switch back to that, I

3  know I do.  Just one second.

4        Were you involved at all in Mr. Richardson's prior

5  case in the Middle District of Florida?

6  A.   No.

7  Q.   Okay.  And so the first time that you became involved with

8  Mr. Richardson was the -- June 25th, when you received a call

9  to go out to the apartment complex?

10  A.   It was.

11  Q.   And you mentioned that it took you a while to get there

12  because it was a busy day or part of the day that was very

13  heavy with traffic?

14  A.   Yes.

15  Q.   And in the course of your transfer over to the apartment

16  complex, were you learning information from various sources

17  about where you were going and what you were going to find when

18  you got there?

19  A.   Yes.  As I remember, I was on my phone for very much of

20  the first week of that investigation, including the time I was

21  probably on the way to that scene.

22  Q.   Can you remember who you were talking to on the way?

23  A.   I don't specifically remember on the drive who I was

24  hearing from.

25        I know I spoke specifically to Agent Burros on the

1    phone during that trip.  We were talking to each other because

2    we were in separate vehicles, to make sure we each had the same

3    information the other had gotten, as up-to-date information as

4    we could get.

5              I don't remember where else I was talking.

6    Q.   You mentioned that in those early days and probably after,

7    you were receiving information from the U.S. Attorney's Office,

8    weren't you?

9    A.   Yes.

10   Q.   Can you tell us who at the U.S. Attorney's Office you were

11   speaking with?

12   A.   Mac Heavener and Mark Devereaux, the assistant U.S.

13   attorneys on this case.

14   Q.   Were you speaking with Mr. Stoddard?

15   A.   I don't recall ever speaking directly to Russ Stoddard.

16   Q.   Okay.  Did you ever learn, either on the way to the

17   apartment complex or before your interview, anything about

18   Aaron -- or Mr. Richardson's history in the Middle District?

19   A.   On the way to the complex that evening?

20   Q.   Either on the way to the apartment complex or in the

21   several hours while you were waiting there or in the hours

22   between your time at the complex and then when you began the

23   interview at the sheriff's office.

24   A.   No.  As I believe I mentioned before -- I can't remember

25   at this point -- when we received information that

1    Mr. Richardson was located and arrested and was someone who had

2    been on our board, I -- I had not even actually seen his name

3    on our board yet at that point, so I had very little

4    information about what his connection might be to Judge

5    Corrigan, why his name had been added at first.

6            I later became aware that it was from the federal

7    probation office and through the marshals.  But on the way to

8    the scene, I didn't know much beyond the fact that there had

9    been an active arrest warrant and that a gun had been found,

10   thus probably leading to a possession -- felon in possession of

11   a firearm charge.

12   Q.   When you -- you said that you later learned more about his

13   history.

14           Was it that evening or was it in the following few

15   days?

16   A.   I knew upon arriving that he was a convicted felon and

17   that he -- that this weapon would potentially lead to that

18   charge.  Outside of that, I don't recall when I learned, for

19   instance, his other prior criminal history.

20   Q.   Did you know that he was on supervised release?

21   A.   I did, based on the fact that I learned that he was

22   referred by the federal probation office, I knew he was on

23   supervised release.

24   Q.   Did you know that part of that release had involved mental

25   health treatment?

1  A.   At that time I don't believe I knew that.

2  Q.   Can you pinpoint when you might have learned some of that

3  mental health history?

4  A.   I believe the first time I learned that there was a mental

5  health history was when we started preparing for court cases.

6  I didn't know, in the course of the investigation, that that

7  was part of his past, as I recall.

8  Q.   You were in communication with the U.S. Attorney's Office

9  at least a little bit that day.  The U.S. Attorney's Office was

10  aware that there was some mental health issues.

11          Did they make you aware of that?

12  A.   They may have.  I honestly don't recall when I learned

13  that information.

14  Q.   Okay.  Were you aware that the government specifically

15  asked for a warrant because of the fear that he might do

16  something because of his mental health issues?

17  A.   I was not aware that that had any relation to the warrant.

18  Q.   Okay.  What time did you -- I'm not sure I understood what

19  time you said you arrived at the apartment on the evening of

20  the 25th.

21  A.   I don't honestly remember specifically.  We, as I

22  remember, traveled there approximately at rush hour.

23  Unfortunately, in that direction of traffic, rush hour is

24  really rush a couple hours.  So I'm not certain whether it was

25  between 5:00 and 6:00 or a little before or a little after that

1    but in that evening traffic period.

2    Q.    Okay.  So 6 o'clock maybe?

3    A.    Approximately.

4    Q.    Okay.  Let's fast-forward to the interview that we watched

5    the video of a few minutes ago here.  I'd like to talk to you

6    about Mr. Richardson's demeanor while you were with him,

7    specifically in that interview.

8              Did you think that he had a coherent thought process

9    during that interview?

10   A.    His thought process seemed coherent.  Sort of the volume

11   with which he spoke and some of the things he decided to speak

12   about at different times didn't immediately make sense to me.

13   But it was also very late for me.  I could relate.

14   Q.    And late for him as well?

15   A.    I'm sorry?

16   Q.    It was late for him as well.

17   A.    Yes.

18   Q.    And he'd been in custody at that point for seven or eight

19   hours?

20   A.    Approximately, I imagine.

21   Q.    Did you think that he had good judgment as to sort of the

22   cause and effect of things and an understanding of why he was

23   there?

24   A.    Yes.

25   Q.    And did you experience any sort of inconsistent responses

1  or -- from him to your answers [verbatim] in that two-hour

2  period?

3  A.   I'm not sure I would use the term inconsistent, but -- I

4  guess the only thing of note that I recognized at first was

5  that he -- he spoke very quietly.

6  Q.   Okay.  Let's talk specifically about the questions that

7  were asked as the advice of rights form came out and sort of

8  that process.

9  A.   Okay.

10  Q.   You testified earlier that it was your arm in the side of

11  the video, and so you were there the entire time?

12  A.   Yes.

13  Q.   Okay.  And you can refer to it if you want.  It is the

14  Government's Exhibit 19.

15  A.   Yes.

16  Q.   And I understand that you -- Mr. Silverstein was doing the

17  question asking, but you were there in the room just across the

18  table.

19  A.   Yes.

20  Q.   You mentioned at several points that you had a difficult

21  time hearing.

22       Is that just because of the recording, or did you

23  have a difficult time hearing in -- live and in person?

24  A.   I remember being able to hear much better in person than I

25  was able to from the recording.  For some reason the recording,

1    I imagine based on its location, picks up a lot of background
2    noise which makes it much harder to hear.
3           It was certainly quiet at the time of the interview,
4    but I thought I could hear and understand.
5    Q.   Okay.  So the plan, with an advice of rights form in an
6    interview like this, is to have the witness read each part of
7    it, correct?
8    A.   Ideally.  And in some cases that's not done if the witness
9    can't read or if they're unable to read it.
10          In this case obviously we had a small form so when
11   Mr. Richardson indicated that he didn't or couldn't read it, we
12   read it for him.
13   Q.   Okay.  And then the goal is to have them confirm at the
14   end that they understand it all?
15   A.   Yes.
16   Q.   And if the person, like you said, can't read it or won't
17   read it, you'll read it to them.
18   A.   Yes.
19   Q.   And that's what happened here.
20          And you want the person, at the very end, to say,
21   "Yes, I agree," and waive their rights and go ahead and engage
22   in the -- in the interview, correct?
23   A.   I mean, the purpose of it is for them to determine whether
24   or not they are willing to talk to us once they've learned
25   their rights, so if they choose to waive their rights, then we

1  continue with the interview.  If not, then we end the

2  interview.

3  Q.   But you would want them to sign and agree if they do agree

4  to waive their rights and they understand all the questions

5  that you ask.

6  A.   Ideally one would have a signature just to -- as a record.

7  Q.   Okay.  But this was different because Mr. Richardson

8  didn't agree.

9  A.   No.  He agreed.  He just refused to sign.

10 Q.   Even though it's not evident -- well, we'll go through

11 each question and talk about that more.

12       We talked about this.  During the process he says --

13 Mr. Silverstein says, "I'm not going to lay a hand on you."

14 They sort of go back and forth.  You can't hear what

15 Mr. Richardson is saying, but it seems like he is afraid of

16 something or afraid of the process.

17 A.   At one point Mr. Richardson asked, during the reading of

18 this, "Are you guys going to hit me?" to which Agent

19 Silverstein responded, "No, we will not lay a hand on you."

20 Q.   Okay.  So Mr. Silverstein walked through each of the

21 questions on this form.  He said, "Before we ask any questions,

22 you must understand your rights.  You have the right to remain

23 silent."

24       And after each of these he would pause and try to get

25 an affirmative response from Mr. Richardson, correct?

1   A.    Yes.

2   Q.    So after that first question, "You have the right to

3   remain silent," he got an affirmative response?

4   A.    Yes.

5   Q.    Okay.  He next asked "Anything that you say can be used

6   against you in court"?

7   A.    Yes.

8   Q.    And he got an affirmative response.

9   A.    Yes.

10  Q.    He next asked "You have" -- or said, "You have the right

11  to talk to a lawyer for advice before we ask any questions,"

12  and he paused?

13  A.    Yes.

14  Q.    And he got an affirmative response?

15  A.    Yes.

16  Q.    "You have the right to a lawyer with you during the

17  questioning," and he paused?

18  A.    Yes.

19  Q.    Got an affirmative response?

20  A.    Yes.

21  Q.    Next he said, "If you can't afford a lawyer, one will be

22  appointed to you before any questioning if you wish."  And,

23  again, he got an affirmative response from Mr. Richardson?

24  A.    Yes.

25  Q.    And finally he said, "If you decide to answer questions

1    now without a lawyer present, you have the right to stop

2    answering at any time," and then he waited for an affirmative

3    response.

4    A.    Yes.

5    Q.    Next he says he wants to get further final affirmation and

6    then get to the signature and agreement.

7              He says, "I have read this statement of my rights and

8    I understand what my rights were.  At this time I'm willing to

9    answer questions without a lawyer present."

10             At that time, sort of the big final question, he does

11   not give an affirmative response, does he?

12   A.    I believe Mr. Richardson asked some follow-up questions,

13   confirmation questions, at that time.

14   Q.    Well, at one point, I believe, Mr. Richardson talked about

15   wanting to go home, correct?

16   A.    At one point he asked Alex if we could help get him home.

17   He asked Agent Silverstein if we could help get him home.

18   Q.    We can't really hear that, but we do hear

19   Mr. Silverstein's response, which is "I can't get you home

20   right now.  We have some other things to sort out."

21   A.    Correct.

22   Q.    So he did not get an affirmative response to that question

23   that time, did he?

24   A.    At the end of the questioning he may not have, but before

25   we continued, he did receive an affirmative response --

1  Q.   But he --

2  A.   -- that Mr. Richardson was willing to continue speaking

3  with us without a lawyer present.

4  Q.   But we see in the video that he tried to get the approval

5  again, and Mr. Richardson responds that he's about to fall out,

6  and he holds the cup to his head, correct?

7  A.   I don't remember the order, but Mr. Richardson agreed to

8  continue speaking with us without a lawyer present.  When he

9  made the affirmation, I don't recall.

10 Q.   He said, "I can't sign anything.  I can't answer,"

11 correct?

12 A.   I don't recall.  I remember him saying he can't sign, at

13 which point we made note of him not being willing to sign.

14 Q.   And Mr. Silverstein kept saying, "Okay.  Okay.  Okay."

15 A.   I don't recall.

16 Q.   Okay.  So you went in -- or Mr. Silverstein went for a

17 clear and unequivocal waiver and did not get it.

18 A.   No.  It was clear and unequivocal in our minds when we

19 were there.  Mr. Richardson asked follow-up questions, but that

20 didn't mean he didn't affirm.

21 Q.   Okay.  And you signed the form for him anyway, or

22 Mr. Silverstein signed the form.

23 A.   Once we believed he had affirmed, we signed for him

24 indicating he would not sign and signed it ourselves.

25 Q.   He was in handcuffs the whole time?

1    A.    No.

2    Q.    They were taken off of him?

3    A.    Yes.

4    Q.    Okay.

5              MS. KINGSLEY:  Just one minute.

6              No further questions, Your Honor.

7              THE COURT:  Redirect?

8              MR. HEAVENER:  Nothing, Your Honor.

9              THE COURT:  I've got a few questions.

10             What -- you went back on a Friday --

11             THE WITNESS:  Yes.

12             THE COURT:  -- and conducted a second search?

13             THE WITNESS:  Yes.

14             THE COURT:  What was the reason or the reasons for

15   that second search?

16             THE WITNESS:  In part -- a number of investigative

17   information had come back, particularly including the fact that

18   we were told that the ballistics determined the bullet was a

19   .30-caliber round likely fired from a rifle, which was

20   different from when we had initially gone out there and

21   believed at that time that it was a large-caliber handgun

22   round.

23             That obviously heightened our interest in determining

24   Mr. Richardson's involvement and what else might be in the

25   apartment that might relate to this crime.

1          THE COURT:  Okay.  What was the reason that you

2     conducted an interview, this second interview, with

3     Mr. Richardson?

4          THE WITNESS:  With Mr. Richardson?

5          THE COURT:  Yes.  On the night of the 25th or early

6     morning hours of the 26th, I guess.

7          THE WITNESS:  During the initial interview, we had

8     four people to respond.  Two went to the hospital and two of us

9     went to the search scene.  As we completed our search, we

10    learned that the hospital interview had been completed as well.

11         As I was leaving, I recall speaking with Agent

12    Silverstein, who had been at the initial interview, who said

13    that upon speaking with our headquarters and with the U.S.

14    Attorney's Office, it was determined that they needed to ask

15    Mr. Richardson about the gun specifically.

16         They had not asked him anything about that in the

17    initial interview.  And so we approached him for a reinterview

18    specifically to mention the weapon that was found in his

19    apartment.

20         THE COURT:  And that was the substance of the second

21    interview?

22         THE WITNESS:  That was the -- the primary purpose for

23    it.  It ended up running about -- approximately two hours, but

24    that was the primary purpose for us to return, was to speak to

25    him about the weapon specifically.

1    THE COURT:  And when you conducted your first search

2    on June 25th, Mr. Richardson was not a prime suspect in the

3    attempted assassination of Judge Corrigan?

4    THE WITNESS:  Correct.

5    THE COURT:  I noticed that in some of the photographs

6    that were taken that -- from that search, there were

7    photographs taken of two pairs of shoes and the bottoms of

8    those shoes.

9    Why were those photographs taken?

10   THE WITNESS:  Yes.  We took photographs of the shoes

11   because we learned that the search team had taken imprints of

12   an area they believed the gunshot had been fired from in dirt,

13   and so we were looking to see if potentially we found a shoe

14   match that would match the impressions that were picked up by

15   our evidence team.

16   THE COURT:  Okay.  Anything else?

17   MR. HEAVENER:  Nothing from the United States, Your

18   Honor.

19   THE COURT:  Anything else for this witness?

20   MR. OSSICK:  No, sir.  No.

21   THE COURT:  You may step down.

22   Does the government have any other witnesses?

23   MR. HEAVENER:  We have no other witnesses, Your

24   Honor.  The only evidence we would offer is I've had

25   discussions with Mr. Ossick.  He's filed a motion to suppress

1  some cell site data.

2      We would simply request the Court to take notice of

3  its own court file.  It's In Re --

4      THE COURT:  Was a warrant issued in connection with

5  that?

6      MR. HEAVENER:  Yes, sir --

7      THE COURT:  Okay.

8      MR. HEAVENER:  -- and the case number is

9  3:13-mj-M13-G25.  I don't think there's any evidence needed.

10 It's just the record itself.

11     MR. OSSICK:  I think the only other thing, Your

12 Honor, we need to show for the purpose of it is that

13 information was obtained pursuant to that which is what, in

14 fact, the motion to suppress would bar the subsequent use of.

15     So that there were, in fact -- beyond that, I don't

16 think we need to make any evidentiary presentation to preserve

17 the fact that there was information that was turned over --

18     MR. HEAVENER:  There was cell site information

19 obtained, Your Honor.

20     THE COURT:  All right.

21     MR. OSSICK:  And that's what I'm seeking to suppress

22 by that so, you know --

23     THE COURT:  Okay.

24     MR. HEAVENER:  There's no other evidence other than

25 that, Your Honor.

1          THE COURT:  The government concedes that there was

2    cell tower location information or information obtained as a

3    result of that -- of that warrant or warrants?

4          MR. HEAVENER:  Yes, sir.

5          THE COURT:  All right.

6          Do you have witnesses, Mr. Ossick?

7          MR. OSSICK:  Yes, sir.

8          THE COURT:  All right.  Let's take about a -- about a

9    ten-minute break, till 4:00, and have your first witness on the

10   stand when we come back.

11         MR. OSSICK:  I will.

12         COURT SECURITY OFFICER:  All rise.

13     (Recess from 3:47 p.m. until 4:02 p.m.; all parties

14   present.)

15         COURT SECURITY OFFICER:  All rise.  This Honorable

16   Court is now in session.

17            Please be seated.

18         THE COURT:  You may proceed.

19         MR. OSSICK:  Thank you, Your Honor.

20        SHARON RICHARDSON, DEFENDANT'S WITNESS, SWORN

21                   DIRECT EXAMINATION

22   BY MR. OSSICK:

23   Q.   Would you state your name, please, and spell your last

24   name for the court reporter.

25   A.   Yes.  It's Sharon Richardson, R-i-c-h-a-r-d-s-o-n.

1  Q.   Now, Ms. Richardson, you're the mother of the defendant in

2  this case, Aaron Richardson; is that correct?

3  A.   Yes.  That's correct.

4  Q.   I want to talk with you a little bit today about some

5  events that have transpired in connection with this case.

6       And I realize you have great affinity, of course, for

7  your son, don't you?

8  A.   Yes.

9  Q.   Now, you also have had occasion to testify previously in

10 connection with his case; is that correct?

11 A.   Yes, absolutely.

12 Q.   And that was when the government called you before a grand

13 jury; is that correct?

14 A.   Right.

15 Q.   Okay.  And you were subpoenaed to testify today by me, and

16 you received that subpoena and appeared personally --

17 A.   Yes.

18 Q.   -- is that true?

19 A.   That's correct.  Yes.

20 Q.   Now, you and I have had an occasion to talk on the

21 telephone prior to today, have we not?

22 A.   Right.

23 Q.   And we have had conversations.  I've asked you a couple of

24 times concerning things related to the search of the residence

25 you had on Collins Avenue.

1    A.    Yes.

2    Q.    I want to direct your attention to the 20 -- excuse me,

3    June 25th of 2013 and show you Exhibit -- Government's Exhibit

4    7.

5          It should appear, I think, on the screen in front of

6    you.

7    A.    Okay.

8    Q.    Now, I don't know if you've seen -- you haven't had

9    occasion to see this, I take it, in several years?

10   A.    At least almost three, I guess.

11   Q.    Okay.  Now, does that -- is that, in fact, your signature

12   where it appears there?

13   A.    Yes.

14   Q.    Okay.  I wanted -- I want you to tell the Court about the

15   events that transpired that caused you -- or what was happening

16   that caused you to sign on this form.

17         Do you recall that date?

18   A.    Yeah.  A federal marshal called me at work to let me know

19   that they had taken my son into custody and they were at my

20   apartment, and so --

21   Q.    What's your best recollection of the time of day that you

22   received that call?

23   A.    I think maybe close to the late afternoon, like around, I

24   don't know, 3:45, 4 o'clock maybe --

25   Q.    Okay.

1    A.    -- something around there.

2    Q.    And at the time you received the call, where were you?

3    A.    I was at work.

4    Q.    Having received the call and the information you

5    described, what, if anything, did you do?

6    A.    Well, my daughter and I share a car so she would have been

7    either at the library or, you know, anywhere really.  So I

8    contacted her to let her know because she had the car.

9           And I told her that, you know, I had to get back to

10   the apartment and that they had taken, you know, my son into

11   custody, so . . .

12   Q.    Had you been informed what, if anything, your son was in

13   custody for?

14   A.    They said they would be at the apartment and they would

15   talk to me when I got there, is what I recall.

16   Q.    Okay.  You were aware that your son was on a supervised

17   release, I believe; is that correct?

18   A.    Yes.

19   Q.    And that that carries certain terms and conditions with

20   it.

21   A.    Yes.

22   Q.    Okay.  And you were aware that he had had previous -- a

23   previous conviction, I believe?

24   A.    Yes.

25   Q.    Okay.  All right.  Do you know about what time you arrived

1  at the apartment?

2  A.    Not really.  Maybe 25 minutes, a half hour later, I guess.

3  I can't really be sure about that.

4  Q.    Okay.  So 5:00, 6:00, somewhere in that time frame

5  probably?

6  A.    Probably.

7  Q.    Okay.  Upon your arrival what, if anything, did you

8  observe?

9  A.    Well, I lived on the third floor, and I did see, I guess,

10  one or two of the marshals.  They were sitting in front of the

11  door, and the door looked as if it was broke down or hanging

12  off the hinges.  And they were sitting in my kitchen chairs in

13  front of the door.

14  Q.    And where were you at the time when you first had

15  occasion, if you did, to talk with somebody from law

16  enforcement on the scene?

17  A.    Down in the parking lot.

18  Q.    Okay.

19  A.    There were several, several -- a whole lot of them, so

20  there were some down in the parking lot, and it looked like

21  there were some upstairs in front of the apartment.

22  Q.    Did anyone ask you to identify yourself?

23  A.    Later on.  I don't -- I can't recall exactly what time

24  frame, but at some point or other, somebody wanted to look at

25  my driver's license.

1    Q.   Let me see if I can pose that question a little -- did

2    anybody ask you to tell them who you were when you first

3    arrived, like, "Who are you?" or something of that nature, or

4    did they appear to know you?

5    A.   I -- I don't know.  I mean, I could have walked up and

6    said, you know, "I'm Aaron's mom," or something.  I really

7    don't remember.  But, I mean, with all of them, it wasn't hard

8    to spot who they were.

9    Q.   Okay.

10   A.   Whether or not they knew who I was when I drove up, I

11   don't know.

12   Q.   All right.  And what was the -- what was the name of your

13   daughter who was accompanying you?

14   A.   Her name is Ronna.  I just have one daughter.

15   Q.   Okay.  Did you attempt to go into your apartment when --

16   after you arrived?

17   A.   I wanted to go, but they told me they would not allow me

18   up there until the FBI arrived.

19   Q.   Did they tell you why they were restricting you or barring

20   you from your apartment?

21   A.   Well, it was a lot of officers out there, and I think I

22   recall someone telling me it was a crime scene and I couldn't

23   go inside.

24   Q.   Okay.  Did you then have occasion to discuss entering into

25   your apartment with someone who appeared to be a law

1  enforcement official?

2  A.    Other than everybody talking to me at one time.  I felt a

3  little bit overwhelmed.  It was a lot of them.  Everybody was

4  asking questions, trying to get a statement in, trying to ask

5  something, and, you know, it was just kind of confusing for me

6  at that point.

7  Q.    Okay.  In response to your request to be able to reenter

8  your apartment, did they tell you you'd have to do anything?

9  A.    Well, they told me that they -- but I don't think it was

10  the marshals at that point.  We had to wait for the FBI to

11  come.

12         And when they arrived they wanted me to go up and, I

13  guess, look around or whatever, but they also had told me at

14  some point or other that they needed to search the apartment.

15  It wouldn't take very long, and either they could search at the

16  time, or if I wanted to wait -- but I did ask them.  I said,

17  "Well, I mean, I -- I don't know what to do."  And I said,

18  "Should I get a lawyer or something?  I don't know what my

19  rights are."

20         So they told me then that they could search it then

21  or they could obtain a search warrant.  And if they had to do

22  that, then they would have to get a judge, and it might -- it

23  may look like I wasn't trying to cooperate or something like

24  that.  So I -- those weren't exact words but kind of what I

25  recall.

1  Q.    Did you feel that you were pressured or intimidated by

2  their actions and statements?

3  A.    Absolutely.  It was a whole lot of them out there and just

4  the one of me because I had my kids sit in the car.  It was a

5  lot of them surrounding the area, and that's new for me.

6         I have not ever dealt directly with the marshals or

7  the FBI directly, but I've had occasion to know, you know,

8  what -- you know, seeing them in passing and you know what they

9  would probably be most likely to do.

10        But this was a first-time experience for me, so I

11  still wanted to know "What are my rights?  Do I -- can I

12  refuse?  Can I just say no or, you know, what do I do?"

13  Q.    In response to your inquiry, was it your understanding

14  that they were going to search one way or the other, and one

15  way would be quicker, and getting a warrant and going to the

16  judge --

17  A.    Well --

18  Q.    -- would take longer?

19  A.    -- yeah.  I mean, it was told to me it wouldn't take them

20  too long, but actually that turned out to be not the truth

21  because it wasn't until the next morning that they were

22  finished.

23  Q.    Do you feel that you're -- their getting you to sign this

24  was not a product of your free will and volition?

25  A.    I mean, what I looked at is I don't know what my rights

1    are.  I don't know do you all have a right to go through my

2    home?  You've already been in there, the marshals had.

3            The door was wide open.  They'd already been through

4    there, so I didn't know do I -- can I really refuse?  I -- you

5    know, I didn't know.

6            They were still going to search anyway, whether it

7    took them the couple of hours they said if I signed then or I'm

8    going to wait until almost nightfall, because they said it

9    would take some time to go and get a warrant once a judge

10   signed off on it.

11           So either way I couldn't get upstairs to my

12   apartment.

13   Q.   Did you eventually sign the document?

14   A.   Yes, I did.

15   Q.   Did they make notations or changes to the document after

16   you had signed it at any time?

17   A.   I don't know.  I don't know if they did or not.

18   Q.   Do you see the bottom two entries in the handwritten

19   portion in the middle of the document with some small initials

20   to the end of them?

21   A.   Where exactly?

22           MR. OSSICK:  May I approach the witness and point it

23   out?

24           THE COURT:  Yes.

25   BY MR. OSSICK:

1  Q.   Looks to me that it might be an S.R. by the end of --

2  A.   Yes.

3  Q.   -- HP?

4  A.   That's -- those are my initials, I guess.

5  Q.   Okay.

6  A.   Yeah, that's my S, uh-huh.

7  Q.   Do you have any clear recollection of when you made those

8  additions to the document, if they were, in fact, additions?

9  A.   No, not really.  The top one I can see is a smartphone.  I

10  don't know what the HP is.  I don't know what that is.

11  Q.   Okay.  Let me show you Government Exhibit 9, please.

12        Have you had occasion to see that before?

13  A.   Yes.

14  Q.   Did you -- in fact, is that your signature on that

15  document?

16  A.   Yes.  Yes, it is.

17  Q.   Do you know who -- this was in connection with a search, a

18  second search, a few days later.

19  A.   Yes.

20  Q.   Is that your understanding?

21  A.   Yes.

22  Q.   And this occurred on the date of the 28th?

23  A.   Right.

24  Q.   Who explained any rights to you at this time?

25  A.   Well, no one explained any rights.  They just presented

1    the search warrant and said they had to search a second time,

2    but they didn't really say what they were looking for or, you

3    know, the purpose of the second search.

4    Q.    Now, you said the term "search warrant."

5          Did you ever see a search warrant, or do you even

6    know what that looks like?

7    A.    I don't know what it looks like.

8    Q.    Was it they presented this document called consent to

9    search for you to execute?

10   A.    Yes.  I think this is what one of the officers or agents

11   presented, yes.

12   Q.    And at this time did the agents also tell you that you'd

13   have to stay out of the apartment until they could obtain a

14   warrant if you didn't sign this consent form --

15   A.    Well, they --

16   Q.    -- to allow the search to start?

17   A.    Well, yeah, that was the indication.  "We can't let you in

18   until we, you know, either -- you can either sign this" -- but

19   I still didn't go in when I signed that.

20         That wasn't the understanding I had, that "Oh, okay.

21   Once you've signed this, now you can come back in while we look

22   around."  I didn't have that understanding, and that was not

23   conveyed to me.

24   Q.    I know I've referred to two separate dates and two

25   separate occasions.

1  A.    Uh-huh.

2  Q.    As to the first, was your daughter in proximity to you

3  during several of these discussions with various law

4  enforcement?

5  A.    Yes.

6  Q.    Okay.

7  A.    She was -- she was there.

8  Q.    How about on the second occasion?

9  A.    I don't remember.  She may have been.  She normally is

10  with me, and I -- I don't really remember.

11        That was kind of confusing as to why they needed to

12  come back the second time.

13        MR. OSSICK:  Excuse me one minute.

14        That's all the questions I have.

15        THE COURT:  Cross-examination?

16        Do you have any cross-examination?

17        MR. HEAVENER:  Yes, Your Honor.

18                    CROSS-EXAMINATION

19  BY MR. HEAVENER:

20  Q.    Good afternoon, Ms. Richardson.  My name is Mac Heavener.

21  A.    Hello.

22  Q.    We've met once before, I believe, in Orlando, Florida --

23  A.    Yes.

24  Q.    -- if you recall.

25        Ma'am, tell us a little bit about your job.  What

1  kind of work do you do?

2  A.   I'm a claims examiner.

3  Q.   Okay.  For who?

4  A.   For the Department of Labor.

5  Q.   Okay.  And was that your job back on June 25th of 2013?

6  A.   Yes.

7  Q.   But you refused to tell that to the agents who interviewed

8  you that day; is that correct?

9  A.   They didn't ask exactly what my job was, and no, I did not

10  volunteer that information.

11  Q.   Okay.  Did they ask you who your employer was?

12  A.   I think I did tell them Department of Labor.

13  Q.   You didn't refuse to tell them who your employer was?

14  A.   I don't know that I did refuse to tell them, but so much

15  happened back then, I can't recall every detail.

16  Q.   How about -- you had a younger son, Roneill, who lived

17  with you?

18  A.   Yes.

19  Q.   Did you refuse to tell the agents his name?

20  A.   I don't recall that I refused to give his name.

21  Q.   Okay.

22  A.   He was with me, so . . .

23  Q.   How about your -- you were going through a divorce

24  proceeding with your husband at the time; is that right?

25  A.   No.  That's not correct.

1    Q.    You were separated from your husband --

2    A.    We were separated.

3    Q.    -- at the time?

4          And the agents asked you his name, correct?

5    A.    I don't remember.  I mean, there's a lot I don't remember.

6    It was a whole lot of them out there, and everybody was asking

7    me different things at one time until I said, "One of you needs

8    to talk to me and not everybody."

9    Q.    Okay.  How many people were asking you different things at

10   one time?

11   A.    However many were out there.  There were a lot of them,

12   and I didn't take a count.  I just knew it was a lot of them.

13   Q.    What is your best estimate of how many people were out

14   there?

15   A.    I would say at least 10 to 12.

16   Q.    10 to 12 people, and they were asking you questions all at

17   the same time?

18   A.    Different ones were coming at me at different times, yes.

19   Q.    10 to 12.

20   A.    You asked me and so I'm telling you.  You said what's my

21   best estimate, so I'm saying 10 to 12.  All I know is it was a

22   lot.

23   Q.    All right.  And, ma'am, if I could ask you to take a look

24   at Government's Exhibit 7.

25   A.    Okay.

1    Q.    It's going to be placed on the screen before you.

2          You said you're a claims examiner for the Department

3    of Labor?

4    A.    Yes.

5    Q.    And that position requires you to read?

6    A.    Yes, it does.

7    Q.    It requires you to read documentation, various business

8    documents?

9    A.    It requires me to read documents, various pieces of

10   information, yes.

11   Q.    Do you have to sign things that you read?

12   A.    You do, but -- or I do, but I don't sign until I've had a

13   thorough explanation or understanding of it.

14   Q.    All right.

15   A.    It's not usually that I look at something right off the

16   bat and then I'm going to sign it right then and there.

17   Q.    All right.

18   A.    No.

19   Q.    Well, let me -- let's go through this form.

20         MR. HEAVENER:   And if you could highlight the very

21   first paragraph, Ms. Ganoe.

22   BY MR. HEAVENER:

23   Q.    She's going to make it larger for you --

24   A.    Okay.

25   Q.    -- so that I can read it and you can read it.   And it's in

1  a notebook in front of you if you -- if that would be better.

2        The very first paragraph says, "I have been asked by

3  special agents of the Federal Bureau of Investigation to permit

4  a complete search of," and then it spells out your apartment

5  and Aaron Richardson's room.

6        What did you not understand about that?

7  A.   What I didn't understand about that is that if it's just

8  going to be the one room, it should not have been the entire

9  apartment.  And that was my impression, that the entire

10 apartment had been searched.

11 Q.   Did they search the entire apartment on June 25th?

12 A.   I don't know if they did.  That's an impression that I

13 had.

14 Q.   Okay.  Was there something misleading about the words

15 "first room on right when entering apartment"?

16 A.   Nothing misleading about the first room on the right when

17 entering the apartment, but it is misleading when I walk into

18 my apartment and see that it's not left the way that I had it.

19 Q.   Okay.  And had you been in your apartment before the

20 marshals had served this --

21 A.   No.

22 Q.   -- arrest warrant?

23 A.   No.

24 Q.   Okay.  All right.  Did you understand that a K-9 had been

25 released because Mr. Richardson was hiding in your bedroom

1    closet?

2    A.    They told me that after I came upstairs when the FBI

3    arrived --

4    Q.    All right.

5    A.    -- and I had made the comment that, you know, "What went

6    on here?"

7    Q.    Okay.  So just to clarify my question, the first paragraph

8    says, "I have been asked by special agents of the Federal

9    Bureau of Investigation to permit a complete search of," and

10   you have some confusion about what they're searching, but the

11   printed language you understand, correct?

12   A.    Printed language I understand, and I don't have confusion

13   about what I'm reading here.  What I'm saying to you, and

14   anybody else, is that that is not what I felt occurred.

15   Q.    Well, you --

16   A.    I don't think they limited it to the first room on the

17   right.

18   Q.    When you use the word "felt," do you have anything to back

19   that up or is that just your feeling because things looked in

20   disarray in other parts of your house?

21   A.    Yes.  Things looked in disarray, and I know how I leave my

22   house.  And if he was the only one there -- he lived with me at

23   the time.  He knew how I left it too --

24   Q.    Okay.

25   A.    -- so --

1  Q.   All right.

2  A.   -- if you're looking for something, cabinet doors should

3  not be open.

4  Q.   Okay.  And do you have a recollection that cabinet doors

5  were open on the 25th and the 28th or just the 28th?

6  A.   On the 25th, when I -- when they let me up into the

7  apartment and I looked around, there were a lot of different

8  little things that all moved to a feeling.

9       For example, the air conditioning was on sky high

10  with the patio door wide open and the screen door pulled open.

11  It was wide open.  That's not normal, how I would leave it on a

12  June day and it's already hot.  Why would I have the outside

13  heat coming in and the air conditioning on?

14       All the cabinet doors were open inside the kitchen,

15  and the kitchen is a very small kitchen.

16  Q.   Okay.  Well, did you know that your front door was knocked

17  off its hinges on the 25th?

18  A.   I could see that from the ground floor --

19  Q.   All right.

20  A.   -- the parking lot.

21  Q.   So let's move to the second paragraph.  The second

22  paragraph reads "I have been advised of my right to refuse

23  consent."

24       Did you read that?

25  A.   Yes, I read that.

1  Q.   Okay.  What do you not understand about that paragraph?

2  A.   I actually did not feel that I could refuse.

3  Q.   Well, when you --

4  A.   I mean, you know, I was presented the option of "We can

5  search now or we can go and get a search warrant later."  That

6  was what I was told.

7  Q.   And that explanation was provided to you when you asked

8  the agent "What will happen if I don't consent?"  Correct?

9  A.   Yes.

10  Q.   Okay.  And the agent explained to you that if you don't

11  consent, the agents would go and seek a search warrant and try

12  to search your apartment pursuant to a court order, correct?

13  A.   Right.

14  Q.   Okay.  The agent explained to you that that would take

15  some time to draft and to get a judge to sign off on, right?

16  A.   He explained that, yes.

17  Q.   Okay.  And so you understood, in paragraph 2, what you

18  signed after you read it.  It says, "I have been advised of my

19  right to refuse consent," correct?

20  A.   Yes.

21  Q.   And you understood that you could refuse that consent,

22  right?

23  A.   I could refuse the consent --

24  Q.   And the agents --

25  A.   -- or they --

1  Q.    -- would go --

2  A.    -- will get --

3  Q.    -- seek a search warrant.

4  A.    -- it eventually.

5        That was what my understanding was, that I -- we can

6  either do it now or we can do it later, but either way they

7  weren't letting me upstairs in my apartment.

8  Q.    All right.

9  A.    That part was clear.  That's not on here.

10  Q.    When did they tell you that a firearm had been discovered

11  in your son's room?

12  A.    When I arrived, there were marshals there, and they told

13  me that that's what they had found and they wanted to wait for

14  the FBI to come.

15  Q.    All right.  Paragraph 3 says, "I give this permission

16  voluntarily."

17        Did you understand that?

18  A.    Yes.

19  Q.    Okay.  And that was true?

20  A.    Yes.  I -- I felt like I didn't have a choice, so yes.

21  Q.    Okay.  Well, you keep saying the word "felt," but no one

22  told you you didn't have a choice, did they?

23  A.    When I asked them what were my rights, they told me they

24  could not advise me on that.

25        And I said, well, could I refuse?

1    And the response was "We can search it now or we will
2  go and get a search warrant."
3    So either way there was going to be a search of my
4  apartment. That's what I understand.
5  Q. But paragraph 2 of the form you signed said, "I've been
6  advised of my right to refuse consent." Correct?
7  A. That's what it says, yes.
8  Q. And you don't dispute that that happened, correct?
9  A. I've been advised of my right to refuse consent. They
10 told me not that you can just refuse altogether. You can --
11 "We can search it now or we'll obtain a search warrant."
12   That's not telling me "If you refuse to consent to
13 the search, we're -- we're not going to search at all just
14 because you refused." That's the understanding that I have.
15 Q. The agents --
16 A. "If you refuse now, we're still going to get a search
17 warrant."
18 Q. The agents told you they were going to apply for a search
19 warrant, correct?
20 A. Yes.
21 Q. They didn't tell you they could just get one. They told
22 you they'd have to go see a judge, correct?
23 A. Right. That's what they said --
24 Q. Okay.
25 A. -- yes.

1   Q.   All right.  And then Exhibit 9, if we could take a look at

2   Exhibit 9.

3   A.   (Complies.)

4   Q.   This is the same form?

5   A.   Yes.

6   Q.   But just on a different date, correct?

7   A.   Right.

8   Q.   And it's got the same language that you've been asked by

9   agents of the Federal Bureau of Investigation to permit a

10  complete search of 6710 Collins Road, correct?

11  A.   Right.

12  Q.   And you read that you've -- paragraph 2, "I've been

13  advised of my right to refuse consent"?

14  A.   Yes.

15  Q.   And paragraph 3, "I give this permission voluntarily,"

16  correct?

17  A.   Right.

18  Q.   And you signed it.

19  A.   Yes.

20  Q.   And you knew, when you signed each of these forms, what

21  you were authorizing the agents to do, correct?

22  A.   I'm authorizing them that if you're going to search my

23  apartment either way, whether it's now or five hours from now,

24  then I guess I don't have a choice.  So, yes, I signed it.

25  Q.   Well, you keep saying that, but you had a choice, correct?

1    A.    No.  That's not the way they presented it to me.  They

2    didn't let me in my apartment.  They told me I couldn't go in

3    until they've had a chance to search.

4    Q.    And --

5    A.    Until they've had a chance to search.

6    Q.    Who told you you couldn't go in your apartment?

7    A.    One of them.  One of the many that were there.

8    Q.    What did that one of them look like?

9    A.    Well, I do recognize this agent here because when I did

10   tell them "All of you can't talk to me, so just have somebody

11   talk to me," he's the one that took the lead.

12   Q.    All right.  So the agent --

13   A.    But I won't say that -- I -- he may be the one that put

14   these forms here.  I think he's the one that made the copy of

15   my driver's license.

16         But other than that, I won't go so far as to say,

17   "Well, he said this," or "He said that," because I can't say

18   for sure.

19   Q.    So did you just say that somebody made a copy of your

20   driver's license?

21   A.    Yes.

22   Q.    A photocopy?

23   A.    Yes.

24   Q.    And where did they make that photocopy?

25   A.    I think one of them took a copy of my driver's license

1    because I had to present it.

2    Q.    Okay.  The agent that you recognize sitting here, is he

3    the agent that told you that you couldn't go back in your

4    apartment?

5    A.    Well, I just told you it was a lot of them.  I won't say

6    that he said it because he wasn't the only one out there.

7    Q.    Okay.  And let me make sure I understand.  The

8    apartment -- you are the -- you were the person that was on the

9    lease of that apartment?

10   A.    Yes.  I was on the lease.  My youngest son was on the

11   lease, and then I did add Aaron on the lease.

12   Q.    Okay.  And are you still residing at that same apartment?

13   A.    No.  Absolutely not.  No.

14   Q.    All right.  And you are the person who permitted Aaron

15   Richardson to reside in that front right bedroom, correct?

16   A.    I let him live with me, and the apartment management

17   consented.  They added him on the lease when I went down to

18   tell him --

19   Q.    All right.

20   A.    -- tell them.

21   Q.    And you are the only person who had a key to that

22   apartment, correct?

23   A.    My youngest son had a key.

24   Q.    And your youngest son lost his key.

25   A.    Yeah.  He lost his key.

1  Q.    And you got a replacement key when Aaron Richardson got

2  put on the lease; is that right?

3  A.    Yes.

4  Q.    But you never gave that key to Aaron Richardson, correct?

5  A.    I -- I'm trying to think.  I think the apartment complex

6  gave him a key.  I don't really remember.  I mean, it's been

7  some time back now.

8  Q.    Do you recall testifying in your grand jury that you had

9  the only key to the apartment?

10 A.    No, but I'm sure you're going to refresh my memory on

11 that.

12        MR. HEAVENER:  If I may have just a moment, Your

13 Honor.

14 BY MR. HEAVENER:

15 Q.    Do you recall saying, "The second key -- once I explained

16 to the house management that Aaron was a student, they actually

17 gave me the key for him, but I wasn't going to give him that

18 key because I didn't want him to think it was going to be

19 permanent, that he was going to be staying with me."

20        Do you recall that?

21 A.    Okay.  I -- yes, I do recall that.

22 Q.    Is that accurate?

23 A.    Yes.

24 Q.    All right.  So you had the only key to the apartment.

25 A.    I had two keys then, and I don't remember if I replaced

1  another one for my youngest son because he had lost his.

2  Q.   Do you -- do you recall ever giving Aaron Richardson a

3  key?

4  A.   I -- I don't know.  I don't remember.  I could have.  I

5  had the second key, and it was made specifically for him.

6  Q.   Okay.  You -- you were the person who had access to every

7  room in that apartment?

8  A.   Yes.

9  Q.   And some of the things that you did in the room that Aaron

10  Richardson occupied, you were the person who moved his clothing

11  from Marsala Lane into that room?

12  A.   He -- he helped.  He moved his stuff as well, yes.

13  Q.   You moved some of it?

14  A.   I moved some; he moved some, yes.

15  Q.   And the stuff you moved, you put in his closet?

16  A.   Yes.  We put it in -- well, we put it in the room, and,

17  you know, he put it in the closet.

18  Q.   And, ma'am, would it be fair to say that you are a mother,

19  correct?

20  A.   I think that's very fair to say.

21  Q.   And as a mother of Aaron Richardson -- he's your son?

22  A.   Yes.  Absolutely.

23  Q.   You love him?

24  A.   Yes.

25  Q.   You care deeply about him?

1   A.   Yes.

2   Q.   And you will shade things for him?

3   A.   I'm not sure what you mean by that.

4   Q.   How about forget things when FBI agents are asking you

5   questions?  Will you do that for him?

6   A.   No.  I won't forget things, but you will have to know that

7   you waited two-and-a-half years, almost three, down the road

8   now to ask me to tag my memory about everything.

9   Q.   Okay.

10   A.   I don't have the exhibits that you have in front of you.

11   Q.   Do you remember sending Aaron Richardson a text message on

12   June 25th of 2013, the same day we're talking about?

13   A.   Okay.  Tell me what the message was.

14   Q.   The message says "Make sure you are not on SS.  FBI

15   investigation ongoing."

16           Do you remember sending your son that message?

17   A.   Yes, I did.  I did send him that.

18   Q.   And you sent him that message, according to these records,

19   at 4:52 in the afternoon.

20   A.   Okay.

21   Q.   That would have been after the marshals called you?

22   A.   No.  I don't think so.  I don't think they had called me

23   then.

24   Q.   Okay.  So if they -- if you sent this message at 4:52, if

25   these records are accurate --

1   A.    Okay.

2   Q.    -- why were you sending your son a text message that said,

3   "Make sure you're not on SS.  FBI investigation ongoing"?

4   A.    Because he was always running out to the beaches for

5   something or another, and that's the number of a bus that would

6   take him out that way.

7           And I knew that he always had something or other

8   going on, and because he was under secure detention type of

9   stuff, you know, I just didn't want him to, you know, get

10  involved with anything.

11  Q.    So why did you tell him "FBI investigating"?

12  A.    Oh, just kind of like as a little something -- really, I

13  had no knowledge at all, but I just threw that out there as a

14  way to -- I guess it was a little bit of manipulation, just to

15  let him know, you know, "You need to be careful."

16          And sometimes he would -- that would cause him to ask

17  me, "What are you talking about?"

18          And then I could say, "Hey, you know, this is what I

19  heard," or "This is what I know about," or whatever.

20  Q.    Because at the time you sent this text message, you knew

21  that your son had not appeared for two court hearings --

22  A.    Yes.

23  Q.    -- is that correct?

24  A.    Yes.  And so that was by way of a warning to him.  I

25  didn't know where he was.  I just knew he was always going out

1   to the beach for whatever.

2   Q.   And you were Mr. Aaron Richardson's third-party custodian?

3   A.   Yes.

4   Q.   And you didn't tell the Court anything about knowing where

5   he was, did you?

6   A.   No, other than he lived with me.  They knew that.

7   Q.   Okay.  Well, let's talk about that 25th, June 25th --

8   A.   Okay.

9   Q.   -- when the agents were talking about you.

10          On that night you told the agents that you had not

11  seen your son -- and I want to get it absolutely correct.

12  A.   Okay.

13  Q.   You stated that you had not seen Aaron Richardson between

14  approximately Thursday, June 20th, until midday Sunday, June

15  23rd of 2013.

16  A.   That's correct.  He had been gone, and because he's an

17  adult, he didn't tell me where he was.

18  Q.   And so you told the agents you hadn't seen him from June

19  20th to June 23rd.

20  A.   Yes.

21  Q.   Okay.  Then you remember you were interviewed by agents at

22  a Burger King?

23  A.   Yes.

24  Q.   Your daughter was present?

25  A.   Yes.

1  Q.   Okay.   That -- that interview took place on July 1st of

2  2013.

3  A.   Okay.

4  Q.   And you're saying it's three years down the road now.

5  These were, like, right around the corner when these things

6  happened, correct?

7  A.   Okay.   And . . .

8  Q.   Okay.   That time you told the FBI that you had seen your

9  son -- that you had seen him the morning of June 22nd, that you

10  had left to do some errands and that you never saw him again

11  until the next morning when you went to go to church.

12  A.   Okay.   So that would have been --

13  Q.   Do you recall telling the FBI that?

14  A.   I don't really recall exactly what the dates are, but I

15  know that there were at least two or three days there that he

16  had not come back to the house.

17          And so if you're telling me those are the dates that

18  I said, then okay.

19  Q.   Well, let me ask you this.   When the FBI agents were

20  asking you about seeing your son --

21  A.   Uh-huh.

22  Q.   -- you didn't tell the FBI agents that you had gone to a

23  different side of Jacksonville at 1:18, or sometime after 1:18,

24  on the morning of June 21st, correct?

25  A.   They didn't -- I don't know that they asked me that.

1  Q.    They asked you "When was the last time you saw your son?"

2  Correct?

3  A.    Right.

4  Q.    And you didn't tell them that you had gone across to an

5  entirely different side of Jacksonville after 1 o'clock in the

6  morning to pick him up, did you?

7  A.    No.

8  Q.    Why not?

9  A.    My son had called me.  I had no way of knowing where he

10  was, and, no, I had not seen him in a couple of days.  Two,

11  three days at the most, so --

12  Q.    But why didn't you tell the FBI that you had gone and

13  picked him up at 1:18 in the morning?

14  A.    Well, I don't know that they asked me about that, but I

15  wasn't going to volunteer that information out to them either.

16  Q.    Why not?

17  A.    Why would I?

18  Q.    Well, my question is, why wouldn't you?

19  A.    That's my son.  Why would I give them information if

20  they're questioning me --

21  Q.    Okay.

22  A.    -- as to what's going on with him?

23         Some things I didn't know what was going on with him

24  myself, but I'm not getting ready to give them all that

25  information until I figure out what's happening.

1   Q.   Let's talk about the evening of the 22nd and the early

2   morning hours of the 23rd.

3   A.   Okay.

4   Q.   Okay.  You told the FBI twice you hadn't seen your son

5   that night, right?

6   A.   Yes, and I talked to two different ones.  I got your

7   point, but I don't recall exactly what the days were.  I just

8   know that I had not seen him for two, three days --

9   Q.   Okay.

10  A.   -- and I didn't know where he was.

11  Q.   That night you went and picked your son up after 2 o'clock

12  a.m. on the south side of Jacksonville, correct?

13  A.   What night was it?

14  Q.   That was the early morning hours of June 23rd.

15  A.   Okay.  I think that was about the time that I did see him,

16  somewhere on the 23rd.

17  Q.   Okay.

18  A.   But --

19  Q.   After you received a phone call --

20  A.   But that would have been for us to get ready to go to

21  church.

22  Q.   Okay.

23  A.   I mean --

24  Q.   You received a phone call at 2:02 a.m. the morning of June

25  23rd --

1    A.    Okay.  Was that a Sunday?

2    Q.    -- according to your phone records.

3    A.    Was that a Sunday?

4    Q.    Yes.  It would have been --

5    A.    Okay.

6    Q.    -- early, early Sunday morning.

7    A.    Okay.

8    Q.    And you went and picked Aaron Richardson up on the

9    Southside, correct?

10   A.    Somewhere over in the Southside, yes.

11   Q.    All right.  When we talked back in Orlando, we didn't --

12   Mr. Devereaux and I talked with you, correct?

13   A.    Yes.

14   Q.    And we knew that you had gone and picked your son up that

15   night, correct?

16   A.    You told me you knew that, yes.

17   Q.    Right.

18         And that was the first you knew that somebody from

19   the authorities knew, correct?

20   A.    When you told me, yes.

21   Q.    Okay.  And at that time we didn't know who had called you

22   but just that someone -- you'd received a phone call that

23   night?

24   A.    Yes.

25   Q.    Okay.  We now know who called you or whose phone called

1  you.

2  A.    Okay.

3  Q.    Do you recognize the Ale House on Southside Boulevard?

4  You were trying to tell us where you went and picked your son

5  up.

6  A.    I don't --

7  Q.    Do you recognize that area of Jacksonville?

8  A.    Not really to know it, so I don't know what the Ale House

9  is.

10  Q.    How about the Tinseltown movie theater?  Do you know where

11  that is?

12  A.    No.

13  Q.    Okay.

14  A.    I don't know where that --

15  Q.    Do you get to Southside Boulevard often?

16  A.    No, I don't.  You had asked me that before.  I don't

17  hardly ever go over there.

18  Q.    All right, ma'am.  With regard to your son's room, you

19  would do his laundry?  You'd go in his room and do his laundry

20  when it stank?

21  A.    No.  You asked me that before too.

22          I don't -- everybody had a laundry day, and as I

23  recall, I think I told you that if he didn't do it, then, yeah,

24  I would go in and get stuff out and put it in the wash to keep

25  the apartment from smelling.

1  Q.   Do you remember being asked "And on top of that, you even

2  would wash his clothes."

3        Your answer, and I'm on page 13 for opposing counsel:

4  "Sometimes if it got stinky and his room was smaller and if he

5  had dirty clothes piled up on the floor and I had already

6  asked, you know, to go ahead and wash them, because we had a

7  washer and dryer in the apartment, and if he didn't do it, then

8  I would pull them out and wash them."

9        Do you remember giving that answer?

10 A.   Yes.  That's no different from what I just said.

11       THE COURT:  Isn't that what she just said?  It's what

12 she just testified to.

13 BY MR. HEAVENER:

14 Q.   Ma'am, do you recall inflating the mattress in Aaron

15 Richardson's room?

16 A.   No.

17 Q.   Okay.  Do you recall that you had -- there was a bag that

18 had some court papers that you moved from his room to under

19 your kitchen sink between the first -- the June 25th search and

20 the June 28th search?

21 A.   No.  What else was in the bag?  Was there anything else in

22 there?

23 Q.   There were gloves.

24 A.   Okay.

25 Q.   Do you remember that?

1 A. Yes.  The gloves I remember.  I don't remember what else

2 was in the bag, but there's a reason for moving the gloves.

3    Under my kitchen sink is where I kept a bucket, a

4 pail, and dish gloves, hair dye gloves.  Any type of gloves

5 would have went under that sink.

6 Q. But my question is, you moved those items from Aaron

7 Richardson's room under your sink.

8 A. Yes, because I was cleaning out his room, then, at that

9 point.  He --

10 Q. The bottom line --

11 A. -- he was not there anymore.

12 Q. -- is you had complete access to his bedroom if you wanted

13 it.

14 A. I had complete access to my entire apartment.

15 Q. Okay.

16    MR. HEAVENER:  No further questions, Your Honor.

17    THE COURT:  Redirect?

18    MR. OSSICK:  None, Your Honor.

19    THE COURT:  You can step down, Ms. Richardson.

20  (Witness excused.)

21    THE COURT:  Call your next witness.

22    MR. OSSICK:  Ronna Richardson, please.

23    THE COURT:  Would you ask your daughter to step

24 inside, Ms. Richardson?

25    THE WITNESS:  Pardon?

1     THE COURT:  Would you ask your daughter to step

2  inside, please?

3     THE WITNESS:  Yes.  Yes, sir.

4     THE COURT:  May she remain in the courtroom?

5     MR. HEAVENER:  No objection, Your Honor.

6     THE COURT:  Ask your daughter to come in and you can

7  come back in too, Ms. Richardson.

8     THE WITNESS:  Okay.

9     MR. OSSICK:  Come around and take a seat right over

10  here, please, ma'am.

11     RONNA RICHARDSON, DEFENDANT'S WITNESS, SWORN

12     DIRECT EXAMINATION

13  BY MR. OSSICK:

14  Q.  Would you state your name for the record, please, spelling

15  the last.

16  A.  Ronna Richardson, R-i-c-h-a-r-d-s-o-n.

17  Q.  Ms. Richardson, what is your relationship to Aaron

18  Richardson, who's the defendant in this matter?

19  A.  He's my brother.

20  Q.  Let me direct your attention to June 25th of 2013, the

21  date of which there was -- he was arrested at the apartment on

22  Collins Avenue.

23     Do you recall that date and time and place?

24  A.  Not exactly --

25  Q.  All right.

1   A.    -- but I know what you're referring to.

2   Q.    Okay.  Did you accompany your mother sometime in the

3   evening, late afternoon/evening, of that day to return to the

4   apartment complex on Collins Avenue?

5   A.    Yes.

6   Q.    Did you observe numerous law enforcement people at that

7   location of the apartment that day?

8   A.    Yes.

9   Q.    Were numerous ones of them attempting to talk with you and

10  your mother?

11  A.    Yes.

12  Q.    Do you have an estimate, a recollection, of how many of

13  them there were that appeared to be some type of law

14  enforcement?

15  A.    There were a lot.  U.S. Marshals, FBI agents.

16  Q.    What's a lot to you, ten, five?

17  A.    More than five.

18  Q.    Okay.  All right.  You were never asked to consent to any

19  sort of search, were you?

20  A.    No.

21  Q.    Did you observe your mother being requested to permit

22  searches?

23  A.    Yes.

24  Q.    Did she appear to be pressured and confused by the process

25  and the questions?

1  A.   I wouldn't say confused, but pressured.

2  Q.   Did she appear that she was taking actions based on duress

3  from the circumstances?

4  A.   Yeah.  She had worked a full day that day.

5  Q.   Okay.

6          MR. OSSICK:  That's all the questions I have for her.

7          THE COURT:  Cross?

8                      CROSS-EXAMINATION

9  BY MR. DEVEREAUX:

10  Q.   Ms. Richardson, the only date that counsel was talking

11  about was the 25th of June of 2013?

12          And on that occasion, when you got to your -- it's

13  actually your apartment complex as well, or was, correct?

14  A.   Correct.

15  Q.   You just lived in a separate apartment.

16  A.   That is correct.

17  Q.   When you got there, did you get out of the car with your

18  mom?

19  A.   Yes.

20  Q.   So you were probably standing there with your mom while

21  she's being talked to?

22  A.   Yes.

23  Q.   So if your mom had testified that you stayed in the car

24  and it was just your mom, that would be incorrect, correct?

25  A.   That's correct.

1  Q.   All right.  So -- and then how many agents -- when they're

2  approaching both you and your mother, are they yelling?

3  A.   No.

4  Q.   Are their guns drawn?

5  A.   No.

6  Q.   Okay.  Is anyone -- do you recall, were there multiple

7  individuals asking questions, you know, at the same time, and

8  you have to go "Slow down, slow down, slow down," type of

9  situation, or is it one person at a time, and there are just

10 other agents there asking your mom questions?

11 A.   It was normally just one or two mainly doing the talking.

12 Q.   Okay.  And nobody's yelling.

13 A.   No.

14 Q.   Is it daytime or nighttime?  I know it's June 25th, so is

15 it still light out?

16 A.   Evening.

17 Q.   Evening?

18       But is it still light, basically?  I mean, could I

19 mow my yard?

20 A.   Probably.

21 Q.   Okay.

22 A.   The time hadn't changed then.

23 Q.   Okay.  So when they're asking questions, were there times

24 when your mother didn't want to answer the question and

25 wouldn't provide an answer?

1    A.    I think she answered everything they asked her.

2    Q.    Well, do you remember her not wanting to tell them where

3    she worked?

4    A.    No.  She didn't feel that that was necessary to tell them.

5    Q.    Well, now, that would have to be something you learned

6    from your mother after that, if she didn't feel, because you

7    can't really tell feelings when you're just standing there next

8    to your mom, correct?

9    A.    No, but I know her.

10   Q.    Okay.  But would it be fair to say, then, that she was

11   asked "Where do you work?" and she did not give an answer?

12   A.    I don't recall her being asked.

13   Q.    Oh, okay.  Now, how about any other questions about, like,

14   your brother's name?

15   A.    I'm sorry.  I --

16   Q.    Any questions -- did she -- was she asked what your

17   brother's name was?  Now he'd been 16, I guess, maybe 17 now.

18   A.    My younger brother?

19   Q.    Yes.  Yes, ma'am.

20   A.    They just asked who he was.

21   Q.    Okay.  Did your -- did the agents allow your mother to

22   read the statement she signed?

23   A.    Yes.

24   Q.    Did you ever consult with your mother on the side, sort

25   of, you know, about the issue?  Did you two sort of discuss it

1   to give your mom any guidance that you might have?

2   A.   Regarding?

3   Q.   Regarding whether or not she should give consent to search

4   that room, your brother Aaron Richardson's -- the room that he

5   was occupying up there in her apartment.

6   A.   Yes.

7   Q.   Okay.  So there was a time when you went to the side to

8   talk to your mom.

9   A.   Yes.

10  Q.   Okay.  And did you support her -- didn't you, in fact,

11  tell her "Go ahead and consent"?

12  A.   Well, we did discuss it, but there weren't many options

13  there.  It was either that or wait.  Either way she couldn't

14  get back into her apartment.

15  Q.   Okay.  So it -- but she could have gone -- I mean, the

16  need to get into an apartment, it's not like she has a bunch of

17  children and they have no house.  I mean, she's got your

18  apartment to go and wait at, correct?

19  A.   Yes.

20  Q.   Within a stone's throw from her apartment, really,

21  correct?

22  A.   That's correct.

23  Q.   Okay.  So if it was anything, it's whether or not they're

24  going to wait for the legal process to work and if the agents

25  could secure a search warrant.

1    They just -- they were up-front with her, correct?

2  They told her "Ma'am, you can give us consent -- that's all

3  we're asking -- to search Aaron Richardson's room, or we can go

4  ask a judge to see if he'll give a search warrant, but right

5  now we can't let you into the room, into the building."

6  A.   That's correct.

7  Q.   That's about the situation.

8  A.   Right.  No option.

9  Q.   Okay.  So did you know that your mother gave consent on

10  Friday, the 28th?

11  A.   I don't recall dates.

12  Q.   Do you remember when you met with this agent, Special

13  Agent Logan, and a Special Agent Alex Silverstein at a

14  hamburger restaurant?

15  A.   Yes.

16  Q.   And that had to do with searching the vehicle, I guess,

17  that you share with your mother.

18  A.   We didn't know that was -- that's what it was about.

19  Q.   But when you got there, you learned they asked for consent

20  to search the vehicle, correct?

21  A.   That's correct.

22  Q.   And that consent was granted on that occasion, and that

23  was on July 1st of 2013, correct?

24  A.   Correct.

25  Q.   So here we would have three times your mother gave

1    consent, which would be the Tuesday, the 23rd [verbatim],

2    correct?

3            She did sign a consent form.

4    A.   I would imagine.

5    Q.   You watched her sign it though, didn't you?

6    A.   I -- you're -- I don't remember those exact moments.

7            MR. DEVEREAUX:  Could we see Government Exhibit

8    No. 7?

9    BY MR. DEVEREAUX:

10   Q.   It will be on the monitor in front of you, also on a tab

11   in front of you if you'd like to look at it on paper.

12           Here's the first one, Government Exhibit No. 7,

13   consent to search.

14           See the signature down there at the bottom?

15   A.   I can see that.

16   Q.   Okay.  See No. 2 where it says, "I have been advised of my

17   right to refuse consent"?

18   A.   Correct.

19   Q.   "And I give this permission voluntarily."

20           And she did do that, didn't she?

21   A.   She didn't have anything to hide.

22   Q.   Okay.  And then -- so -- and just like you gave consent to

23   search -- I mean, you had no problem with them searching the

24   car on July 1st.

25           There was no problem, correct?

1  A.    Nothing to hide.

2  Q.    And your mom was very upset, wasn't she, when she learned

3  that there was a long gun, a rifle type of gun, found in her

4  apartment.

5  A.    She was.

6  Q.    She was, because she doesn't allow firearms in her

7  apartment, correct?

8  A.    That's correct.

9  Q.    And would it be fair to say that that's somewhat --

10  she's -- I mean, she's right there.  When she's being asked to

11  sign this consent form, her son's been arrested.

12        She knew that, right?

13  A.    Correct.

14  Q.    She's just been told that her son -- that -- well, she's

15  been told that a firearm was found in the apartment that she

16  was unaware of, correct?

17  A.    Correct.

18  Q.    And all of those things, and she sees a lot of law

19  enforcement.

20  A.    Correct.

21  Q.    That's essentially the situation.

22        Nobody threatened her, correct?

23  A.    Pressure.  Not threaten.

24  Q.    No threatens?  No promises?

25  A.    Not that I recall.

1    Q.    All right.

2              MR. DEVEREAUX:  Thank you very much.

3              THE COURT:  Redirect?

4              MR. OSSICK:  No.

5              THE COURT:  You may step down, Ms. Richardson.

6         (Witness excused.)

7              THE COURT:  Do you have any other witnesses?

8              MR. OSSICK:  No, Your Honor.

9              THE COURT:  All right.  I will get a report and

10   recommendation out on these three motions sometime in the next

11   couple of weeks sometime.  That will give the party who is --

12   or parties who disagree with the recommendation time to file

13   objections before your trial date.

14             MR. OSSICK:  Is there any issue you care to hear

15   anything about by filing something or --

16             THE COURT:  I presume that you've each adequately

17   briefed the issues.

18             You know, with the --

19             MR. OSSICK:  I'm just asking.

20             THE COURT:  -- shortness of time --

21             MR. OSSICK:  I'm not volunteering.

22             THE COURT:  With the shortness of time between now

23   and the trial date, I don't know that there is enough time to

24   file supplemental briefs.

25             But if either of you feels that you want to file a

1  supplemental brief, I could give you till Tuesday of next week

2  at 5 o'clock to do that.

3      MR. OSSICK:  Okay.  It's not required though.

4      THE COURT:  It's not required.

5      MR. HEAVENER:  We'll stand on our papers.  We don't

6  need to do anything else.

7      THE COURT:  All right.  Now, there are six other

8  motions that Mr. Ossick indicates that he would like to have

9  resolved.

10      One is a motion for a copy of defendant's statements.

11  Has that been received?

12      MR. OSSICK:  I believe it has.  We just want, again,

13  just an order that -- and we've had an excellent, excellent, I

14  think, discovery process mutually, I believe.  So -- but

15  nonetheless, we certainly want an order that would require that

16  to be done.  I believe it's even in the standing order.

17      MR. HEAVENER:  I think it's already been ordered,

18  Your Honor.

19      THE COURT:  Okay.  How about defendant's motion

20  regarding bad prior acts?

21      MR. OSSICK:  Is there a separate 404(b)?

22      MR. HEAVENER:  We have not served a separate 404(b)

23  notice.  A lot of the prior bad acts that were -- would be at

24  issue in this case are already at issue by virtue of some of

25  the counts that are charged.

1      MR. OSSICK:  Yeah.

2      THE COURT:  All right.  Motion for discovery of *Brady*

3  materials and Rule 16 discovery?

4      MR. OSSICK:  An order just granting it.

5      MR. HEAVENER:  And I think it's already been --

6  that's already been ordered in this case.

7      THE COURT:  Motion, notice by the government, intent

8  to use evidence.

9      MR. OSSICK:  That's that residual exception notice

10 for something they seek to admit under that section.  We'd ask

11 for --

12     MR. HEAVENER:  We've provided all the evidence that

13 we'll be intending to use at trial.

14     THE COURT:  All right.  Motion for exemplars or

15 tests?

16     MR. HEAVENER:  That's all been provided, Your Honor.

17     MR. OSSICK:  There may be some -- something that

18 needs to be worked out yet with some experts, but unless

19 there's a problem, we'll just -- we'll bring that kind of -- if

20 there is a problem, we'll bring that to the Court.

21     THE COURT:  All right.  My --

22     MR. OSSICK:  At this point there's no problem about

23 that, but there's also -- you know, there are some protocols

24 that I don't -- that's not really sort of between us, but yet

25 we're in charge of making sure that it gets before the Court.

1     MR. HEAVENER:  If Mr. Ossick advised me he thinks

2  anything is missing in terms of expert discovery, I will --

3     THE COURT:  All right.  My intention, with regard to

4  those five motions, is to enter orders granting those five

5  motions indicating that required documents, if they have not

6  already been produced, will be provided at least seven days

7  prior to jury selection.

8     And I am, again, assuming that he already has all

9  these things.

10     MR. HEAVENER:  He -- the only thing I would say,

11  Judge, is there was a scheduling order entered in this case,

12  and it's docket No. 60.

13     THE COURT:  I've got that.

14     MR. HEAVENER:  And I think a lot of these things have

15  already been ordered, and there's been a time frame in that

16  order set out.  So I don't want to create conflicts if --

17     MR. OSSICK:  And we're happy with that.

18     MR. HEAVENER:  We're happy doing it seven days before

19  trial, but I think the order actually makes it earlier.

20     THE COURT:  14 days?

21     MR. HEAVENER:  Yes, sir.

22     MR. DEVEREAUX:  It's 14 days --

23     MR. OSSICK:  Then we're real happy with that order.

24     MR. DEVEREAUX:  14 days for exhibits.

25     MR. OSSICK:  Okay.

1     MR. DEVEREAUX:  The 5th of January.

2     MR. OSSICK:  Okay.

3     THE COURT:  When's y'all's trial scheduled to start?

4     MR. HEAVENER:  January the 19th, Your Honor.

5     THE COURT:  All right.  I will say those are due at

6 least 14 days prior to trial if they haven't already been

7 provided.

8     MR. HEAVENER:  That's fine, Your Honor.

9     THE COURT:  Now, the big one that you have left or

10 one that you have left is the motion to sever offenses.

11     Do either of you wish to make any argument in

12 addition to what you've submitted in your written pleadings?

13  (No response.)

14     THE COURT:  Don't y'all jump up at once.

15     MS. KINGSLEY:  I'm sorry.  I'm getting instruction

16 over here.

17     Your Honor, I'm prepared to make an argument on the

18 motion, but if you feel like you have enough before you, then

19 we can certainly . . .

20     THE COURT:  Well, I'm prepared to rule on that based

21 upon the written pleadings, but I will give you this

22 opportunity to make further argument if you so desire --

23     MS. KINGSLEY:  Yes, Your Honor.  I'll be brief.

24     THE COURT:  -- so it's up to you.

25     MS. KINGSLEY:  All right.

1          THE COURT:  You will not offend me by arguing.

2          MS. KINGSLEY:  Thank you, Your Honor.  I'll be very

3    brief.

4          As you know -- you've seen the papers -- we've moved

5    for and respectfully request that you sever some counts of the

6    indictment, specifically Count Three, which is possession of a

7    firearm and ammunition by a convicted felon; Counts Fourteen

8    through Nineteen, which are false statements to U.S. Probation

9    Office while on release.

10          Counts Fourteen and Fifteen relate to texts to

11   Ms. Sally Watson, the probation officer, on the dates that

12   Mr. Richardson was scheduled to come in on violations of his

13   supervised release.

14          And Counts Sixteen through Nineteen relate to January

15   and March 2003 -- or, excuse me, 2013 monthly supervision

16   reports.

17          Counts Twenty and Twenty-Four -- or Twenty-Three and

18   Twenty-Four relate to more false statements to the U.S.

19   Probation Office, and those are October, November, and December

20   2012 monthly supervision reports.

21          Mr. Richardson will suffer severe or compelling

22   prejudice if those counts are not severed from the balance of

23   the counts in the indictment.  As you know, in deciding a

24   motion to sever under Rule 14, the Court must balance the

25   prejudice for the defendant against the interests of judicial

1  economy.

2  Here, common sense dictates that a jury would be more

3  inclined to convict if they hear the underlying facts between

4  specifically Count Three and then Counts Fourteen through

5  Twenty-Four.

6  The limiting instruction from the Court -- it will be

7  difficult for a limiting instruction to overcome this risk of

8  prejudice, and constitutional dictates of the due process

9  clause also counsel the Court to exercise its discretion and

10  order separate trials.

11  There's very good reasons to sever here, especially

12  for the false statement counts, which are Fourteen through

13  Twenty-Four.  Those false statements involve underlying

14  questioning or arrests for petit theft, a criminal traffic

15  offense, burglary, and carrying a concealed electronic weapon.

16  To be clear, Mr. Richardson isn't charged with any of

17  these crimes in the counts in the indictment but is charged

18  with falsely stating that he was not questioned or arrested or

19  did not appear in court related to those offenses.

20  It's just his statements about the questioning,

21  arrests, and appearances that is relevant, not whether he

22  committed the underlying acts.  But in proving the truth or

23  falsity of those statements, Your Honor, the government will

24  have to put forward information about those underlying acts.

25  Counts Sixteen and Seventeen regarding him carrying a

1    concealed firearm are especially prejudicial here, given the

2    nature of the other charges in the indictment that will

3    certainly be before the Court.

4         Second, it's important to remember that those charges

5    that we're asking to be severed are very different in nature

6    from the balance of the counts.  They don't show a history of

7    assaults or shootings, gun violations, or gun offenses.

8    They're not even crimes of violence.  They're not

9    confrontational, but they're crimes that were committed or

10   alleged to be committed more for pecuniary gain.

11        So they're completely unrelated to what is at the

12   heart of this case, which is the alleged attempted murder of a

13   federal judge.  And if proof of all of those other crimes come

14   in before the jury, they'll cumulate the evidence against

15   Mr. Richardson and are much more likely to infer a criminal

16   disposition of his.

17        The false statement offenses aren't of the same or

18   similar character.  They're not based on the same act or

19   transaction, and they're not connected with and don't

20   constitute parts of the same or common scheme or plan.

21        The elements that the government will have to prove

22   are very different in the false statement counts and the felon

23   in possession than they are for the balance of the offenses in

24   the indictment.

25        They'll have to prove that he made a false statement,

1    and as I said, in doing that, they'll have to show the

2    underlying allegations and put forward evidence about those

3    charges.  They also have to show whether he acted willfully,

4    knowingly, and whether the statement was false.

5            There's no overlapping evidence.  There's not

6    overlapping witnesses.  And the evidence isn't inextricably

7    intertwined between the group that we're asking to be severed

8    and the group that we know will remain with the Court.  They're

9    distinct as to subject and time.  The false statement counts

10   begin seven or eight months before the events that are at the

11   heart of this case.

12           And, in sum, they're just getting to propensity and

13   back-door character evidence.  And we believe that he'll face a

14   real prejudice that can't be overcome, as I said, by a limiting

15   instruction.

16           And so we ask this Court to sever those -- those

17   group of offenses.

18           THE COURT:  Will you stipulate that he is a convicted

19   felon?

20           MS. KINGSLEY:  Yes.

21           THE COURT:  Will the government accept that

22   stipulation that he is a convicted felon as it relates -- or

23   that he was a convicted felon on or about June 20th to 25th,

24   2013?

25           MR. HEAVENER:  On the possession?

1          THE COURT:  On Count Three.

2          MR. HEAVENER:  Yes, sir.  I think we're required to

3     under *Old Chief*.

4          THE COURT:  Okay.  So that would be a stipulation on

5     that.

6          There would be, then, no evidence as to the nature of

7     the prior felony conviction.

8          MR. HEAVENER:  That would be correct.  We wouldn't

9     intend to --

10         THE COURT:  Okay.

11         MR. HEAVENER:  -- introduce the nature of it.  I

12    think it would come up on the other counts because he's on

13    supervised release for that, but we don't have to dwell on what

14    it is or even mention what it is.

15         THE COURT:  I'll hear a response if you want to make

16    any response to her argument.

17         MR. HEAVENER:  Judge, I'll rely on our papers.  I

18    would note, and I think I noted in our papers, but two of the

19    false statements actually were lies about missing court, and

20    that's charges they haven't moved to sever, and it would be

21    "consciousness of guilt" evidence.

22         If the Court were to sever all these offenses, we

23    would file a 404(b) notice because this is proof of motive in

24    the case.

25         THE COURT:  Yeah, but couldn't you just prove your

1    alleged motive by showing that he faced this probation

2    revocation warrant?

3              MR. HEAVENER:  Well, the problem is the order that

4    was recovered from the mother's house, it not only discharged

5    the federal warrant but discharged all these State cases that

6    he was facing, and that's -- you know, that's part of the

7    motive as to why he wanted to -- he was looking at significant

8    time on the State prosecutions as well.

9              THE COURT:  All right.  Anything else?

10             MS. KINGSLEY:  Nothing further, Your Honor.

11             MR. HEAVENER:  No, Your Honor.

12             THE COURT:  All right.  I will get orders out on

13   these six nondispositive motions and reports and

14   recommendations out on the three motions to suppress and for

15   the voluntariness of statements.

16             Is Mr. Richardson still housed at Baker County?

17             THE MARSHAL:  Yes, Your Honor.

18             THE COURT:  As far as we know, there is no longer any

19   confusion with the Baker County personnel about the

20   administration of the medication?

21             THE MARSHAL:  Yes, Your Honor.

22             THE COURT:  All right.  If there's nothing else,

23   then -- as far as I'm concerned, you can take him back, unless

24   you want to keep him here.

25             MR. OSSICK:  No.  We've tried to make arrangements to

1    schedule a visit tomorrow.  A lot of times we have to do it

2    several days in advance.

3            Do you think we'd be able to schedule something on

4    short notice, or do you all have any control of that?

5            THE MARSHAL:  You shouldn't have any problem.

6            MR. OSSICK:  We'll work with the marshals office.

7            THE COURT:  As far as I'm concerned, you can take him

8    back to Baker County now.

9            And if you can make a request with the head jailer or

10   sheriff that they provide Mr. Ossick with access to

11   Mr. Richardson tomorrow so they can take care of it while

12   they're all in this area.

13           THE MARSHAL:  Will do, sir.

14           THE COURT:  Thank you.

15           We're in recess.

16           COURT SECURITY OFFICER:  All rise.

17        (The proceedings were concluded at 5:05 p.m.)

18                           -   -   -

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3

 4  UNITED STATES DISTRICT COURT )

 5  MIDDLE DISTRICT OF FLORIDA    )

 6

 7          I hereby certify that the foregoing transcript is a

 8  true and correct computer-aided transcription of my stenotype

 9  notes taken at the time and place indicated therein.

10

11          DATED this 14th day of December, 2015.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```